UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

TAMARAC 10200, LLC and                        Case No. _____
UNIPHARMA, LLC,                               Case No. _____

        Debtors.[1]                           Chapter 11 Cases
                                              (Joint Administration Pending)

_____/

**DECLARATION OF NEIL F. LURIA IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

        I, Neil F. Luria, hereby declare that the following is true to the best of my knowledge,

information, and belief:

        1.      I am the Chief Restructuring Officer ("CRO") of Tamarac 10200, LLC

("Tamarac") and Unipharma, LLC ("Unipharma" and together with Tamarac, collectively, the

"Debtors").  I have over 20 years of experience in the restructuring industry.  I am a Senior

Managing Director, President, and lead the Restructuring and Distressed Asset Support Services

divisions of SOLIC Capital Advisors, LLC ("SOLIC Capital Advisors").  Immediately prior to

joining SOLIC Capital Advisors in 2014, I was a Managing Director of Navigant Capital

Advisors, LLC.  Before that, I served as Director at Casas, Benjamin & White, LLC from 1999

to 2005.  Between 1998-1999, I was the Executive Vice President and General Counsel, and

subsequently the President, of BMJ Medical Management, Inc.  During the earlier part of my

career (1992-1998), I was an attorney with the law firm of Jones Day Reavis & Pogue.  I am a

Certified Insolvency and Restructuring Advisor (CIRA), a member of the Association of

---

[1]     The last four digits of each Debtor's federal tax identification number are Tamarac 10200, LLC (2050) and
        Unipharma, LLC (8962).  The address of the Debtors is 10200 N.W. 67th Street, Tamarac, FL 33321.

Insolvency and Restructuring Advisors (AIRA) and hold a FINRA Series 79 General Securities Representative License and a FINRA Series 63 State Securities License. I have obtained both a Bachelor of Arts degree in American History and a Bachelor of Science in Economics degree from the University of Pennsylvania, the latter of which was earned from the Wharton School. I have also obtained a Juris Doctor from Boston University School of Law.

2.      I specialize in capital restructuring, operational remediation, alternative recovery strategy, and execution support on behalf of SOLIC's clients. I possess significant experience negotiating and restructuring balance sheet obligations and overseeing asset divestitures and orderly liquidations. I have served as a chief restructuring officer or chief wind-down officer in numerous matters, both in and out of court-supervised Chapter 11 bankruptcy cases, including: (i) Dimensional Dental Management, LLC (chief restructuring officer of a major dental services organization managing and owning 60+ dental clinics); (ii) *In re Louisiana Medical Center and Heart Hospital, LLC* (Case No. 17-10353 (Bankr. E.D. La. 2017)) (chief restructuring officer of an acute care hospital providing inpatient and outpatient medical, surgical, and diagnostic services); (iii) Memorial Health, Inc. (chief wind-down officer of a 700-bed academic medical center in Savannah, Georgia, which includes the region's only Level 1 trauma center and children's hospital); (iv) Mission Health System, Inc. / ANC Healthcare, Inc. (chief wind-down officer of a seven hospital integrated health system in Western North Carolina with in excess of $1.7 billion of revenue); (v) *In re Ocala Funding, LLC* (Case No. 3:12-bj0945240-JAF (Bankr. M.D. Fla. 2012) (chief restructuring officer of a commercial paper financing entity for the origination of mortgage loans); (vi) *In re Beth Israel Hospital Association of Passaic d/b/a PBI Regional Medical Center* (Case No. 06-16186 (Bankr. D. N.J. 2008) (chief restructuring officer of a northeastern regional medical center); and (vii) *In re Taylor, Bean & Whitaker Mortgage*

*Corp.* (Case No. 3:09-bk-07047-JAF (Bankr. M.D. Fla. 2009) (chief restructuring officer of the largest independent mortgage originator and servicer in the United States).  In addition, I have served as a liquidating trustee of a number of trust entities which were formed upon the conclusion of successful Chapter 11 cases, such as SageCrest Finance LLC, Mortgage Lenders Network USA, and Orthodontic Centers of America, Inc.

3.      SOLIC Capital Advisors is a professional services firm engaged in the business of providing restructuring, financial advisory and distressed asset management services, with offices located at 425 W. New England Avenue, Suite 300, Winter Park, Florida 32789.  Both SOLIC Capital, LLC ("SOLIC Capital" and together with SOLIC Capital Advisors, collectively, "SOLIC") and SOLIC Capital Advisors operate out of the same offices.  SOLIC Capital provides investment banking, private placement, merger, acquisition, and divestiture services.  SOLIC provides a broad range of services to a variety of businesses with a large range of enterprise values, including publicly traced and private companies, and SOLIC has extensive experience in dealing with a full range of issues and challenges that arise in corporate restructurings and business reorganizations.

4.      Prior to the Petition Date (defined below), on October 18, 2020, the Debtors retained SOLIC in connection with their financial and operational restructuring.  Subsequently, on November 10, 2020, the board of Unipharma and the manager of Tamarac each appointed me as the CRO of the Debtors.  Since SOLIC's original engagement during October 2020, SOLIC has become familiar with the Debtors' businesses, financial affairs, debt structure, assets, contractual arrangements operations and strategic challenges.  SOLIC has been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors.  Accordingly, SOLIC has acquired the necessary

3

background and experience regarding the Debtors that will assist SOLIC in providing effective and efficient services to the Debtors with the many issues that may arise in the context of the Debtors' Chapter 11 Cases (defined below).

5.      SOLIC possesses widespread experience in providing restructuring and financial advisory services in reorganization proceedings, and it has an excellent reputation for the services it has rendered in Chapter 11 cases on behalf of debtors and creditors throughout the United States.  For over 15 years, SOLIC professionals have been involved in numerous Chapter 11 bankruptcy cases, including:  *In re SLT Holdco, Inc.*, Case No. 20-89368 (Bankr. D.N.J 2020); *In re Thomas Health System, Inc.*, Case No. 20007 (Bankr. S.D.W.V. 2020); *In re LMCHH PCP, LLC*, Case No. 17-10353 (Bankr. E.D. La. 2017); *In re Life Care St. Johns, Inc.*, Case No. 3:13-bk-4158-JAF (Bankr. M.D. Fla. 2013); *In re Ocala Funding, LLC*, Case No. 3:12-04524-JAF (Bankr. M.D. Fla. 2012); and *In re Taylor Bean & Whitaker Mortgage Corp.*, Case No. 3:09-bk-07047-JAF (Bankr. M.D. Fla. 2009).

6.      During this time period, SOLIC's professionals have also represented various stakeholders in a number of distressed healthcare, healthcare services, and supplier situations, including unsecured creditors, senior  lenders, equity holders, and debtors in matters both in and out of court.  These matters have included the restructuring of contract manufacturers of health and beauty-related products.  Furthermore, the SOLIC professionals involved in the Debtors' Chapter 11 Cases have been involved in many other healthcare-related bankruptcy cases in recent years, including: (i) *In re Sumner Health Systems, Inc., et al*., Case No.  3:10-bk-04766 (Bankr. M.D. Tenn. 2010), involving a large regional health system in Gallatin, Tennessee; (ii) *In re Quincy Medical Center, Inc*., Case No. 11-16394-MSH (Bankr. D. Mass. 2011), involving a regional hospital in Quincy, Massachusetts; (iii) *In re Beth Israel Hospital Association of*

*Passaic, d/b/a PBI Regional Medical Center*, Case No. 06-16186 (Bankr. D. N.J. 2006) involving a regional medical center in Passaic, New Jersey; (iv) *In re University General Health System. Inc*., Case No. 15-31086 (Bankr. S.D. Tex. 2015), involving a surgical hospital in Houston, Texas; (v) *In re Twin City Hospital*, Case No. 10-64360 (Bankr. N.D. Ohio 2010), involving a community hospital in central Ohio; (vi) *In West 380 Family Care Facility D/B/A North Texas Community Hospital and Doctors' Hospital*, Case No. 12-46274-dml11 (Bankr. N.D. Tex. 2012), involving a regional hospital in North Texas; (vii) *In re Progressive Acute Care, LLC*, Case No. 16-50740 (Bankr. W.D. La. 2016), involving three regional hospitals in Louisiana; and (viii) *In re Coshocton County Memorial Hospital Association*, Case No. 16-51552-amk (Bankr. N.D. Ohio, Eastern Division), involving a regional community hospital in Ohio.

7.    On the date hereof (the "Petition Date"), the Debtors each commenced a bankruptcy case (collectively, the "Chapter 11 Cases") by filing a voluntary petition for relief in this Court under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their business and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Florida (the "United States Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

8.    To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors have filed certain motions, applications and other pleadings seeking various types of "first day" relief (including all attachments and exhibits

5

thereto and any amendments, collectively, the "First Day Pleadings").[2]  The First Day Pleadings

seek relief, among other things, to establish the foundation for the smooth and efficient entry into

Chapter 11 and the administration of these Chapter 11 Cases.  The relief requested in the First

Day Pleadings is important to the success of the efforts of the Debtors to preserve and to

maximize the value of their estates.

9.    I submit this declaration ("Declaration") to provide an overview of the Debtors,

their business, and the Chapter 11 Cases, as well as to support the Debtors' petitions and the First

Day Pleadings.  I have reviewed the Debtors' Chapter 11 petitions and the First Day Pleadings,

or otherwise had the contents explained to me, and to the best of my knowledge after reasonable

inquiry, believe that the relief sought in each First Day Pleading: (a) is necessary to enable the

Debtors to enter into, and to operate in, Chapter 11 with minimal disruption or loss of

productivity or value; (b) constitutes a critical element to the Debtors' efforts to preserve value

and maximize creditor and stakeholder recoveries and to achieve a successful liquidation; and (c)

best serves the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief

that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the

goals of these Chapter 11 Cases.  The facts set forth in each First Day Pleading are incorporated

herein by reference.

10.    Except as otherwise indicated, I have personal knowledge of the matters set forth

herein, and all statements and facts set forth herein are based upon my personal knowledge,

discussions with current and former members of the Debtors' senior management and

professional advisors, my review of the Debtors' books and records, relevant documents and

other information prepared or collected by the Debtors' representatives, or my opinion based

---

[2]    Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the relevant
First Day Pleading(s).

upon my experience with the Debtors' operations and financial condition.  In making my statements based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals and representatives, I have relied upon these professionals and representatives accurately recording, preparing or collecting such documentation and other information.  I am authorized to submit this Declaration on behalf of the Debtors.  I am over the age of eighteen, and if called to testify as a witness in this matter, I could and would competently testify to each of the statements and facts set forth herein.

11.    This Declaration is divided into three parts.  Part I provides background information about the Debtors, their business operations, their corporate and capital structure, and the events leading up to the filing of these Chapter 11 Cases.  Part II summarizes the Debtors' primary objectives in these Chapter 11 Cases.  Part III sets forth the relevant facts in support each of the First Day Pleadings.

**PART I**

**<u>BACKGROUND</u>**

**A.    Overview of the Debtors.**

12.    Unipharma is a healthcare packaging company serving the pharmaceutical and nutraceutical sectors in the development, manufacturing, and packaging of liquid, disposable,



and single-dose units.  Tamarac owns a state-of-the-art, 165,000 square foot, FDA-registered, blow-fill-seal ("<u>BFS</u>") and conventional seal manufacturing facility built in 2018 located in Tamarac, Florida (the "<u>Facility</u>") that, among other things, packages prescription ("<u>Rx</u>"), over the counter ("<u>OTC</u>"), and nutraceutical (i.e., dietary

7

supplement) oral and ophthalmic solutions.

13.    The Debtors' Facility is capable of producing over 39 million units per month (i.e., over 470 million units annually).  Batch size ranges from 250 to 9,000 liters.  Tamarac leases the Facility to Unipharma pursuant to a certain *Commercial Lease*, dated May 1, 2018 (as amended), by and between Tamarac (as landlord) and Unipharma (as tenant).



14.    Many of the Debtors' products are produced under strict controls in one of the Facility's 17 clean rooms and ultra-clean facilities designed for producing sterile products of the highest quality.  The Facility is specially equipped to provide BFS aseptic packaging as well as high speed conventional bottle filling, stick pack and pentafill packaging for prescription and OTC pharmaceuticals and nutraceuticals.  Through the BFS process, a container is formed, filled and sealed in a continuous process without human involvement, in a sterile enclosed area inside the machine.  The many benefits of the BFS process include, among others, higher automation,

  

reduced production costs, reduced human interaction (the major cause of sterility failures), production flexibility, product integrity and consumer safety.

15.    The Debtors' vision is to combine quality, safety, and innovation in creating strategies to help overcome the challenges their clients face in today's healthcare industry.  The Debtors' team of scientific, commercial, and administrative specialists work together to provide its clients with the newest product packaging and safety innovations, as well as expertise in

product development.

16.    The Debtors focus their efforts on transforming their clients' projects into reality, including: (i) providing manufacturing turn-key solutions; (ii) offering contract and private label  manufacturing; (iii) developing packaging solutions for Rx, OTC and nutraceutical formulations; (iv) furnishing product development services; and (v) undertaking regulatory filing assistance services. With their state-state-of-the art Facility and full-service capabilities, the Debtors also offer a variety of other healthcare packaging solutions, including push-ball tech device (i.e., an innovative design for a single-dose disposable therapeutic cream applicator, stick packs (a complete range of convenient single-serve flexible stick packages for consumers on the go) and PET bottles (the traditional form of packaging for OTC, Rx and nutraceutical products. In addition, the Debtors offer solutions in  private label manufacturing, product design and formulations, R&D, and regulatory assistance.

17.    As of the Petition Date, the Debtors employ approximately 132 employees, consisting of 69 hourly employees and 63 salaried employees. All of the employees are based out of the Facility and employed by Unipharma. The Debtors have no unionized employees and are not party to any collective bargaining agreements.

**B.    The Corporate Structure and Governance of the Debtors.**

18.    Unipharma is a Delaware limited liability company authorized to transact business in the State of Florida. Unipharma's board of managers is currently comprised of Charles Sweet and Elizabeth Muscato. The equity ownership of Unipharma's 245,000 issued

and outstanding units are as follows: (i) Raimundo José Santamarta (99,900 founder units); (ii) Reinaldo Santamarta (46,250 founder units); (iii) Yohana Santamarta (9,250 founder units); (iv) Raimundo Esteban Santamarta (27,750 founder units); (v) International Supply Group Corp. (1,850 founder units); and (vi) NHTV (AIV) Ulm Holdings LLC (60,000 investor units).[3]

19.    Tamarac is a Florida limited liability company.  Tamarac's sole manager is Charles Sweet.  The equity ownership of Tamarac's 1,000 issued and outstanding units are as follows: (i) Raimundo José Santamarta (900 membership units); and (ii) International Supply Group Corp. (100 membership units).[4]

20.    The following are the officers of both of the Debtors: (i) Alan Petro (Chief Executive Officer); (ii) S. Waite Popejoy III (Chief Financial Officer); (iii) Gregory Hagood (EVP of Strategy); (iv) Robert Annas (EVP of Operations); (v) Matthew Caine (VP of Strategy); and (vi) Mary Dressler (Director of Strategy).  As stated above, the Debtors operate their business from a common headquarters located at the Facility.

**C.    The Prepetition Capital Structure of the Debtors.**

21.    The Debtors' prepetition capital structure consists of: (i) the Senior Secured Loan Agreement; (ii) the Subordinated Notes; (iii) the Paycheck Protection Loan; and (iv) other tax-related and general unsecured claims, each as defined and described in more detail below.

---

[3]    Per the *Second Amended and Restated LLC Agreement of Unipharma, LLC* (as amended), the founder and investor units vote equally as a single class.  *See* § 3.4(b)(iv).  Pursuant to the exercise of certain rights arising from proxies entered into as a part of the Senior Secured Loan Agreement (defined herein), and due to continuing defaults under the Senior Secured Loan Agreement, I am informed by counsel that the Senior Secured Lender (defined herein) has the right, among other things, to vote the interests all holders of "founder" units (i.e., the individuals and entity listed in "(i)" through "(v)" of this paragraph).

[4]    Pursuant to the exercise of certain rights arising from proxies entered into as a part of the Senior Secured Loan Agreement (defined herein), and due to continuing defaults under the Senior Secured Loan Agreement, I am informed by counsel that the Senior Secured Lender has the right, among other things, to vote the interests of both holders of membership units (i.e., the individual and entity listed in "(i)" and "(ii)" of this paragraph).

(i)    Senior Secured Loan Agreement

22.    On or about September 28, 2018, Unipharma (as "Borrower"), Tamarac (as "Guarantor" and together with the Borrower, collectively, the "Senior Secured Obligors"), International Supply Group Corp. (as a pledgor, "ISG"), Raimundo J. Santamarta (as a pledgor, "RJS"), Reinaldo Santamarta (as a pledgor, "RS"), Yohana Santamarta (as a pledgor, "YS"), Raimundo Esteban Santamarta (as a pledgor, "RES", and together with ISG, RJS, RS, and YS, collectively, the "Pledgors", and the Pledgors, together with the Borrower and the Guarantor, collectively, the "Loan Parties"), and NHTV ULM Holdings LLC (as lender, the "Senior Secured Lender") entered into that certain *Loan Agreement*, dated as of September 28, 2018 (as amended by that certain Incremental Amendment to Loan Agreement, dated as of November 20, 2020 (the "First Incremental Amendment"), and that certain Second Incremental Amendment to Loan Agreement, dated as of December 4, 2020 (the "Second Incremental Amendment" and, together with the First Incremental Amendment, collectively, the "Incremental Amendments"), the "Senior Secured Loan Agreement"), by and among the Senior Secured Lender, the Borrower, the Guarantor, and the Pledgors.  The Senior Secured Loan Agreement is a delayed draw term loan credit facility that matures on September 28, 2023.

23.    As of the Petition Date, the Senior Secured Obligors were indebted and liable to the Senior Secured Lender in respect of the obligations under the Senior Secured Loan Agreement (together with the Incremental Amendments and any ancillary documents, security agreements, guarantees, pledge agreements and notes issued in connection therewith, collectively, the "Senior Secured Loan Documents") in the aggregate principal amount of not less than $69,632,715.46 plus all accrued but unpaid interest (including interest paid in kind and interest at the default rate, as applicable), fees, expenses, and all other obligations expressly

provided for thereunder, or incurred in connection therewith, including any "Obligations" as defined in the Senior Secured Loan Agreement (such obligations under the Senior Secured Loan Agreement and the Senior Secured Loan Documents, the "Senior Secured Loan Obligations"), and the Debtors are unconditionally liable, without defense, counterclaim, offset or setoff of any kind, with respect to the Senior Secured Loan Obligations.

24.     To secure the Senior Secured Loan Obligations, the Senior Secured Obligors entered into various security and collateral documents pursuant to and in connection with the Senior Secured Loan Documents, pursuant to which the Senior Secured Lender was granted the benefit of valid, binding, perfected, enforceable, first-priority liens and security interests the "Senior Secured Loan Liens") in substantially all of the Debtors' assets, as described more fully in the Senior Secured Loan Documents (the "Prepetition Collateral").

25.     Events of default have occurred and are continuing under the terms of the Senior Secured Loan Documents.  Pursuant to a certain *Forbearance Agreement* dated October 23, 2020 (as amended), the Senior Secured Lender has agreed to temporarily forebear from exercising its rights to accelerate the obligations due it under the Senior Secured Loan Agreement.

(ii)    Subordinated Notes

26.     Prior to the Petition Date, Unipharma entered into (a) that certain Promissory Note, dated as of September 28, 2018, in favor of Raimundo J. Santamarta (the "Individual Shareholder") in the original face amount of $7,240,529.76 (the "Individual Shareholder Note") and (b) that certain Promissory Note, dated as of September 28, 2018 in favor of Global Capital Invest Finance Ltd. ("GCIF") in the original face amount of $73,164,261.36 (the "GCIF Note" and together with the Individual Shareholder Note, collectively, the "Subordinated Notes").

27.     As of November 30, 2020, the Debtors estimate that approximately $8.70 million is outstanding under the Individual Shareholder Note and $73.65 million is outstanding under the GCIF Note.

28.     Pursuant to that certain Subordination Agreement, dated as of September 28, 2018 (the "Subordination Agreement"), by and between Individual Shareholder, GCIF (together, the "Subordinated Creditors"), and the Senior Secured Lender, and agreed to by the Senior Secured Obligors and the Pledgors, the Subordinated Creditors agreed, among other things, to subordinate all amounts owing under the Subordinated Notes (the "Subordinated Debt") to all of the Senior Secured Loan Obligations;

(iii)    Paycheck Protection Loan

29.     Prior to the Petition Date, the Debtors applied for and received a loan under the Paycheck Protection Program, administered by the Small Business Administration under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, in the approximate amount of $1.6 million (the "Paycheck Protection Loan").  The Debtors intend to request 100% forgiveness of the Paycheck Protection Loan.

(iv)    Other Claims

30.     As of the Petition Date, the Debtors estimate that they have approximately (i) $611,183 in outstanding real estate and personal property taxes for 2020 on a pro-rated basis and (ii) $7.1 million in general unsecured trade liabilities and commitments on a preliminary estimated basis.

(v)     Recent Financial Information

31.     Unipharma's total annual revenues and earnings for the 2019 fiscal year were, respectively, approximately $1,239,000 (annual revenue) and -$30,494,000 (net loss).  During

2020 through October, 31, 2020, Unipharma's part-year revenues have been approximately $5,017,985 and net losses are -$29,892,206.

32.    Tamarac's total annual revenues and earnings for the 2019 fiscal year were, respectively, approximately $1,826,000 (annual revenue) and $1,635,466 (net income).  During 2020 through October 31, 2020, Tamarac's part-year revenues have been approximately $1,521,481 and earnings are $1,359,046.

**E.    Events Leading to the Filing of the Chapter 11 Cases.**

33.    On April 16, 2020, I am informed by counsel that the Senior Secured Lender provided notice to the Loan Parties of various defaults under the Senior Secured Loan Agreement.  As a result of continuing defaults thereunder, on October 18, 2020, I am informed by counsel that the Senior Secured Lender provided notice to the Loan Parties and exercised its voting and other consensual rights vested in the Senior Secured Lender pursuant to certain proxies executed by each of the Pledgors.  As a result, and among other things, I am informed by counsel that the managers of the Debtors were removed, and (i) Charles Sweet and Elizabeth Muscato were appointed to the board of managers of Unipharma and (ii) Charles Sweet was appointed as the sole manager of Tamarac.  Mr. Sweet is a highly qualified and esteemed fiduciary in the restructuring community, and Ms. Muscato has had a long career running contract manufacturers and packaging companies.

34.    Thereafter, the Debtors removed certain officers and employees and approved the appointment of Alan Petro as Chief Executive Officer to oversee and manage the Debtors' day-to-day business operations, and to assist the Debtors with formulating strategic financial and operational alternatives with the ultimate goals of optimizing the Debtors' business outlook and maximizing the Debtors' value for the benefit of their stakeholders.  At the time, the Debtors also

14

approved the retention of Berger Singerman LLP and SOLIC as their advisors.  Subsequently, the Debtors approved the appointment of additional officers for the Debtors as detailed above.

35.    When SOLIC was retained during October 2020, SOLIC discovered that Unipharma had cash on hand in the approximate amount of $3.7 million, which represented approximately two months of operating cash, based on historical cash burn. Unipharma's cash position became perilously low by the third week of November, and Unipharma would not have been able to continue operations without an incremental loan from the Senior Secured Lender in the approximate amount of $1.15 million and a subsequent $150,000 incremental loan on December 4, 2020, to facilitate operations until the Debtors' entry into these Chapter 11 Cases.

36.    Upon SOLIC's retention during October 2020, and after the Debtors' respective Boards of Managers had removed the Santamarta family members from such Boards and terminated their employment with the Debtors, SOLIC has been made aware of transactions, transfers and non-arm's length business dealings between Unipharma and certain members of the Santamarta family and their affiliates.  SOLIC has brought these issues of concern to the Board of Managers of Unipharma, and that Board recently directed SOLIC and Berger Singerman LLP (the proposed bankruptcy counsel to the Debtors) to commence an investigation into a variety of matters related to certain of the Santamarta family members and their affiliates and/or associates.

37.    The Unipharma Board of Managers recently directed that SOLIC and Berger Singerman LLP advance the investigation of these and other matters. Berger Singerman LLP will soon issue discovery under the authority of Federal Rule of Bankruptcy Procedure 2004, to various Santamarta family members, entities affiliated with them, and other third parties.

38.    For the past seven weeks, the Debtors and their advisors have undertaken an evaluation of the Debtors' assets, liabilities, and current and projected financial outlook, and

have analyzed various capital restructuring and reorganization options. Pursuant to such evaluation, the Debtors and their advisors have determined to provide this innovative business with a fresh start under a new management, through a court-supervised sale process that is intended to maximize the value of the Debtors' assets for the benefit of their stakeholders.

## PART II
## DEBTORS' OBJECTIVES IN THESE CHAPTER 11 CASES

39.    The primary goal of these Chapter 11 Cases is simple:  to consummate a sale of the Debtors' assets which will maximize recoveries for the Debtors' estates and preserve a viable business that will continue to employ over 130 individuals, to maintain contracts with its vendors and service providers, and to provide products and services to the customers of the Debtors. Absent the agreement of Senior Secured Lender to serve as the stalking-horse bidder, and to provide debtor-in-possession financing and access to cash collateral to fund the sale process and working capital needs pending a sale, the Debtors would have been forced to cease operations, lay off their remaining employees, and shut their operations.  Without the relief requested in the First Day Pleadings, and later, with respect to the bidding procedures and the sale motions, immediate liquidation likely remains the Debtors only viable options.

40.    The First Day Pleadings will permit the Debtors to preserve and maximize their enterprise value during the proposed sale process for the benefit of their employees, their secured creditor, their vendors, and their other creditors.  The Debtors' immediate objective is to stabilize their operations, preserve liquidity, and to minimize any adverse effects that these Chapter 11 Cases might otherwise have on their estates by obtaining the relief requested in the First Day Pleadings and to work with interested parties to obtain a sale of their business for the benefit of the above-mentioned stakeholders.

41.     For these reasons, and the additional reasons discussed in the First Day Pleadings which are incorporated herein by reference, I respectfully submit that the various relief requested in the First Day Pleadings should be approved by this Court

### PART III
### FIRST-DAY PLEADINGS

42.     Concurrently with the filing of these Chapter 11 Cases, the Debtors are filing certain First Day Pleadings.  The Debtors respectfully request that the Court conduct a hearing as soon as practicable after the commencement of the Chapter 11 Cases (the "First Day Hearing") to consider the First Day Pleadings.

43.     I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, I believe that the facts set forth therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day Pleadings is: (a) vital to enable the Debtors to enter into, and to operate in, Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries; and (c) best serves the Debtors' estates and creditors' and stakeholders'  interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases, including the ability of the Debtors to preserve and to maximize, as well as to avoid immediate and irreparable harm, to the Debtors' estates.

**A.     Debtors' *Ex Parte* Motion for Joint Administration (the "Joint Administration Motion").**

44.     The Debtors believe that it would be more efficient for the administration of these cases if joint administration were authorized.  The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for all of the

Debtors resulting in duplicative pleadings repeatedly being filed should joint administration be denied. Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

45.    The Debtors submit that the rights of the creditors and other stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases.  The Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1.  The Debtors submit that the entry of an Order approving joint administration of the Debtors' Chapter 11 Cases will be in their best interests and those of their creditors.

**B.**    **Debtors' Application for Entry of an Order Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants, LLC as Notice, Claims and Solicitation Agent,  Effective as of the Petition Date (the "<u>KCC Application</u>").**

46.    The Debtors seek approval of their agreement with Kurtzman Carson Consultants, LLC ("**KCC**") and to have KCC appointed as notice, claims and solicitation agent of the Court.  I am informed that KCC is one of the country's leading Chapter 11 administrators, with experience in noticing, claims administration, balloting, solicitation, and facilitating other administrative aspects of Chapter 11 cases.  I am further informed that KCC has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and solicitation agent in many large bankruptcy cases pending in various districts nationwide.  As explained in the KCC Application, the approval of the Debtors' agreement with KCC and KCC's appointment as claims, noticing, and solicitation agent of the Court will facilitate the orderly and efficient management of these Chapter 11 Cases.  Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates, and creditors to retain KCC under the terms of its engagement letter.

C.    **Debtors' Application for Approval, on an Interim and Final Basis, of the Employment of Paul Steven Singerman and the Law Firm of Berger Singerman LLP as Counsel to the Debtors-in-Possession, Effective as of the Petition Date (the "BSLLP Application").**

47.    The Debtors seek authority to retain, Paul Steven Singerman and the law firm of Berger Singerman LLP ("BSLLP") as general bankruptcy counsel to the debtors and debtors-in-possession effective as of the Petition Date.  As detailed in the BSLLP Application, the Debtors understand that Mr. Singerman and BSLLP have extensive experience representing Chapter 11 debtors in this district (and other districts in Florida and across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtors.  The Debtors believe it is in their best interests, and those of their creditors, that Mr. Singerman and BSLLP be retained to serve as Debtors' general bankruptcy counsel in their Chapter 11 Cases.

48.    To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Paul Steven Singerman on Behalf of Berger Singerman LLP, as Proposed Counsel for the Debtors-in-Possession, Effective as of the Petition Date*, affirmed by Mr. Singerman and attached to the BSLLP Application as Exhibit "A", neither Mr. Singerman nor BSLLP has any connection with the Debtors' creditors or other parties in interest or their respective attorneys. Counsel has informed me that corporations like the Debtors may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a various relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened.  It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.  In that regard, counsel advises that this relief has been granted in numerous Chapter 11 cases in this and other Districts in Florida, including

large Chapter 11 cases.  *See*, *e.g.*, *In re National Auto Lenders, Inc.*, Case No. 18-24586-LMI

(Bankr. S.D. Fla. Dec. 20, 2018); *In re Adinath Corp., et al.*, Case No. 15-16885-LMI (Bankr.

S.D. Fla. April 21, 2015); *In re McGuire Holdings*, Case No. 11-39347-RAM (Bankr. S.D. Fla.

Oct. 27, 2011); *In re Old Corkscrew Plantation, LLC, et al.,* Case No. 11-14559-BSS (Bankr.

M.D. Fla. Aug. 25, 2011); *In re HearUSA, Inc.*, Case No. 11-23341-EPK (Bankr. S.D. Fla. May

20, 2011); *In re American Homebuilders, Inc., et al.,* Case No. 09-05668-PMG (Bankr. M.D.

Fla. Aug. 5, 2009); *In re Land Resource, LLC, et al.,* Case No. 08-10159-KSJ (Bankr. M.D. Fla.

Dec. 9, 2008); *In re Gencor Industries, Inc., et al.,* Case No. 00-03597-KSJ (Bankr. M.D. Fla.

Sept. 20, 2000), and by other bankruptcy courts throughout the country.  Accordingly, in the

exercise of my business judgment, I believe it is in the best interests of the Debtors, their estate

and creditors to retain BSLLP as the Debtors' corporate restructuring counsel.

**D.**     **Debtors' Application, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, for Approval of Agreement with SOLIC Capital Advisors, LLC and SOLIC Capital, LLC to Provide the Services of (I) Neil F. Luria as Chief Restructuring Officer, (II) Certain Other Interim Officers, and (III) Certain Support Personnel Effective as of the Petition Date (the "<u>CRO Application</u>").**

49.     In the ordinary course, the Debtors seek authority to retain approval of an

agreement with SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (as defined above,

"<u>SOLIC</u>") to provide (i) myself, Neil F. Luria ("<u>Luria</u>"), as the CRO to the Debtors, S. Waite

Popejoy III to serve as Chief Financial Officer (the "<u>CFO</u>"), Gregory Hagood to serve as

Executive Vice President of Strategy (the "<u>EVP of Strategy</u>"), Robert Annas as Executive Vice

President of Operations (the "<u>EVP of Operations</u>"), Matthew Caine as Vice President of Strategy

(the "<u>VP of Strategy</u>"), and Mary Dressler as the Director of Strategy (the "<u>Director of Strategy</u>",

and together with the CRO, the CFO, the EVP of Strategy, the EVP of Operations, and the VP of

Strategy, the "<u>Interim Officers</u>"); and (ii) the services of certain support personnel effective as of

the Petition Date.

50.    The Debtors understand that SOLIC and I have significant and extensive experience in providing interim management services in the capacity as Chief Restructuring Officer.  The Debtors understand that SOLIC and I have an excellent reputation for providing such services throughout Florida and the United States in restructuring matters, and that my firm and I are well-qualified to provide services to the Debtors in these Chapter 11 Cases.  The Debtors believe that it is in their best interests, and those of their creditors and other stakeholders, that SOLIC and I be retained to serve as Chief Restructuring Officer, and to provide other interim officers, to the Debtors in their Chapter 11 Cases.

51.    Prior to the Petition Date, on October 18, 2020, the Debtors retained SOLIC in connection with their financial and operational restructuring.  Subsequently, on November 10, 2020, the board of Unipharma and the manager of Tamarac each appointed me as the CRO of the Debtors.  Since SOLIC's original engagement during October 2020, SOLIC has become familiar with the Debtors' businesses, financial affairs, debt structure, assets, contractual arrangements operations and strategic challenges.  SOLIC has been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors.  Accordingly, SOLIC has acquired the necessary background and experience regarding the Debtors that will assist SOLIC in providing effective and efficient services to the Debtors with the many issues that may arise in the context of the Debtors' Chapter 11 cases.

52.    As a result of my prior service as interim chief restructuring officer in other restructuring matters, and the prepetition work done for the Debtors by SOLIC, I believe that the Debtors will suffer immediate and significant harm if they are unable to obtain my services and the services of SOLIC in these Chapter 11 Cases.  It is, therefore, my belief that only with the granting of an order approving SOLIC's and my employment will such immediate and

irreparable injury be avoided. Accordingly, I believe that it is in the best interests of the Debtors and their estates that the Court grant the CRO Application.

**E.      Debtors' Emergency Motion for (A) Authority to (I) Maintain Bank Accounts and to Continue to Use Existing Business Forms and Checks, and (II) Continue to Use Existing Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines (the "Cash Management Motion").**

53.     I understand from counsel that the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases.  These guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims.  In the Cash Management Motion, the Debtors seek a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

54.     Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of their business, the Debtors used a cash management system which permits the efficient collection, transfer, and disbursement of funds generated on a daily basis from their operations (the "Cash Management System") comprised of four (4) bank accounts (each a "Bank Account" and collectively, the "Bank Accounts"); two of these accounts are Operating Accounts, one in the name of each of the Debtors (the "Tamarac Operating Account" and "Unipharma Operating Account").  The third account, held by Unipharma, is used to fund the Unipharma Operating

Account (the "Funding Account"). The fourth account was used to provide operating capital to Unipharma, as needed (the "Advisory Fee Funding Account").

55.     The Debtors maintain the Tamarac Operating Account and Unipharma Operating Account at JPMorgan Chase. Unipharma maintains the Funding Account and Advisory Fee Funding Account at Morgan Stanley Smith Barney ("Morgan Stanley")  Central to the Cash Management System is financing provided by the Senior Secured Lender that is utilized by Unipharma to fund its business operations.  A list of the Debtors' Bank Accounts and the amount on deposit in each such Bank Account as of the Petition Date is set forth on Exhibit "A" attached to the Cash Management Motion.  The Bank Accounts are part of a carefully constructed and highly automated Cash Management System that ensures the Debtors' ability to efficiently monitor and control their cash position.

56.     The Cash Management System used by the Debtors constitute ordinary, usual, and essential business practices.  These systems allow the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses.  The Debtors' existing Bank Accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest. The Debtors' transition into Chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers.  The Debtors further request authority to deposit funds in and withdraw funds from all such accounts postpetition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, check, wire, transfers, ACH, electronic funds transfers and other debits and to treat the Bank Accounts for all purposes as debtors in possession accounts.

57.     The Debtors' operations requires the Cash Management System to continue during the pendency of the Chapter 11 Cases.  If the Debtors were required to create and implement a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors' ability to undertake the proposed sales process. Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' bankruptcy estates.  Accordingly, the Debtor submit that the maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

58.     The Debtors seek a waiver of certain operating Guidelines established by the U.S. Trustee.  For example, the Debtors seek a waiver of the requirements that they: (i) close all existing bank accounts; (ii) open new debtor in possession ("DIP") bank accounts; (iii) establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes); (iv) maintain a separate DIP account for cash collateral; (v) obtain checks for all DIP accounts that bear the designation, "debtor in possession," the bankruptcy case number, and the type of account; and (vi) open a new set of books and records as of the Petition Date.  Closing and opening new bank accounts and books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date.  The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing bank accounts and business forms without alteration or change.  A substantial amount of time and expense would be required in order to

close and open new bank accounts and print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtors request that they be authorized to continue to use their existing bank account and business forms and to maintain their existing business records.

59.    I further understand that section 345 of the Bankruptcy Code and the U.S. Trustee establishes certain requirements with respect to all deposits and investments of money of the estate. The Debtors believe that the banks at which they maintain their accounts are financially stable banking institutions, and for those located in the United States, are FDIC insured and authorized depositories pursuant to 11 U.S.C. § 345(b). Additionally, as explained above, the Debtors' Bank Accounts comprise an established Cash Management System that the Debtors need to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted. The Debtors will note, in their respective records, the date and times the Chapter 11 petitions were filed, and the records will reflect each post-petition receipt and disbursement. Therefore, a waiver of the section 345 deposit guidelines would not pose a risk to the Debtors' estates nor their creditors.

60.    The Debtors should be granted further relief from the Guidelines to the extent that they require the Debtors to make all disbursements by check. In particular, the Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the complexity of the Debtors' operations, the Debtors must conduct transactions by debit, wire, or ACH payments and other similar methods, as discussed above. In addition, the Debtors' receive a portion of their customer receipts through wire. To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors'

performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors.  Therefore, the Debtors request a waiver of this requirement.

61.     The Debtors and I have been advised by counsel that the relief requested in the Cash Management Motion has been granted in other large Chapter 11 cases in this district. Therefore, I submit that the entry of an order authorizing the relief sought will be in the Debtors' best interests and those of their creditors.

**F.      Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations; (II) Authorizing the Debtors to Maintain Employee Benefit Programs and Other Practices, and (III) Directing Banks to Honor Related Prepetition Transfers (the "_Employee Motion_").**

62.     The Debtors seek the relief requested in the Employee Motion because any delay in paying employee compensation, deductions, or benefits will fundamentally harm the Debtors' relationships with the employees and irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical.  The Debtors face the imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments described in the Employee Motion. Employee support for the Debtors' reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtors' operations.  At this critical early stage of these Chapter 11 Cases, the Debtors simply cannot risk the substantial disruption to their business operations that would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay employee compensation, deductions, and benefits in the ordinary course.   Finally, to remain in a position to maintain necessary operational integrity, oversight, and quality control, the Debtors must continue their corporate policies of permitting certain employees to incur business-related expenses and

26

thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements.

63.      As the stability of the Debtors' workforce is essential to a successful sale process, it is critical that it be permitted to continue the ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.  The Debtors believe that the requested relief will enable them to maintain their current operations without interruption during the sale process, thereby preserving the value of the business, and, at the same time, maintaining employee morale.  Without the relief requested, the Debtors' ability to preserve the assets of the estates for the benefit of all creditors will be dramatically impaired and that a grant of the relief requested will be in the best interests of the Debtors and their creditors.

**G.     Debtors' *Ex Parte* Motion to File Under Seal Unredacted Schedule to Employee Wage and Benefit Motion (the "<u>Motion to Seal</u>").**

64.      The Debtor seeks approval, on an *ex parte* basis, of an order authorizing the Debtors to file and the Court to maintain under seal Exhibit <u>"A"</u> to the contemporaneously filed Employee Motion which is the schedule containing information required by Local Rule 9013-1(I)(1) (the "<u>Employee Schedule</u>") containing information required by Local Rule 2018-1(B), including the names of employees and their respective wages as of the Petition Date (as defined below).  Making payroll information available to all of the employees and the general public may cause widespread employee anxiety and discord, particularly if employees are earning disparate compensation.  For this reason and the others set forth therein, I respectfully request the Court to grant the Motion to Seal.

**H.     Debtors' Emergency Motion For Authorization to (I) Continue to Administer Insurance Policies and Related Agreements and (II) Honor Certain Obligations in Respect Thereto (the "<u>Insurance Motion</u>").**

65.      Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing,

but not directing, the Debtors to continue administering the insurance policies described in the Insurance Motion (the "Insurance Policies") and agreements relating thereto, and paying certain claims, deductibles and/or premiums, in the Debtors' discretion to the extent they become due and payable during the pendency of these Chapter 11 Cases.

66.      The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets during the sale process.  I understand that, in many cases, the insurance coverage provided by the Insurance Policies is required by diverse regulations, laws, and contracts.  Therefore, I believe that it is essential for the Debtors to maintain the Insurance Policies, which provide a comprehensive range of coverage for the Debtors.  Moreover, if the Insurance Policies are allowed to lapse, the Debtors will be exposed to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.

67.      The Debtors' continued operations, combined with the Debtors' efforts to undertake an orderly sales process, require that the Insurance Policies be maintained on an ongoing and uninterrupted basis.  In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid for the Insurance Policies are continued and maintained by the Debtors.  For example, the risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain in the Debtors' employ.  Departures by employees at this critical time may result in a severe disruption of the Debtors' business to the detriment of all parties in interest.

68.      To the extent that the Insurance Policies and related agreements may be deemed executory contracts, the Debtors do not at this time seek authority to assume these contracts.  The

Debtors request only authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the Insurance Policies in force.

69.     In sum, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.  Accordingly, it is my opinion that the Insurance Motion should be approved.

**I.**     **Debtors' Emergency Motion for Order Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, and Other Taxes and Similar Obligations (the "Tax Motion").**

70.     The Debtors are requesting that the Court enter an order authorizing, but not directing, the Debtors to pay prepetition sales, use, trust fund, property, and other taxes and similar obligations, as detailed in the Tax Motion, in the ordinary course of the Debtors' businesses without regard as to whether such taxes accrued or arose before or after the Petition Date.  In addition, the Debtors are requesting that (i) to the extent Debtors have paid certain taxes which should not have been paid, the Court authorize the Debtors to seek a refund of such taxes, and (ii) to the extent that the Debtors dispute any such pre-petition tax, the Court authorize the Debtors to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether the Debtors are obligated to pay the subject tax.

71.     The Debtors must continue to pay the taxes and fees to avoid potentially costly distractions during these Chapter 11 Cases.  For example, if the taxes and fees are not paid, it is possible that some, if not all, of the taxing authorities may, pursuant to Bankruptcy Code § 362(b)(9), cause the Debtors to be audited and subjected to various administrative proceedings. Such audits and administrative proceedings and the accompanying disruption in business activities would materially and adversely affect the Debtors' reorganization prospects and

unnecessarily divert the Debtors' attention away from this case.  In the event that such action is taken by the taxing authorities, the Debtors need the authority of this Court to pay, if necessary, the various taxes and fees.

72.    Accordingly, the Debtors request that they be authorized, but not directed, to pay the taxes and fees to the relevant taxing authorities in the ordinary course of business.  Nothing herein, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of any taxes or fees under bankruptcy or non-bankruptcy law.  For the reasons stated above and in the Tax Motion, I respectfully request the Court to grant the Tax Motion.

**J.    Debtors' *Ex Parte* Motion for Authorization to File Consolidated Chapter 11 Case Management Summary ("Consolidated Case Management Motion").**

73.    I am advised that in accordance with Local Rule 2081-1(B), the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form *Chapter 11 Case Management Summary* (the "Case Management Summary") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors.  These Chapter 11 Cases were commenced by Tamarac and Unipharma.

74.    Contemporaneously herewith, the Debtors have each filed in their respective Chapter 11 Cases *ex parte* motions seeking joint administration of these Chapter 11 Cases. Through the Consolidated Case Management Motion, I am advised that the Debtors will request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors.  I believe that the Debtors' request for authority to file a consolidated Case Management Summary is justified, as the filing of a separate Case Management Summary for each of the two Debtors would be duplicative as

30

substantially all of the information in the Case Management Summary would be for Unipharma because it is the operating company whereas Tamarac is not an operating company, but rather, owns the Facility which it leases to Unipharma.  In brief, the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

75.     I am advised by counsel that the United States Trustee will not oppose the relief requested by this motion.   Therefore, I submit that the entry of an order approving the Consolidated Case Management Motion is in the best interests of the Debtors, their estates, creditors and other parties in interest and should be approved by the Court.

**K.     Emergency Motion (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Lender, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing ("DIP Financing Motion").**

76.     The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates during the Chapter 11 Cases while the Debtors pursue an orderly sale process of substantially all of their assets.  During the past seven weeks, SOLIC, together with the Debtors' other advisors, have undertaken a detailed analysis of the Debtors' operations and funding needs.  From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow the Debtors to operate in Chapter 11 as they work with their advisors and key stakeholders to achieve their restructuring goals and pursue a potential sale of the business. Specifically, the Debtors' advisors have determined that debtor in possession financing is necessary to ensure (a) sufficient working capital to operate their business and to administer their estates; (b) an appropriate liquidity cushion in order effectively to deal with anticipated vendor contraction and tightening of trade terms; (c) the timely payment of administrative expenses to be incurred; and (d) a positive

message to the market that these Chapter 11 cases are sufficiently funded, which is critical to address the concerns raised by the Debtors' customers, employees, and vendors.

77.     Given the Debtors' desire to avoid the cost and uncertainty of a postpetition DIP facility that would attempt to non-consensually prime the Senior Secured Lender, the Debtors concluded that under the circumstances acceptable third-party financing was not reasonably obtainable.    Moreover, the Senior Secured Lender informed the Debtors that it would not consent to the priming of the Senior Secured Liens.    Nevertheless, the Debtors' management approached various parties with the goal of determining whether the Debtors would be able to obtain third-party financing.    Recognizing their need for immediate liquidity, the Debtors' management began an arm's-length process and evaluation of available alternatives.

78.     Notwithstanding the foregoing outreach, no third-party has come forward with any proposal for a facility on a junior or unsecured basis to meet the Debtors' liquidity needs. Specifically, no interested party was willing to provide (i) senior secured financing absent the explicit consent to prime the Senior Secured Liens (which the Senior Secured Lender would not provide), (ii) secured financing junior to the Senior Secured Liens, or (iii) financing on an unsecured basis.  Given the Debtors' challenging liquidity situation and the fact that no third-party lender was willing to provide financing on a junior basis to the existing secured facility, or to refinance in full the existing secured debt as well as provide incremental capital to fund the Debtors' chapter 11 cases, the Debtors determined that the DIP Facility provides the best path forward for the Debtors to maximize the value of their estates in these Chapter 11 Cases. Accordingly, the Debtors, with the help of their professionals, engaged the Senior Secured Lender to negotiate and execute the DIP Facility. The Debtors negotiated the DIP Documents with the Senior Secured Lender (who is also now the DIP Lender) in good faith, at arm's-length and with the assistance of SOLIC and their counsel, and the Debtors believe that they have obtained financing on the best terms reasonably available.

32

79.     Given these challenges and the anticipated funding needs of the Debtors during the sale process, the Debtors concluded proceeding with the DIP Facility is the most efficient and cost-effective way to proceed.  In my role as the Debtors' Chief Restructuring Officer, I was actively involved in the solicitation of proposals to procure debtor in possession financing, as well as in the negotiation process, including engaging in good faith discussions with the potential lenders. The proposed DIP Facility, including the pricing is fair and reasonable under the circumstances, is in the best interest of the Debtors' estates, will provide the Debtors with the financing required for these Chapter 11 Cases, and will add liquidity to fund the Debtors' bankruptcy cases through an orderly sales process and a plan of liquidation.  I understand the DIP Facility contains Original Issue Discount; however, the DIP Facility does not include any other fees or premiums that might be customary for other DIP facilities such as agent fees, administration fees, seasoning fees or backstop fees.  In the absence of any other fees, I believe the Original Issue Discount is reasonable under the circumstances.  Accordingly, I believe the DIP Facility and its terms are both fair and reasonable and in the best interests of the Debtors' and their estates.

80.     The continued and viable operation of the Debtors' business will not be possible absent the Court's entry of the Interim DIP Order.  Approval of the Interim DIP Order will ensure the uninterrupted operation of the Debtors' business, the maintenance of ordinary course relationships with vendors, customers and employees, the satisfaction of working capital needs in the ordinary course, and the consummation of the sale process.  For the reasons set forth in the DIP Financing Motion and herein, I respectfully request the Court to approve the DIP Financing Motion.

## PART IV
## CONCLUSION

81.    This Declaration illustrates the factors that have led to the commencement of the Chapter 11 Cases and the need for the relief requested in the First Day Pleadings.  For the reasons described herein and in the First Day Pleadings which are incorporated herein by reference, I believe that the prospect for achieving the objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Pleadings.

### 28 U.S.C.  § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 7th day of December, 2020 in Tamarac, Florida.

/s/ _____

Neil F. Luria
Chief Restructuring Officer

10138527-11