

**ORDERED in the Southern District of Florida on December 31, 2020.**



Peter D. Russin, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

TAMARAC 10200, LLC and                    Case No. 20-bk-23346-PDR
UNIPHARMA, LLC,                            Case No. 20-bk-23348-PDR

      Debtors[1].                          Chapter 11 Cases
                                           (Jointly Administered)

_____/

**FINAL ORDER**
**(I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED**
**FINANCING  AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE**
**PROTECTION  TO SENIOR SECURED LENDER, (III) GRANTING LIENS AND**
**SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, AND**
**(V) GRANTING RELATED RELIEF**

Upon the *Emergency Motion (I) Authorizing the Debtors to Obtain Postpetition*

*Financing, (II) Authorizing the Debtors to Use the Cash Collateral, (III) Granting Adequate*

*Protection to Senior Secured Lender, (IV) Granting Liens and Superpriority Claims, (V) Modifying*

*the Automatic Stay, and (VI) Scheduling a Final Hearing* (ECF No. 20) (the "**Motion**") filed by

Unipharma, LLC (the "**Borrower**") and Tamarac 10200, LLC, as debtors and debtors-in-

---

[1] The last four digits of each Debtor's federal tax identification number are Tamarac 10200, LLC (2050) and Unipharma, LLC (8962).  The address of the Debtors is 10200 N.W. 67th Street, Tamarac, FL 33321.

possession (the "**Debtors**") in the above-captioned case (the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 4001-2, 4001-3, 9013-1(F)-(H) and 9075-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Florida (the "**Local Rules**"), and the *Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (the "**Guidelines**") seeking, among other things:

A.     authorization for the Debtors to receive senior secured debtor-in-possession term loan financing (the "**DIP Financing**") in an aggregate principal amount of up to $15,600,000 of commitments (the "**DIP Commitments**"), subject to commitment increases (the "**Commitment Increases**") in the DIP Lender's (as defined below) sole discretion, but subject to the requirements of the terms of paragraph 15(d) hereof, in an aggregate amount not to exceed $2,000,000  to make term loans (the "**DIP Facility**"), of which $1,300,000 (plus accrued and unpaid interest thereon) shall consist of a deemed roll-up (the "**DIP Roll-Up**") and refinancing on a dollar-for-dollar basis of a portion of the Senior Secured Obligations (as defined below) provided on November 20, 2020 and on December 4, 2020 on a prepetition emergency basis pursuant to the Incremental Amendments (as defined below), all on the terms and conditions set forth in this final order (the "**Final Order**") and the DIP Documents (as defined below);

B.     authorization for the Debtors to execute and enter into the Superpriority Secured Debtor-in-Possession Loan Agreement, among the Debtors and NHTV ULM HOLDINGS LLC, as lender thereto (the "**DIP Lender**"), attached hereto as **Exhibit A** (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Loan Agreement**" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, collectively, the "**DIP Documents**"),[2] and the other DIP Documents, and to perform all such other and further acts as may be required in connection with the DIP Facility and the DIP Documents;

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Loan Agreement.

C.  the granting of adequate protection to NHTV ULM Holdings LLC, in its capacity as the lender (the "**Senior Secured Lender**") under that certain Loan Agreement, dated as of September 28, 2018 (as amended by that certain Incremental Amendment to Loan Agreement, dated as of November 20, 2020 (the "**First Incremental Amendment**"), and that certain Second Incremental Amendment to Loan Agreement, dated as of December 4, 2020 (the "**Second Incremental Amendment**" and, together with the First Incremental Amendment, collectively, the "**Incremental Amendments**"), the "**Senior Secured Loan Agreement**"), by and among the Senior Secured Lender, the Borrower, the Pledgors (as defined therein) and Tamarac 10200, LLC as guarantor (the "**Guarantor**" and together with the Borrower, the "**Senior Secured Obligors**");

D.  subject to the restrictions set forth in the DIP Documents and this Final Order, authorization for the Debtors to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which the Senior Secured Lender has an interest and the granting of adequate protection to the Senior Secured Lender with respect to, *inter alia*, such use of Cash Collateral and the other Prepetition Collateral;

E.  subject to certain challenge rights of parties in interest set forth herein, approval of certain stipulations by the Debtors with respect to the Senior Secured Loan Documents (as defined below) and the liens and security interests arising therefrom;

F.  the granting of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lender as well as liens, including priming liens, pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all prepetition and postpetition property of the Debtors' estates and all proceeds thereof (including any Avoidance Proceeds (as defined below));

G.  the waiver of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

H.  a finding that neither the DIP Lender nor the Senior Secured Lender shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral; and

I.  the modification of the automatic stay to the extent set forth herein and in the DIP Documents.

This Court having reviewed the Motion, the exhibits attached thereto, the *Declaration of Neil F. Luria in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), and the evidence submitted at both the interim hearing held on December 9, 2020 (the "**Interim**

Active\118023760.v1-12/30/20

**Hearing**") and the final hearing held on December 30, 2020 (the "**Final Hearing**"); and the Court having entered that certain *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Senior Secured Lender, (III) Granting Liens and Superpriority Claims, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (ECF No. 69) (the "**Interim Order**"); and adequate notice of the Motion and the Final Hearing having been given under the circumstances; and any objections to the Motion having been withdrawn or overruled on the merits; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      <u>Debtor-in-Possession Operation</u>.  On December 7, 2020 (the "**Petition Date**"), the Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334. Venue for the Chapter 11 Cases and proceeding on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      <u>Committee</u>.  On December 18, 2020, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**").

D.      <u>Notice</u>.  Notice of the Motion and the Final Hearing has been provided in accordance with the Bankruptcy Rules and the Local Rules, and no other or further notice of the

Motion with respect to the relief requested at the Final Hearing or the entry of this Final Order shall be required.

      E.    <u>Debtors' Stipulations</u>.  Without prejudice to the rights of the Committee and any other party in interest and subject to the limitations thereon contained in paragraph 13 below, the Debtors admit, acknowledge, agree, and stipulate to the following, which stipulations shall be binding on the Debtors, their estates, and all parties in interest:

      i.    Prior to the Petition Date, the Senior Secured Obligors were indebted and liable to the Senior Secured Lender in respect of the obligations under the Senior Secured Loan Agreement (together with the Incremental Amendments and any ancillary documents, security agreements, guarantees, pledge agreements and notes issued in connection therewith, collectively, the "**Senior Secured Loan Documents**") in the aggregate original principal amount of not less than $61,300,000 plus interest paid in kind that has been capitalized all accrued but unpaid interest (including accrued but unpaid interest paid in kind, interest payable in cash and interest at the default rate, as applicable), fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith, including any "Obligations" as defined in the Senior Secured Loan Agreement (such obligations under the Senior Secured Loan Agreement and the Senior Secured Loan Documents, the "**Senior Secured Loan Obligations**"), and the Debtors are unconditionally liable, without defense, counterclaim, offset or setoff of any kind, with respect to the Senior Secured Loan Obligations.

      ii.    The Senior Secured Loan Obligations constitute legal, valid, and binding obligations of the Senior Secured Loan Documents.  No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Senior Secured Loan Obligations exist.  No portion of the Senior Secured Loan Obligations (including any interest owed

thereunder) is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity. The Senior Secured Loan Documents are valid and enforceable by the Senior Secured Lender against each of the Senior Secured Obligors.

       iii.    To secure the Senior Secured Loan Obligations, the Senior Secured Obligors entered into various security and collateral documents pursuant to and in connection with the Senior Secured Loan Documents, pursuant to which the Senior Secured Lender was granted the benefit of valid, binding, perfected, enforceable, first-priority liens and security interests in the Prepetition Collateral (as defined below) (the "**Senior Secured Loan Liens**"). The Senior Secured Loan Liens provide the Senior Secured Lender with valid, binding, perfected, enforceable, first-priority liens, and security interests in all property described in the Senior Secured Loan Documents, including, without limitation, certain cash collateral as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") and the "Collateral" (as defined in the Senior Secured Loan Agreement) (collectively, the "**Prepetition Collateral**"). All cash of the Debtors and cash proceeds of the Prepetition Collateral, including all such cash and cash proceeds of such Prepetition Collateral held at any time and from time to time in any of the Debtors' securities accounts and banking, checking, or other deposit accounts with financial institutions (in each case, other than trust, escrow, payroll, and custodial funds held as of the Petition Date in properly established trust, escrow, payroll, and custodial accounts), are and will be Cash Collateral of the Senior Secured Lender.

iv.       The Senior Secured Loan Liens are (a) valid, binding, perfected, and enforceable liens on and security interests in the Prepetition Collateral; (b) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity; (c) entitle the Senior Secured Lender to credit bid the entirety of the Senior Secured Loan Obligations pursuant to section 363(k) of the Bankruptcy Code without further challenges from the Debtors or any other party and implemented by the Senior Secured Lender in its absolute discretion; and (d) subject and subordinate only to (1) the Carve-Out (as defined below) and (2) valid and enforceable liens and encumbrances in the Prepetition Collateral (if any) that were expressly permitted to be senior to the Senior Secured Lender's liens under the applicable Senior Secured Loan Documents, that are valid, perfected, enforceable, and non-avoidable as of the Petition Date and that are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors irrevocably waive, for themselves and their estates, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, and enforceability of the Senior Secured Loan Liens or the validity, enforceability, or priority of payment of the Senior Secured Loan Obligations and the Senior Secured Loan Documents.  The Senior Secured Loan Liens were granted to the Senior Secured Lender for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the Senior Secured Loan Documents.  Pursuant to and as more particularly described in the Senior Secured Loan Documents, the Senior Secured Loan Liens are valid,

binding, properly perfected, enforceable, non-avoidable, first-priority liens and security interests in and against the Prepetition Collateral (including, without limitation, Cash Collateral), and are senior in right, priority, operation and effect to all other interests in the Prepetition Collateral (subject to the Senior Liens (as defined below)) in all respects, notwithstanding any provisions of the Uniform Commercial Code or any other Federal, State or foreign law.

      v.      By virtue of any of the actions taken with respect to, in connection with, related to or arising from the Senior Secured Loan Documents, the Senior Secured Lender does not control the Debtors or their properties or operations or have authority to determine the manner in which the Debtors' operations are conducted, and is not a control person or insider of the Debtor.

      vi.      The Borrower has also entered into (a) that certain Promissory Note, dated as of September 28, 2018, in favor of Raimundo J. Santamarta (the "**Individual Shareholder**") in the original face amount of $7,240,529.76 (the "**Individual Shareholder Note**", and together with any other instrument or agreement entered into, now or in the future in connection with the Individual Shareholder Note, and as each such instrument or agreement may be amended, restated, supplemented, or otherwise modified from time to time, the "**Individual Shareholder Note Documents**") and (b) that certain Promissory Note, dated as of September 28, 2018 in favor of Global Capital Invest Finance Ltd. ("**GCIF**") in the original face amount of $73,164,261.36 (the "**GCIF Note**", and together with any other instrument or agreement entered into, now or in the future in connection with the GCIF Note, and as each such instrument or agreement may be amended, restated, supplemented, or otherwise modified from time to time, the "**GCIF Note Documents**") (the Individual Shareholder Note Documents, and the GCIF Note Documents, collectively, the "**Subordinated Note Documents**").

vii.        Pursuant to that certain Subordination Agreement, dated as of September 28, 2018 (the "**Subordination Agreement**"), by and between Individual Shareholder, GCIF (together, the "**Subordinated Creditors**"), and the Senior Secured Lender, and agreed to by the Senior Secured Obligors and the Pledgors (as defined therein), the Subordinated Creditors agreed (a) to subordinate all amounts owing under the Subordinated Note Documents whether presently existing or arising in the future (the "**Subordinated Debt**") to all of the Senior Secured Loan Obligations; (b) to not exercise any rights or remedies with respect to the Debtors' property and the Prepetition Collateral until the Senior Secured Loan Obligations are paid in full; (c) the Subordination Agreement is valid and enforceable by the Senior Secured Lender and shall remain in full force and effect during the Chapter 11 Cases in accordance with Section 510(a) of the Bankruptcy Code; (d) the Senior Secured Loan Obligations shall be paid in full in cash prior to any payment being made to the Subordinated Creditors; (e) to appoint Senior Secured Lender as attorney in fact to vote to accept or reject any plan of reorganization in the Chapter 11 Cases with respect to the Subordinated Creditors' claims in any manner in the Senior Secured Lender's sole discretion; (f) to not oppose or object to the Debtors' use of Cash Collateral or any debtor-in-possession financing provided by the Senior Secured Lender; and (g) not to object to and consent to any sale of the Debtors' assets under section 363 of the Bankruptcy Code, or otherwise, so long as the Senior Secured Lender consents to such sale.

viii.        Events of default have occurred and are continuing under the terms of the Senior Secured Loan Documents.  The Senior Secured Lender expressly reserves all of its respective rights, powers, privileges, and remedies under the Senior Secured Loan Documents.

ix.        The liens granted to the DIP Lender shall be valid, enforceable and non-avoidable liens against the Debtors.

F.    <u>Release</u>.  Subject in all respects to paragraph 13 below, each of the Debtors and the Debtors' estates on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge the DIP Lender, and the Senior Secured Lender, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "**Representatives**"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations (as defined below), the DIP Liens (as defined below), the DIP Documents, the Senior Secured Loan Obligations, the Senior Secured Liens, or the Senior Secured Loan Documents, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender and the Senior Secured Lender. Notwithstanding anything to the contrary contained herein, the releases set forth in this paragraph

Active\118023760.v1-12/30/20

F shall become effective upon the expiration of the Challenge Period (as defined below) solely for the purposes of paragraph 13.

G.    <u>Stipulation Binding on Debtors</u>.  The Debtors' acknowledgments, stipulations, waivers, and releases (solely with respect to the releases, once they become effective) shall be binding  on the Debtors and their respective representatives, successors, and assigns, and on each of the Debtors' estates and all entities and persons, including any creditors of the Debtors, and each of their respective representatives, successors, and assigns, including, without limitation, but subject in all respects to paragraph 13, any trustee or other representative appointed in these Chapter 11 Cases, or upon conversion to chapter 7, whether such trustee or representative is appointed under chapter 11 or chapter 7 of the Bankruptcy Code.

H.    <u>Findings Regarding the DIP Financing and Cash Collateral</u>.

i.    Good and sufficient cause has been shown for the entry of this Final Order.

ii.    The Debtors have an immediate need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral).  The Debtors' borrowings from the DIP Lender under the DIP Facility will be used in a manner consistent with the terms and conditions of the applicable DIP Documents and this Final Order for: (a) working capital and other general corporate purposes of the Debtors solely in accordance with the Budget (as defined in the DIP Loan Agreement); (b) payment of amounts due under the DIP Facility (as applicable), including interest and fees payable thereunder and any adequate protection payments payable pursuant to this Final Order, in accordance with the Budget; (c) the DIP Roll-Up; (d) payment of the professional fees and expenses of administering the Chapter 11 Cases; and (e) other purposes as expressly set forth in this Final Order, the Budget, or as expressly approved by the DIP Lender. Except with the prior written consent of the DIP Lender in its sole discretion, the Debtors shall not

be permitted to use the proceeds of the DIP Facility and the proceeds of the Prepetition Collateral (including the Cash Collateral) in contravention of the provisions of the orders entered in the Chapter 11 Cases (including this Final Order), including any restrictions or limitations on the use of proceeds contained therein.  The Debtors' access to sufficient working capital through the use of Cash Collateral and other Prepetition Collateral and the incurrence of indebtedness under the DIP Facility are necessary and vital to the preservation and maintenance of the going-concern value of the Debtors.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Final Order.  The access by the Debtors' to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Facility (including the DIP Roll-Up), and other financial accommodations provided under the DIP Documents are necessary and vital to avoid an immediate liquidation and for the preservation and maintenance of the going concern value of the Debtors and to a successful restructuring of the Debtors.

        iii.      The Debtors are unable to obtain financing on terms more favorable than that offered by the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Lender, the DIP Liens and the DIP Superpriority Claims (as defined below) on the terms and conditions set forth herein and granting the Adequate Protection Obligations (as defined below), in each case, under the terms and conditions set forth in this Final Order and in the DIP Documents.

iv.        Based on the Motion, the declaration filed in support of the Motion, and the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the DIP Financing, the terms of the Adequate Protection Obligations, and the terms on which the Debtors' may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Final Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

v.        The Senior Secured Lender has consented to the use of Cash Collateral and the other Prepetition Collateral, the priming of the Senior Secured Loan Liens pursuant to section 364(d)(1) of the Bankruptcy Code, and the Debtors' entry into the DIP Documents in accordance with and subject to the terms of this Final Order and the DIP Documents.

vi.        The Subordinated Creditors have consented to (and are otherwise deemed to consent to), for all purposes of the Subordination Agreement, the Senior Secured Loan Documents, and the Subordinated Note Documents to the Debtors' use of Cash Collateral and the incurrence of the DIP Obligations authorized by this Final Order, and under the DIP Credit Agreement, and the Debtors' and DIP Lenders' entry into the DIP Credit Agreement, and the other DIP Documents.

vii.        The DIP Financing, as well as the terms of the Adequate Protection Obligations, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Lender, and the Senior Secured Lender, and their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including: (a) all loans made to and guarantees issued by the Debtors pursuant to the DIP

Documents (collectively, the "**DIP Loans**") and (b) any "Obligations" (as defined in the DIP Loan Agreement) of the Debtors owing to the DIP Lender or any of its affiliates, in accordance with the terms of the DIP Documents, including any obligations, to the extent provided for in the DIP Documents, to indemnify the DIP Lender and to pay any interest, fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the DIP Documents), amounts, charges, costs, indemnities and other obligations that are chargeable or reimbursable under this Final Order or the DIP Documents (the foregoing in clauses (a) and (b) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Lender and its respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  In providing the DIP Loans and consenting to the use of Cash Collateral, the DIP Lender, and the Senior Secured Lender and their Representatives have acted in the best interests of the Debtors' estates, for the benefit of all stakeholders, to preserve and enhance the value of the Prepetition Collateral and maximize recoveries for stakeholders.  The Senior Secured Lender and the DIP Lender have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens), in accordance with the terms hereof, and the Senior Secured Lender (and its Representatives) and the DIP Lender (and its Representatives) shall be entitled to the full protection of section 363(m) of

the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

viii.   The Senior Secured Lender is entitled to the adequate protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral; provided, however, nothing in this Final Order or the other DIP Documents shall (a) be construed as the affirmative consent by the Senior Secured Lender for the use of Cash Collateral, other than on the terms set forth in this Final Order and in the context of the DIP Financing authorized by this Final Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (c) prejudice, limit or otherwise impair the rights of the Senior Secured Lender to seek new, different or additional adequate protection or assert the interests of any of the Senior Secured Lender.

ix.   The Debtors have prepared and delivered to the DIP Lender a Budget (such initial budget, the "**Initial DIP Budget**"), a copy of which is attached hereto as **Exhibit B**.  The Initial DIP Budget reflects the Debtors' anticipated net cash flow and anticipated disbursements for each month during the period from the Petition Date through and including April 5, 2021.  The Initial DIP Budget may be modified, amended and updated from time to time in accordance with the DIP Loan Agreement, and once approved in form and substance satisfactory to the DIP Lender (in its sole discretion), shall supplement and replace the Initial DIP Budget (the Initial DIP Budget

and each subsequent approved budget, shall constitute without duplication, an "**Approved Budget**"). The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances. The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget, the other DIP Documents, and this Final Order in determining to enter into the postpetition financing arrangements provided for in this Final Order.

x.    The Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rules 4001-2 and 9075-1. Absent granting the relief set forth in this Final Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing, including the DIP Roll-Up, and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Final Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

I.    <u>Senior Secured Lender Good Faith</u>. By virtue of the stipulations and findings in this Final Order related to the Senior Secured Loan Obligations and the DIP Financing, and the Senior Secured Lender agreeing to provide the DIP Financing and the DIP Facility in its capacity as a DIP Lender, no "cause" has been shown to limited or otherwise impair the Senior Secured Lender's right to credit bid the Senior Secured Loan Obligations pursuant to Section 363(k) of the Bankruptcy Code.

J.    <u>Sections 506(c) and 552(b)</u>. In light of, among other things, the Senior Secured Lender's agreement to subordinate the Senior Secured Loan Liens and Senior Secured Loan Obligations to the DIP Liens and the Adequate Protection Liens, and to permit the use of the DIP Facility and Cash Collateral for payments made in accordance with the terms of this Final Order and the other DIP Documents, including the Approved Budget (and specifically including the fees

and expenses of the Committee's professionals), the DIP Lender and the Senior Secured Lender are entitled to a waiver of (i) the provisions of Bankruptcy Code section 506(c), (ii) any "equities of the case" claims under Bankruptcy Code section 552(b), and (iii) the equitable doctrine of "marshaling" or any similar doctrine.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      <u>DIP Financing Approved</u>.  The Motion is granted on a final basis as set forth herein, and the use of Cash Collateral on a final basis is authorized, subject to the terms of this Final Order.

2.      <u>Objections Overruled</u>.  Any objections, reservations of rights, or other statements with respect to entry of the Final Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Final Order shall become effective immediately upon its entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062 and 9014.

3.      <u>Authorization of the DIP Financing and the DIP Documents</u>.

(a)      The Debtors are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Debtors are hereby authorized to borrow money pursuant to the DIP Loan Agreement in an aggregate principal or face amount not to exceed $15,600,000 under the DIP Facility (including the DIP Roll-Up), subject to the Commitment Increases, which shall be used for all purposes permitted under the DIP Documents (and subject to the terms and conditions set forth herein and therein).

(b)      In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including the execution or recordation of security agreements,

mortgages and financing statements), and to pay all fees (including the Original Issue Discount) that may be reasonably required or necessary for the Debtors' performance of their obligations under or related to the DIP Financing, including:

(i)    <u>Entry/Execution</u>.  The execution and delivery of, and performance under, each of the DIP Documents;

(ii)    <u>Amendment</u>.  The execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Lender may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including any attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or materially and negatively impact the Global Settlement (as defined below);

(iii)    <u>Repayment</u>.  The incurrence of, and the non-refundable payment to the DIP Lender, of any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Loan Agreement, and the costs and expenses as may be due from time to time, including fees and expenses of the professionals retained by the DIP Lender, in each case, as provided for in the DIP Documents, shall be without the

18

need to file retention or fee applications or to provide notice to any party, other than as provided in paragraph 14 hereof; and

(iv)  <u>Performance</u>.  The performance of all other acts required under or in connection with the DIP Documents, including effectuating the Commitment Increases with the approval of the DIP Lender (in its sole discretion), and the granting of the DIP Liens and DIP Superpriority Claims and perfection of the DIP Liens as permitted herein and therein.

(c)  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Debtors, enforceable against the Debtors in accordance with the terms of the DIP Documents and this Final Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Final Order to the DIP Lender shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548 or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim.

(d)  The Initial DIP Budget is approved in its entirety.  Not later than 5:00 PM (Eastern Standard Time) on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person, shall deliver to the Debtors and the DIP Lender a statement setting forth the actual amount of fees and expenses incurred during the preceding week by such Professional Person (through the Saturday of such week, the "**Calculation Date**") along with a good-faith estimate of such Professional Person's cumulative total amount of unpaid fees and expenses incurred through the applicable Calculation Date.

4.      <u>DIP Superpriority Claims</u>.  Subject only to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof (excluding the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) subject to the interests of the Liquidating Trust (as defined in the Amended Plan) pursuant to the Global Settlement described in Paragraph 43 below.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

20

5.     <u>DIP Liens</u>.  As security for the DIP Obligations, effective and perfected upon the date of this Final Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted to the DIP Lender for its own benefit (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "**DIP Collateral**"), subject only to the Carve-Out (all such liens and security interests granted to the DIP Lender pursuant to this Final Order and the DIP Documents, the "**DIP Liens**"):

(a)     <u>First Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien (collectively, "**Unencumbered Property**"), including any and all unencumbered cash of the Debtors and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than the Avoidance Actions, including the

Avoidance Proceeds, subject to the interests of the Liquidating Trust pursuant to the Global Settlement described in Paragraph 43 below.;

(b)      <u>Priming Liens on Prepetition Collateral</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and postpetition property of the Debtors (including any and all cash and cash collateral and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including post-petition intercompany claims against any Debtor), contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing), whether now existing or hereafter acquired, that is subject to the Senior Secured Loan Liens, which lien shall be senior in all respects to such Senior Secured Loan Liens.  Such security interests and liens shall be senior in all respects to the interests in such property of the Senior Secured Lender arising from current and future liens of the Senior Secured Lender (including the Adequate Protection Liens granted hereunder);

(c)      <u>DIP Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Debtors subject to valid, binding, and unavoidable liens that are otherwise senior to the Senior Secured Loan Liens as of the Petition Date (the "**Senior Liens**"); and

(d)    <u>DIP Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be (i) subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (b) unless otherwise provided for in the DIP Documents or in this Final Order, any liens or security interests arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (c) any intercompany or affiliate liens of the Debtors, or (d) any orders of attachment or judicial liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.

6.    <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized, subject to the terms and conditions of this Final Order, to use all Cash Collateral; provided, however, (a) the Senior Secured Lender is granted the adequate protection as hereinafter set forth and (b) except on the terms and conditions of this Final Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

7.    <u>Adequate Protection of Senior Secured Lender</u>.  The Senior Secured Lender is entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of its interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Senior Secured Lender's interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral (including Cash Collateral), the priming of the Senior Secured Lender's security interests and liens on the Prepetition Collateral (including Cash Collateral) by the DIP Lender

23

pursuant to the DIP Documents, the Interim Order, and this Final Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Adequate Protection Claim**").  In consideration of the foregoing, the Senior Secured Lender, as applicable, shall receive the following (collectively, the "**Adequate Protection Obligations**"):

(a)    Adequate Protection Liens.  The Senior Secured Lender is hereby granted (effective and perfected and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Adequate Protection Claim, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral including all Unencumbered Property, and the Avoidance Proceeds, in each case subject and subordinate only to (i) the DIP Liens and any liens to which the DIP Liens are junior, including the Senior Liens, if any, (ii) the Carve-Out and (iii) the interests and amounts due to the Liquidating Trust pursuant to the Global Settlement described in Paragraph 43 below (the "**Adequate Protection Liens**").

(b)    Adequate Protection Section 507(b) Claim.  The Senior Secured Lender is hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claim with, except as set forth in this Final Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Adequate Protection 507(b) Claim**"), which Adequate Protection 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral in accordance with the priorities set forth herein, including the Avoidance Proceeds, subject to the interests of the Liquidating Trust pursuant to the Global Settlement described in Paragraph 43 below   The Adequate Protection 507(b) Claim shall be subject and subordinate to the Carve-Out,  the DIP

24

Superpriority Claims and the interests of the Liquidating Trust pursuant to the Global Settlement described in Paragraph 43 below.  Except to the extent expressly set forth in this Final Order or the DIP Loan Agreement, the Senior Secured Lender shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims, including claims that benefit from the Carve-Out, have indefeasibly been paid in cash in full and all DIP Commitments have been terminated.

(c)    Adequate Protection Payments.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of Paragraph 14 of this Final Order, all reasonable and documented out-of-pocket fees and expenses (the "**Adequate Protection Fees**"), whether incurred before or after the Petition Date, including all reasonable and documented out-of-pocket fees and expenses of the Senior Secured Lender and the DIP Lender and for the counsel and other professionals retained as provided for in the DIP Documents and this Final Order.  None of the Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

8.    Application of Proceeds of Collateral.  As a condition to entry into the DIP Loan Agreement, the extension of funds under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Lender, and the Senior Secured Lender, in their respective capacities, have agreed that as of and commencing on the date of the Interim Order (and continuing upon entry of this Final Order), and to the extent set forth therein, the Debtors shall apply the proceeds of DIP

Collateral and Prepetition Collateral solely in accordance with this Final Order, the DIP Documents, the Senior Secured Loan Documents, and the Approved Budget.

9.    <u>Milestones</u>.  The DIP Lender and Senior Secured Lender are hereby entitled to performance of the following milestones by the dates set forth below (or such later date as may be agreed by the DIP Lender and the Senior Secured Lender, in their respective capacities) (the "**Milestones**"), and for the avoidance of doubt, the failure of the Debtors to comply with any of the Milestones shall constitute an immediate Event of Default under the DIP Loan Agreement and this Final Order and permit DIP Lender and the Senior Secured Lender to exercise the rights and remedies provided for in this Final Order and the DIP Documents:

>   a.    On the Petition Date, (i) the Debtors shall file a motion with the Bankruptcy Court seeking approval of the Interim Order and (ii) the Debtors shall have entered into the Stalking Horse APA.

>   b.    On or before the date that is one (1) calendar day after the Petition Date, the Debtors shall have filed the Bidding Procedures Motion in the Bankruptcy Court.

>   c.    On or before the date that is two (2) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

>   d.    On or before the date that is ten (10) calendar days after the Petition Date, the Debtors shall have filed (i) the Acceptable Chapter 11 Plan; (ii) the Disclosure Statement; and (iii) a motion to approve the Disclosure Statement; and (iv) solicitation materials with respect to the Acceptable Chapter 11 Plan and Disclosure Statement, and each of which shall be in form and substance satisfactory to the Senior Secured Lender and the DIP Lender.

>   e.    On or before the date that is fifteen (15) calendar days after the Petition Date, each of the Debtors shall have filed schedules and statements of financial affairs pursuant to Rule 1007 of the Federal Rule of Bankruptcy Procedure.

>   f.    On or before the date that is twenty-five (25) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order and this Final Order.

g.      On or before the date that is forty-two (42) calendar days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

h.      On or before the date that is forty-four (44) calendar days after the Petition Date, the Debtors shall have commenced the Auction, if necessary.

i.      On or before the date that is forty-five (46) calendar days after the Petition Date, a hearing shall have occurred in the Bankruptcy Court to consider approval of the (i) Stalking Horse APA and the Stalking Horse Transaction, or another alternative transaction pursuant to the Bidding Procedures and (ii) the Disclosure Statement.

j.      On or before the date that is forty-five (46) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.

k.      On or before the date that is sixty (60) calendar days after the Petition Date, the Stalking Horse Transaction or another the sale transaction approved in the Sale Order shall be consummated and closed.

l.      On or before the date that is eighty-five (85) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order in a form and substance acceptable to the DIP Lender and the Senior Secured Lender.

m.      On or before the date that is ninety (90) calendar days after the Petition Date, the consummation of the Acceptable Chapter 11 Plan, including all transactions contemplated thereunder, shall have occurred.

10.      <u>Event of Default</u>.  With respect to the (a) the DIP Lender and the DIP Facility or (b) the Senior Secured Lender and the Debtors use of Cash Collateral, for purposes of this Final Order an "**Event of Default**" means an Event of Default as defined in the DIP Loan Agreement. Notwithstanding anything in this Final Order, following an Event of Default, the Senior Secured Lender shall be stayed from enforcing any rights and remedies under this Final Order unless and until the DIP Lender has delivered a Trigger Notice (as defined below) or consents to such enforcement.

11.      <u>Remedies Upon Event of Default</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP Lender and Senior Secured Lender (as applicable) to enforce all of their rights under the DIP Documents and

Senior Secured Loan Documents and (a) immediately upon the occurrence of an Event of Default, declare (i) the termination, reduction or restriction of Cash Collateral and any further DIP Commitments to the extent any such DIP Commitment remains in effect and (ii) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors and (b) upon the occurrence of an Event of Default and the giving of five (5) business days' prior written notice (the "**Remedies Notice Period**") (which shall run concurrently with any notice required to be provided under the DIP Documents or Senior Secured Loan Documents) via email to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee to (i) immediately terminate consent to the Debtors' continued use of Cash Collateral and/or the DIP Facility and (ii) exercise all other rights and remedies provided for in the DIP Documents, Senior Secured Loan Documents, and under applicable law.  Notwithstanding anything in the Interim Order, or this Final Order, during the Remedies Notice Period, the Debtors may only use Cash Collateral with the express written consent of the DIP Lender and the Senior Secured Lender in their respective capacities.  In any hearing regarding any exercise of rights or remedies under the Senior Secured Loan Documents or the DIP Documents, the only issues that may be raised by the Debtors and any other parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and any other parties in interest hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Lender or the Senior Secured Lender set forth in this Final Order, the DIP Documents, or the Senior Secured Loan Documents. No rights, protections or remedies of the DIP Lender and the Senior Secured Lender granted by the provisions of this Final Order, the DIP Documents, or Senior Secured Loan Documents shall

Active\118023760.v1-12/30/20

be limited, modified or impaired in any way by: (a) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (b) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (c) except as provided herein, the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

12.    <u>No Marshaling</u>.  Neither the DIP Lender nor the Senior Secured Lender shall be subject to (a) the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral or (b) the "equities of the case" exception in section 552(b) of the Bankruptcy Code

13.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' stipulations, admissions, releases, and agreements contained in this Final Order, including in paragraph E and F of this Final Order, shall be binding upon the Debtors and any successor thereto (including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, releases, and agreements contained in this Final Order, including in paragraphs E and F of this Final Order, shall be binding upon all other parties in interest, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Committee) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtors, in all circumstances and for all purposes unless:  (a) such committee, or any other party in interest, with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, among others, in this paragraph 13) by no later than (i) (x) with respect to parties

in interest with requisite standing other than the Committee, 60 calendar days after entry of the Interim Order and (y) with respect to the Committee, 60 calendar days after the appointment of the Committee (December 18 , 2020), and (ii) any such later date as has been agreed to, in writing, by the Senior Secured Lender (the time period established by the foregoing clauses (i) and (ii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of any of the Senior Secured Loan Obligations or the Senior Secured Loan Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against either the Senior Secured Lender or their respective Representatives in connection with matters related to the Senior Secured Loan Documents, the Senior Secured Loan Obligations, the Senior Secured Loan Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; provided, however, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified before the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If (a) no such Challenge is timely and properly filed during the Challenge Period, or (b) the Court does not rule in favor of the plaintiff in any such proceeding then: (i) the Debtors' stipulations, admissions, releases, and agreements contained in this Final Order, including those contained in paragraphs E and F of this Final Order, shall be binding on all parties in interest, including the Committee; (ii) the obligations of the Debtors under the Senior Secured Loan Documents, including the Senior Secured Loan Obligations, shall constitute allowed claims (without the need to file a proof of claim) not subject to defense, claim, counterclaim,

recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (iii) the Senior Secured Loan Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens on the Prepetition Collateral, not subject to recharacterization, subordination, avoidance or other defense; and (iv) the Senior Secured Loan Obligations and the Senior Secured Loan Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by the Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtor) and any defenses, claims, causes of action, counterclaims and offsets by the Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, including any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtor), whether arising under the Bankruptcy Code or otherwise, against the Senior Secured Lender and their Representatives arising out of or relating to any of the Senior Secured Loan Documents shall be deemed forever waived, released and barred. If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, releases, and agreements contained in this Final Order, including those contained in paragraphs D and E of this Final Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases, including the Committee, and on any other person or entity, except to the extent that such stipulations, admissions, releases, and agreements were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable

order of a court of competent jurisdiction.  Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee  or any non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including Challenges with respect to the Senior Secured Loan Documents, the Senior Secured Loan Obligations, or the Senior Secured Loan Liens.

14.    <u>Fees & Expenses</u>.  The Debtors are authorized and directed to pay any and all reasonable and documented fees and expenses of the DIP Lender and Senior Secured Lender in connection with the DIP Documents, the Senior Secured Loan Documents, and the Adequate Protection Obligations, including the fees and expenses of attorneys, advisors, accountants and other consultants, whether incurred before, on or after the Petition Date and whether or not the transactions contemplated hereby are consummated, including, but not limited to fees and expenses incurred in connection with (a) the preparation, negotiation and execution of the DIP Orders, the DIP Documents, and the Adequate Protection Obligations; (b) the creation, perfection or protection of the DIP Liens and the Adequate Protection (including all search, filing and recording fees); (c) the on-going administration of the DIP Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Chapter 11 Cases (including the filing of any proofs of claim); (d) the enforcement of the DIP Documents, the DIP Orders or the Senior Secured Loan Documents; and (e) any legal proceeding relating to or arising out of the DIP Facilities or the other transactions contemplated by the DIP Documents, the DIP Orders, and the Senior Secured Loan Documents including the Chapter 11 Cases and credit bid of the DIP Obligations and/or the Senior Secured Loan Obligations. Payment of all such professional fees and expenses shall not be subject to

allowance by the Bankruptcy Court or to the U.S. Trustee guidelines; provided that requests for payment of such professional fees and expenses shall be provided to the Debtors, the U.S. Trustee and the Committee on a 10 days' notice.  Such reasonable and documented fees and expenses shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

      15.   <u>Carve-out</u>.

      (a)   For purposes hereof, the "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (iii) all accrued and unpaid fees and expenses (including, but not limited to, any "Deferred Restructuring Fee" as detailed in that certain engagement letter (the "**Solic Engagement Letter**") dated November 10, 2020 between and among the Debtors, SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (the "**Deferred Restructuring Fee**")) or otherwise of persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") to the extent allowed at any time (collectively, the "**Allowed Debtor Professional Fees**"); (iv) all accrued and unpaid hourly fees and expenses to the extent allowed at any time (collectively, the "**Allowed Committee Professional Fees**" and together with the Allowed Debtor Professional Fees, the "**Allowed Professional Fees**") of persons or firms retained by any official committee of unsecured creditors (the "**Committee**") in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code (the "**Committee Professionals**, together with the Debtor Professionals, the "**Professional Persons**") (strictly subject to the Approved Budget and the line items applicable to  the Debtor Professionals,

Active\118023760.v1-12/30/20

the Committee and the Committee Professionals set forth therein) incurred at any time on or before the Debtors' receipt of the Trigger Notice (as defined below); (v) the amounts set forth in the Approved Budget for Committee Professionals to the extent not already funded or paid; and (vi) Allowed Professional Fees incurred after the Debtors' receipt of the Trigger Notice in an amount not to exceed the sum of (x) of $500,000 plus (y) the Deferred Restructuring Fee, provided that the Deferred Restructuring Fee is then due and owing or thereafter becomes due and owing pursuant to the terms of the SOLIC Engagement Letter (the "**Debtor Trigger Notice Cap**") with respect to the Debtor Professionals (collectively, (i)-(vi), the "**Carve-Out Cap**"), in each case subject to the limits imposed by this Final Order, the Approved Budget, or otherwise, on Allowed Professional Fees permitted to be incurred, including in connection with any permitted investigation of the claims, liens, and defenses against the Senior Secured Lender; provided, however, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii), (iv); (v) and (vi) above on any other grounds.  "**Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice shall be delivered following (i) the occurrence and during the continuation of an Event of Default (as defined in the DIP Loan Agreement) and (ii) acceleration of the DIP Obligations under the DIP Facility, stating that the Carve-Out Cap has been invoked.

(b)    On a weekly basis, the Debtors shall fund from borrowings under the DIP Facility the Funded Reserve Amount (as defined below), into a segregated account (the "**Funded Reserve Account**") at the DIP Lender for the benefit of Professional Persons, an amount (the "**Funded Reserve Amount**") equal to the sum of, the total weekly fees of Debtor and Committee

Professionals for the current week subject to the Approved Budget. For the avoidance of doubt, the DIP Lenders shall have no obligation to fund aggregate fees and expenses in excess of (i) the amounts set forth in the Approved Budget or (ii) subject, to the DIP Lender Carve-Out Increase Notice, the DIP Commitments. Upon entry of this Final Order, the Debtors shall fund an amount equal to the Debtor Trigger Notice Cap into the Funded Reserve Account. Upon the Deferred Restructuring Fee being earned, in accordance with the terms of the Solic Engagement Letter and the Approved Budget, an amount equal to the Deferred Restructuring Fee (subject to the terms of the Solic Engagement Letter) shall be funded into the Funded Reserve Account or otherwise paid pursuant to an order of the Court with respect to the Solic Engagement Letter. The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Debtor and Committee Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy Court; provided that no Allowed Professional Fees shall be paid from the Funded Reserve Account in excess of the applicable line items in the Approved Budget. Funds transferred to the Funded Reserve Account shall not be subject to any liens or claims granted to the Senior Secured Lender or the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute cash collateral or assets of the Debtors' estates; provided, that, notwithstanding anything to the contrary herein or in the DIP Documents, the DIP Collateral shall include the Debtors' reversionary interest in funds held in the Funded Reserve Account and such reversionary interest shall be treated as DIP Collateral and subject to the DIP Liens and the DIP Superpriority Claims.

(c)    On the day on which a Trigger Notice is given by the DIP Lender to the Debtors (the "**Termination Declaration Date**"), the Trigger Notice shall (i) first, constitute a demand to

the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by the Debtors, to fund the Funded Reserve Account (to the extent not already funded) an amount equal to unpaid Allowed Professional Fees in the Approved Budget as of the Termination Declaration Date and (ii) only if after utilizing all available cash on hand as of the Termination Declaration Date to fund the Funded Reserve Account as set forth above in (i) of this sentence, be deemed a draw request and notice of borrowing by the Debtors under the DIP Facility (any such amounts actually advanced shall constitute DIP Loans) to fund the Funded Reserve Account. The Debtors shall deposit and hold such amounts in the Funded Reserve Account in trust to pay such then unpaid Allowed Professional Fees in the Approved Budget prior to any and all other claims (the "**Pre-Carve-Out Trigger Notice Reserve**"). On the Termination Declaration Date, the Trigger Notice shall also (i) first, constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by the Debtors, after funding the Pre-Carve-Out Trigger Notice Reserve, to fund the Funded Reserve Amount in an amount equal to the Carve-Out Cap (less any amounts already funded into the Funded Reserve Account) (any such amounts actually advanced shall constitute DIP Loans), and (ii) only if after utilizing all available cash on hand as of the Termination Declaration Date to fund the Carve-Out Cap as set forth above in (i) sentence, be deemed a draw request and notice of borrowing by the Debtors under the DIP Facility (any such amounts actually advanced shall constitute DIP Loans) to fund the Carve-Out Cap into the Funded Reserve Account. The Debtors shall deposit and hold such amounts in the Funded Reserve Account to pay such then unpaid Allowed Professional Fees benefiting from the Carve-Out Cap (the "**Post Carve-Out Trigger Notice Reserve**" and, together with the Pre Carve-Out Trigger Notice Reserve, the "**Carve-Out Reserves**") prior to any and all other claims. Notwithstanding any restriction on the Debtors' use of Cash Collateral, all funds in the Pre-Carve-Out Trigger

Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (v) of the definition of Carve-Out set forth above (the "**Pre-Carve-Out Amounts**"), but not, for the avoidance of doubt, the Post Carve-Out Trigger Notice Reserve , until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Senior Secured Lender.  Notwithstanding any restriction on the Debtors' use of Cash Collateral, all funds in the Post Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (vi) of the definition of Carve-Out set forth above (the "**Post-Carve-Out Amounts**"), and then, to the extent the Post Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Senior Secured Lender.  Notwithstanding anything to the contrary in the DIP Documents, or this Final Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in this Paragraph 15, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this Paragraph 15, prior to making any payments to the DIP Lender or the Senior Secured Lender, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve-Out Trigger Notice, the DIP Lender and the Senior Secured Lender shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the

DIP Lender for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, (iii) in no way shall the Approved Budget, Carve-Out, Post Carve-Out Trigger Notice Reserve, Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors Professionals, and (iv) subject to the DIP Lender Carve-Out Increase Notice, under no circumstances shall the DIP Lender have any obligation to extend DIP Loans in excess of the amounts authorized under this Final Order or the DIP Commitments.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in any facility pursuant to Prepetition Credit Agreements, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the DIP Superpriority Claims, and the Adequate Protection Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Senior Secured Loan Obligations (including, but not limited to the, DIP Liens, DIP Collateral, Adequate Protection Claim, Adequate Protection 507(b) Claim, and Adequate Protection Fees).

(d)    Notwithstanding anything to the contrary in this Final Order or the DIP Documents, upon the Termination Declaration Date, if (i) after complying with all of the terms of paragraphs 15(b)-(c) of this Final Order, the Debtors are unable to fully fund either the Allowed Debtor Professional Fees portion of the Pre-Carve-Out Trigger Notice Reserve or the Debtor Trigger Notice Cap portion of the Carve-Out Cap because the DIP Facility is fully drawn and no further DIP Commitments are available *and* (ii) as of the Termination Declaration Date, the Debtors have

Active\118023760.v1-12/30/20

made payments to the DIP Lender that exceed the budgeted amount of payments to the DIP Lender pursuant to the Approved Budget under the line item "Lender/DIP Professionals" (any such amount exceeding the budgeted amount in the Approved Budget, "**DIP Lender Professional Fee Excess**"), then, and only if (i) and (ii) of this sentence (the "**DIP Lender Carve-Out Increase Conditions**") are satisfied, the Debtors may deliver a notice to the DIP Lender signed by the Debtors' Chief Restructuring Officer (the "**DIP Lender Carve-Out Increase Notice**") setting forth the amount of the DIP Lender Professional Fee Excess and certifying that each of the DIP Lender Carve-Out Increase Conditions have been satisfied. Upon receipt of the DIP Lender Carve-Out Increase Notice by the DIP Lender and the satisfaction of the DIP Lender Carve-Out Increase Conditions, the DIP Lender shall transfer to the Funded Reserve Account, an amount equal to the lesser of any of (i) the DIP Lender Professional Fee Excess; (ii) the amount necessary to fund the Allowed Debtor Professional Fee portion of the Pre-Carve-Out Trigger Notice Reserve and the Debtor Trigger Notice Cap portion of the Carve-Out Cap; and (iii) the amount of the unused Commitment Increases.

(e)    Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (i) the investigation (other than, before the receipt of a Trigger Notice, as permitted under paragraph 15 of this Final Order), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Lender and the Senior Secured Lender, each in such capacity, and their respective agents, attorneys, advisors or representatives, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Senior Secured Loan Documents, including the Senior Secured Loan Obligations, (whether in such

capacity or otherwise), including, in each case, for lender liability or pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise, (ii) attempts to modify any of the rights granted to the DIP Lender or the Senior Secured Lender hereunder or under the applicable DIP Documents or Senior Secured Loan Documents, (iii) attempts to prevent, hinder, or otherwise delay any of the DIP Lender's assertion, enforcement or realization upon any DIP Collateral or Prepetition Collateral in accordance with the DIP Documents, this Final Order, or (iv) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of the Court and permitted under the DIP Documents, including the Approved Budget.

16.    <u>Protection of DIP Lender's Rights</u>.

(a)    So long as there are any DIP Obligations, outstanding or the DIP Lender has any outstanding DIP Commitments under the DIP Loan Agreement, or the Senior Secured Loan Obligations are outstanding, the Subordinated Creditors shall: (i) have no right to and shall take no action to directly or indirectly foreclose upon, or recover in connection with, the Subordinated Debt, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral or the Prepetition Collateral; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on the DIP Collateral or the Prepetition Collateral; and (iii) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases, or assignments in favor of the DIP Lender or other documents necessary to effectuate the sale of any DIP Collateral or Prepetition Collateral.

(b)    To the extent the Senior Secured Lender or Subordinated Creditors have possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a

titled good constituting Prepetition Collateral or DIP Collateral, then the Senior Secured Lender of Subordinated Creditors shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee or gratuitous agent for perfection for the benefit of the DIP Lender, and shall comply with the instructions of the DIP Lender with respect to the exercise of such control.

(c)    Other than as expressly consented to in writing by the DIP Lender, any proceeds of Prepetition Collateral received by the Senior Secured Lender or the Subordinated Creditors in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by the Senior Secured Lender, in its respective capacity, (other than on account of the Adequate Protection Obligations) or the Subordinated Creditors shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Lender in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.

17.    <u>Limitation on Charging Expenses Against Collateral</u>.    No costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender or the Senior Secured Lender, in their respective capacities, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Senior Secured Lender and nothing contained in this Final Order shall be deemed to be a consent by the DIP Lender or the Senior Secured Lender

41

to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

18.     <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to the DIP Lender or the Senior Secured Lender pursuant to the provisions of the Interim Order or this Final Order or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, whether asserted or assessed by, through or on behalf of the Debtors.

19.     <u>Reservation of Rights of Senior Secured Lender</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable to protect the interests of the Senior Secured Lender.

20.     <u>Consent to Adequate Protection; Right to Seek Additional Adequate Protection; No Admission</u>.  The Senior Secured Lender is deemed to have consented to the Adequate Protection Obligations, the priming of the Senior Secured Loan Liens by the DIP Liens, and the use of Cash Collateral provided for herein; provided, however, that such consent is expressly conditioned upon the entry of this Final Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Documents; and provided further, however, that such consent shall be of no force and effect in the event this Final Order is reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Senior Secured Lender) or the DIP Documents and DIP Facility as set forth herein are not approved.  The Adequate Protection Claims provided to the Senior Secured Lender hereunder adequately protects the Senior Secured Lender as of the date hereof; provided, however, this Final Order: (a) is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Senior

Secured Lender to request additional or alternative forms of adequate protection from the Debtors; and (b) shall not be deemed an admission, acknowledgement, or stipulation by the Senior Secured Lender that the Senior Secured Lender is in fact adequately protected by the terms and conditions of this Final Order or otherwise following the date of this Final Order.

21.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    The DIP Lender, and the Senior Secured Lender are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Lender or the Senior Secured Lender shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Final Order.  Upon the request of the DIP Lender, the Debtors, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

Active\118023760.v1-12/30/20

(b)      A certified copy of this Final Order may, in the discretion of the DIP Lender and the Senior Secured Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code is hereby modified to the extent necessary to permit the DIP Lender and the Senior Secured Lender to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)      Notwithstanding anything to the contrary in the Motion, the DIP Documents or this Final Order, for purposes of this Final Order, in no event shall the DIP Collateral include, or the DIP Liens or Adequate Protection Liens attach to, any lease, license, contract or agreement or other property right to which the Debtors are a party, or any such relevant Debtors' rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in:  (i) the abandonment, invalidation, unenforceability or other impairment of any right, title or interest of the Debtors therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract or agreement or other property right pursuant to any provision thereof, unless, in the case of each of clauses (i) and (ii), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements or other property rights are collectively referred to as the "**Specified Contracts**"); provided, however, the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection 507(b) Claims shall in all events attach to and have recourse from all proceeds, products, offspring or profits from any and all Specified Contracts (including from the sale, transfer, disposition or monetization thereof).

22.     <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner, any responsible officer or any other estate representative subsequently appointed in these Chapter 11 Cases or any successor case, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Documents at any time before the repayment in full in cash of (a) all DIP Obligations and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, and (b) all Senior Secured Loan Obligations, including subsequent to the confirmation of any plan with respect to the Debtors and the Debtors' estates, and such financing is secured by any DIP Collateral or Prepetition Collateral, then all of the cash proceeds derived from such credit or debt shall immediately be turned over first to the DIP Lender, to be applied as set forth the DIP Documents, and second to the Senior Secured Lender to be applied as set forth in the Senior Secured Loan Documents, except as provided under such confirmed plan (if applicable).

23.     <u>Disposition of DIP Collateral; Rights of DIP Lender</u>.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any DIP Collateral without the prior written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction, or acquiescence), except as expressly permitted in the DIP Documents.

24.     <u>Preservation of Rights Granted Under This Final Order</u>.

(a)     Other than the Carve-Out and other claims and liens expressly granted or permitted by this Final Order and the DIP Documents, no claim or lien having a priority superior to or *pari passu* with those granted by this Final Order to the DIP Lender or the Senior Secured Lender shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations or Senior Secured Loan Obligations remain outstanding.  No lien or security interest shall be granted to any

other party in any of the Specified Contracts without first granting such lien or security interest to the DIP Lender or the Senior Secured Lender, as applicable.

(b)    Notwithstanding any order that may be entered dismissing the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the Adequate Protection 507(b) Claims, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, Adequate Protection 507(b) Claims, DIP Liens, and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Final Order shall not be affected; and (iii) this Court shall, to the extent permitted by applicable law, retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Final Order.

(c)    If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred before the actual receipt of written notice by the DIP Lender or the Senior Secured Lender, as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred or granted by the Debtors to or for the benefit of the DIP Lender or the Senior Secured Lender, as the case may be, before the actual receipt of written notice by the DIP Lender or the Senior Secured Lender, as

46

applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender and the Senior Secured Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations, and Adequate Protection Obligations.

(d)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Lender and the Senior Secured Lender granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting the Chapter 11 Cases to a case under chapter 7, dismissing the Chapter 11 Cases, or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral or Prepetition Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in this Chapter 11 Cases, in any successor cases and in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Lender and the Senior Secured Lender as approved in the Final Order (including the Carve-Out) and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated.

25.    <u>Cash Management</u>.  Unless otherwise agreed by the DIP Lender and the Senior Secured Lender, in their respective capacities, the Debtors shall maintain their cash management arrangements in all material respects in a manner consistent with that described in the applicable "first-day" order and the related motion seeking authorization to continue the Debtors' cash management arrangements.

26.    <u>Limitation on Use of DIP Loans and DIP Collateral</u>.  Notwithstanding any other provision of this Final Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral or any portion of the Carve-Out, may be used directly or indirectly by the Debtors, the Committee, or any trustee appointed in the Chapter 11 Cases or any successor case, including any chapter 7 case, or any other person, party or entity (a) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lender or the Senior Secured Lender or their Representatives, or any action purporting to do the foregoing in respect of the Senior Secured Loan Obligations, liens on the Prepetition Collateral, DIP Obligations, DIP Liens on the DIP Collateral, DIP Superpriority Claims, or the adequate protection obligations, adequate protection liens and superpriority claims granted to the Senior Secured Lender, as applicable, under the Interim Order or the Final Order, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Senior Secured Loan Obligations, the DIP Obligations, or the liens, claims, rights, or security interests granted under the Interim Order, this Final Order, the DIP Documents, or the Senior Secured Loan Documents including, in each case for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; provided, however, advisors to the   Committee may investigate any potential challenges with

respect to the Senior Secured Loan Documents, the Senior Secured Loan Obligations, or Senior Secured Loan Liens during the Challenge Period at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $100,000 in the aggregate; (b) to prevent, hinder, or otherwise delay the Senior Secured Lender or the DIP Lender, as applicable, enforcement or realization on the Senior Secured Loan Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim Order or the Final Order, each in accordance with the DIP Documents, the Senior Secured Loan Documents, or this Final Order, other than, and subject to the notice period set forth in paragraph 11 hereof, to seek a determination that an Event of Default has not occurred or is not continuing; (c) to seek to modify any of the rights and remedies granted to the Senior Secured Lender or the DIP Lender under this Final Order, the Senior Secured Loan Documents or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the Carve-Out or the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and Superpriority Claims granted to the Senior Secured Lender and the DIP Lender unless all DIP Obligations, Senior Secured Loan Obligations, Adequate Protection Obligations, and claims granted to the DIP Lender or Senior Secured Lender under this Final Order, have been refinanced or paid in full in cash or otherwise agreed to in writing by the DIP Lender and the Senior Secured Lender; or (e) to seek to pay any amount on account of any claims arising before the Petition Date unless such payments are agreed to in writing by the DIP Lender or are otherwise included in the Approved Budget.

27.    <u>Loss or Damage to Collateral</u>.  Nothing in this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to

impose or allow the imposition upon the DIP Lender or the Senior Secured Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  The DIP Lender and the Senior Secured Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the DIP Collateral or the Prepetition Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral and the Prepetition Collateral shall be borne by the Debtors.

28.    <u>Credit Bidding</u>.  (a) The DIP Lender shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral and (b) subject to a successful Challenge pursuant to paragraph 13 of this Final Order, the Senior Secured Lender shall have the right to credit bid up to the full amount of the Senior Secured Loan Obligations in the sale of any Prepetition Collateral whether (with respect to both (a) and (b) above, as applicable) pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for the Debtors under section 725 of the Bankruptcy Code and each of the DIP Lender and Senior Secured Lender, in their respective capacities, shall be deemed a qualified bidder (or such analogous term) in connection with any such sale.

29.    <u>Application of Sale Proceeds</u>.  Notwithstanding anything herein: (a) the right of the DIP Lender to consent to the sale of any portion of its collateral, including, without limitation, any Assets, on terms and conditions acceptable to the DIP Lender, are hereby expressly reserved and not modified, waived or impaired and (b) unless otherwise ordered by the Court, including without

limitation pursuant to the Sale Order (as defined in the DIP Documents), all cash proceeds generated from the sale of any assets secured by Senior Secured Loan Liens or DIP Liens shall be paid to the DIP Lender and Senior Secured Lender upon the closing of such sale for permanent application against the obligations owing by the Debtors under the DIP Documents and the Senior Secured Loan Documents in accordance with the terms and conditions of the DIP Order, the Senior Secured Loan Documents and the DIP Documents in accordance with the terms of this Order until such time as all DIP Obligations and Senior Secured Loan Obligations have been paid in full in cash.

30.    <u>Final Order Governs</u>.  In the event of any inconsistency between the provisions of this Final Order, on the one hand, and the DIP Documents or any other order entered by this Court, on the other hand, the provisions of this Final Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to and any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Final Order and the DIP Documents, including the Approved Budget.

31.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including the DIP Lender, the Senior Secured Lender, the Subordinated Creditors, the Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtor) and shall

inure to the benefit of the DIP Lender, the Senior Secured Lender, and the Debtors and their respective successors and assigns; provided, however, the DIP Lender and the Senior Secured Lender shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

32.    No Liability to Third Parties.  The Debtors stipulate and the Court finds that the DIP Lender and the Senior Secured Lender shall not (a) be deemed to have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," "owner or operator," or "participant" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other federal, state, or applicable international statute or regulation) as a result of its consent to the use of Cash Collateral hereunder or (b) owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors as a result of its extension of credit under the DIP Documents or the Senior Secured Loan Documents.

33.    No Standing Granted.  Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including any committee appointed in the Chapter 11 Cases (including the Committee), if any, standing or authority to pursue any challenge or other cause of action belonging to the Debtors or their estates with respect to the Senior Secured Loan Documents or the Senior Secured Obligations.

34.    No Waiver.  No delay or failure by the Senior Secured Lender or the DIP Lender in the exercise of its rights and remedies under the DIP Documents or this Final Order, as

applicable, shall constitute a waiver, in whole or in part, of any of such party's rights hereunder or otherwise.

35.    <u>Proofs of Claim</u>.  The Senior Secured Lender and the DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases or any successor case to assert claims on behalf of itself for payment of it's the Senior Secured Loan Obligations or the DIP Obligations, including any principal, unpaid interest (including default interest therein), fees, expenses, and other amounts under the Senior Secured Loan Documents.  The statements of claim in respect of the Senior Secured Loan Obligations and the DIP Obligations set forth in the Interim Order, and this Final Order, together with any evidence accompanying the Motion and presented at the Interim Hearing and the Final Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  The stipulations of the Debtors set forth in paragraph E hereof shall be deemed to constitute a timely filed proof of claim for the Senior Secured Lender in respect of all of the Senior Secured Loan Obligations.  In addition, the Senior Secured Lender and the DIP Lender shall not be required to file any request for allowance or payment of any administrative expenses, and this Final Order shall be deemed to constitute a timely filed request for allowance or payment of any Senior Secured Loan Obligation or DIP Obligation constituting administrative expenses, as applicable.

36.    <u>Insurance</u>.  To the extent that the Senior Secured Lender is listed as loss payee under the Debtors' insurance policies, the DIP Lender is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in the order of priorities set forth herein.

37.    <u>Effectiveness</u>.  Subject to the rights to assert Challenges as set forth in paragraph 13 of this Final Order, this Final Order shall constitute findings of fact and conclusions of law and

Active\118023760.v1-12/30/20

shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

38.    Headings.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

39.    Payments Held in Trust.  Except as expressly permitted in this Final Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source before indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lender and shall immediately turn over such proceeds to the DIP Lender, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.

40.    Bankruptcy Rules.  The requirements of Local Rules 4001-2, 9013-1(F)-(H) and 9075-1, the Guidelines, and Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

41.    Necessary Action.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Final Order.

Active\118023760.v1-12/30/20

42.      Assignment of DIP Obligations.  The DIP Lender may assign any or all of its rights or obligations under the DIP Loan Agreement (a) at any time, to any affiliate of the DIP Lender, (b) prior to the occurrence of an Event of Default (under and as defined in the DIP Loan Agreement), to any person with the prior written consent of the Borrower, and (c) during an Event of Default (under and as defined in the DIP Loan Agreement), to any other person without the consent of any Loan Party (under and as defined in the DIP Loan Agreement).

43.      Global Settlement.  The Debtors shall amend that certain *Debtors' Joint Plan of Liquidation* (ECF No. 88) (as amended, the "**Amended Plan**") and the related *Disclosure Statement for Debtors' Joint Plan of Liquidation* (ECF No. 87) to reflect the terms of the global settlement as between the Debtors, the DIP Lender, and the Committee as agreed in that certain term sheet between them on December 29, 2020, certain terms of which were recited into the record at the Final Hearing (the "**Global Settlement**").  The Amended Plan and Disclosure Statement shall provide that notwithstanding the terms of this Final DIP Order, the Amended Plan shall control with respect to all of the terms of the Global Settlement.  All of the rights and obligations of the Debtors, the DIP Lender, and the Committee pursuant to this paragraph 43 and the Global Settlement shall immediately terminate upon the filing by the Committee of any Challenge or any motion seeking standing to bring a Challenge.

44.      Chubb Reservation of Rights.  For the avoidance of doubt, nothing, including the DIP Loan Agreement and/or this Final Order, alters or modifies the terms and conditions of any insurance policies issued by ACE American Insurance Company and/or any of its U.S.-based affiliates and any agreements related thereto.

45.      Retention of Jurisdiction.  The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and

consummation of any chapter 11 plan for the Debtors notwithstanding the terms or provisions of

any such chapter 11 plan or any order confirming any such chapter 11 plan.


\*        \*        \*

**Submitted by:**

Christopher Andrew Jarvinen, Esq.
Florida Bar No.  021745
*Counsel for Debtors and*
  *Debtors-in-Possession*
Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Tel. (305) 755-9500
Fax (305) 714-4340
Email:  cjarvinen@bergersingerman.com

**Copy to:**
*(Christopher Andrew Jarvinen, Esq., is directed to serve a copy of this Order upon all interested*
*parties and to file a Certificate of Service).*

**<u>Exhibit A</u>**

**DIP Loan Agreement**

$15,600,000

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT

among

UNIPHARMA, LLC,
as Borrower,

TAMARAC 10200, LLC,
as Guarantor,

and

NHTV ULM HOLDINGS LLC,
as Lender

Dated as of December [___],
2020

Table of Contents

Page

Article I        Definitions..........................................................................................1

Section 1.01        Defined Terms .............................................................1
Section 1.02        Uniform Commercial Code.........................................21

Article II        The Loans...................................................................................21

Section 2.01        Loans..........................................................................21
Section 2.02        Evidence of Debt........................................................22
Section 2.03        Procedure for Borrowing ...........................................22
Section 2.04        Loan Payments; Maturity...........................................22
Section 2.05        Interest........................................................................24
Section 2.06        Termination or Reduction of Commitments ...............24
Section 2.07        Withdrawal of Funds from the DIP Funding Account ...............24
Section 2.08        Increase of Commitments ..........................................26

Article III        Representations and Warranties..................................................26

Section 3.01        Corporate Existence; Power and Authority ...............26
Section 3.02        Enforceability.............................................................27
Section 3.03        Perfected Liens...........................................................27
Section 3.04        No Violation; Compliance with Laws; Governmental Consents...............27
Section 3.05        Foreign Assets Control Regulations ..........................28
Section 3.06        USA PATRIOT Act....................................................29
Section 3.07        Title to Assets; No Encumbrances ............................29
Section 3.08        Jurisdiction of Organization; Location of Chief Executive Office;
                    Commercial Tort Claims.............................................30
Section 3.09        Litigation....................................................................30
Section 3.10        Financial Statements; No Material Adverse Effect ...............30
Section 3.11        [Reserved]...................................................................31
Section 3.12        Employee Benefits .....................................................31
Section 3.13        Environmental Matters................................................32
Section 3.14        Intellectual Property...................................................33
Section 3.15        Leases.........................................................................34
Section 3.16        Deposit Accounts and Securities Accounts ...............34
Section 3.17        Collateral Reports ......................................................34
Section 3.18        Indebtedness...............................................................34
Section 3.19        Payment of Taxes.......................................................34
Section 3.20        Margin Stock..............................................................35
Section 3.21        Governmental Regulation ..........................................35
Section 3.22        Employee and Labor Matters......................................35
Section 3.23        Guarantor....................................................................36
Section 3.24        Investments.................................................................36
Section 3.25        Perfection...................................................................36
Section 3.26        Location of Collateral.................................................36
Section 3.27        Food and Drug Administration ...................................36
Section 3.28        Mortgaged Real Property............................................37

Table of Contents
(continued)

|  |  |  | Page |
|---|---|---|---|
| Article IV | Conditions Precedent | | 39 |
| Section 4.01 | | Conditions Precedent to Initial Borrowing | 39 |
| Section 4.02 | | Conditions Precedent to Borrowings subsequent to the Closing Date | 42 |
| Section 4.03 | | Conditions Subsequent | 42 |
| Article V | Covenants | | 42 |
| Section 5.01 | | Affirmative Covenants | 42 |
| Section 5.02 | | Negative Covenants | 52 |
| Article VI | Events of Default | | 54 |
| Section 6.01 | | Events of Default | 54 |
| Section 6.02 | | Rights and Remedies of Lender Upon Default | 59 |
| Section 6.03 | | [Reserved] | 61 |
| Section 6.04 | | Application of Funds | 61 |
| Article VII | Costs and Expenses | | 62 |
| Section 7.01 | | Lender Costs | 62 |
| Section 7.02 | | Indemnity | 62 |
| Article VIII | Miscellaneous | | 62 |
| Section 8.01 | | Recourse; Right to Setoff | 62 |
| Section 8.02 | | Exercise of Rights | 63 |
| Section 8.03 | | Cumulative Remedies | 63 |
| Section 8.04 | | Certain Waivers | 63 |
| Section 8.05 | | Third-Party Rights; Assignment | 63 |
| Section 8.06 | | Register | 63 |
| Section 8.07 | | Severability; Obligations Absolute | 64 |
| Section 8.08 | | Amendment | 64 |
| Section 8.09 | | Notices | 64 |
| Section 8.10 | | Interpretation | 65 |
| Section 8.11 | | Further Assurances | 65 |
| Section 8.12 | | Counterparts | 65 |
| Section 8.13 | | Entire Agreement | 65 |
| Section 8.14 | | Governing Law | 66 |
| Section 8.15 | | SUBMISSION TO JURISDICTION; WAIVERS | 66 |
| Section 8.16 | | WAIVER OF JURY TRIAL | 66 |
| Section 8.17 | | Non-Recourse | 66 |
| Article IX | Collateral Matters | | 67 |
| Section 9.01 | | Grant of Security Interest | 67 |
| Section 9.02 | | Loan Parties Remain Liable | 67 |
| Section 9.03 | | Control Agreements | 67 |
| Article X | Guaranty | | 68 |

WEIL:\97711728\19\64058.0301

Table of Contents
(continued)

Page

Section 10.01    Guaranty.................................................................................................68
Section 10.02    No Subrogation .......................................................................................68
Section 10.03    Amendments, etc......................................................................................68
Section 10.04    Guaranty Absolute and Unconditional......................................................69
Section 10.05    Reinstatement..........................................................................................70
Section 10.06    Payments .................................................................................................70

WEIL:\97711728\19\64058.0301

Table of Contents
(continued)

Exhibits

Exhibit A — Form of Interim Order
Exhibit B — Form of Perfection Certificate
Exhibit C — Form of Promissory Note

Schedules

Schedule M — Real Property
Schedule 3.08(a) — Jurisdictions of Organization
Schedule 3.08(b) — Chief Executive Offices
Schedule 3.08(c) — Commercial Tort Claims
Schedule 3.09 — Litigation
Schedule 3.12(a) — Company Benefit Plans
Schedule 3.12(d) — Qualified Plans
Schedule 3.12(g) — Severance
Schedule 3.14 — Intellectual Property
Schedule 3.16 — Deposit and Securities Accounts
Schedule 3.18 — Indebtedness
Schedule 3.26 — Location of Collateral
Schedule 8.18(a) — Persons Excluded from Non-Recourse Provision
Schedule 8.18(b) — Nonparty Affiliates

WEIL:\97711728\19\64058.0301

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT, dated as of December [__], 2020 among UNIPHARMA, LLC, a Delaware limited liability company ("**Borrower**"), TAMARAC 10200, LLC, a Florida limited liability company ("**Guarantor**"), and NHTV ULM HOLDINGS LLC, a Delaware limited liability company, as lender ("**Lender**" and, together with Borrower and Guarantor, the "**Parties**").

RECITALS

1.      On December 7, 2020 (the "**Petition Date**"), Borrower and Guarantor (in such capacity, each a "**Debtor**" and collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**" and each, a "**Case**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      Borrower has requested that Lender agree to provide a debtor-in-possession term loan facility in an aggregate principal amount of $15,600,000 pursuant to this Agreement (the "**DIP Facility**"), with all of Borrower's obligations under the DIP Facility to be guaranteed by Guarantor.

3.      Borrower has agreed to grant a security interest in all of its property to secure the obligations of the Loan Parties hereunder and under the other Loan Documents.

4.      Guarantor, an affiliate of Borrower, has agreed to guarantee the obligations of the Loan Parties hereunder and under the other Loan Documents and to grant a security interest in all of its property to secure such obligations.

5.      The priority of the DIP Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

6.      Borrower and Guarantor are engaged in related businesses, and each of them will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement.

7.      Lender has agreed to make loans to Borrower on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual promises set forth herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree as follows:

ARTICLE I<br>Definitions

Section 1.01      <u>Defined Terms</u>. As used in this Agreement, the following terms shall have the meanings specified below:

"**Acceptable Chapter 11 Plan**" means a plan of reorganization or liquidation for the Debtors pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (as applicable), to be implemented in the Cases, which will be: (i) consistent in all respects with this Agreement; (ii) provide for (A) payment in full in cash of all of the Obligations under this Agreement and all "Obligations" under and as defined in the Prepetition Credit Agreement and (B) other treatment acceptable to the Lender in its sole and absolute

discretion, (iii) included in the solicitation package sent with the Disclosure Statement; and (iv) otherwise satisfactory in form and substance to the Lender.

"**Adequate Protection Payments**" has the meaning given in <u>Section 5.01(u)</u>.

"**Affiliate**" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise.

"**Agreement**" means this Superpriority Secured Debtor-in-Possession Loan Agreement, as may be amended, restated, supplemented, waived or otherwise modified from time to time.

"**Anti-Corruption Laws**" means any applicable Laws, relating to bribery or corruption including, without limitation, the U.S. Foreign Corrupt Practices Act (15 U.S.C. §§ 78a et seq. (1997 and 2000)) and the UK Bribery Act of 2010.

"**Anti-Money Laundering Laws**" means any applicable Law relating to money laundering, drug trafficking, terrorist related activities or other money laundering predicate crimes, including the Currency and Foreign Transactions Reporting Act of 1970, as amended, the Bank Secrecy Act as amended by the USA PATRIOT Act of 2001, and the Money Laundering Control Act of 1986 including the laws relating to prevention and detection of money laundering under 18 U.S.C. Sections 1956 and 1957.

"**Applicable Report Date**" has the meaning given in <u>Section 5.01(q)</u>.

"**Approved Budget**" has the meaning given in <u>Section 5.01(p)</u>.

"**Auction**" means the auction to be held pursuant to the Bidding Procedures Order.

"**Avoidance Proceeds**" means all proceeds or property recovered, unencumbered or otherwise, whether by judgement, settlement or otherwise from  Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

"**Bankruptcy Code**" means chapter 11 of title 11 of the United States Code.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Florida or any appellate court having jurisdiction over the Cases from time to time.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Bidding Procedures**" means the bidding procedures in substantially the form attached as an exhibit to the Bidding Procedures Order or otherwise in form and substance satisfactory to Lender.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures and the Bidding Procedures Motion.

"**Bidding Procedures Motion**" means one or more motions filed with the Bankruptcy Court seeking approval of the Bidding Procedures, which motion(s) shall be in form and substance satisfactory to

2

Lender (together with all exhibits thereto), (i) seeking approval of (A) the Stalking Horse Transaction and the Stalking Horse APA and (B) the Bidding Procedures and the scheduling of certain dates, deadlines and forms of notice in connection therewith, and (ii) granting other related relief.

"**Blocked Person**" means any Person (a) whose name appears on the list of Specially Designated Nationals and Blocked Persons published by OFAC (an "**OFAC Listed Person**") or (b) a department, agency or instrumentality of, or is otherwise controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or (y) the government of a country subject to a comprehensive U.S. economic sanctions administered by OFAC.

"**Books**" means all of Borrower's and Guarantor's now owned or hereafter acquired books and records (including all of their records indicating, summarizing, or evidencing their assets (including the Collateral) or liabilities and all of Borrower's or Guarantor's records relating to its business operations or financial condition).

"**Borrower**" has the meaning given in the introductory paragraph of this Agreement.

"**Borrower Designated Account**" means any account that Borrower may designate as such by written notice to Borrower in accordance with the notice procedures set forth in Section 8.09.

"**Borrower Operating Agreement**" means the Second Amended and Restated Operating Agreement of Unipharma, LLC, dated as of September 28, 2018, as amended by the Amendment and Restatement of Schedule A to the Second Amended and Restated Operating Agreement of Unipharma, LLC, dated as of March 15, 2019, the Second Amendment and Restatement of Schedule A to the Second Amended and Restated Operating Agreement of Unipharma, LLC, dated as of September 27, 2019, the First Amendment to Second Amended and Restated Operating Agreement of Unipharma, LLC, dated as of October 18, 2020, and the Second Amendment to Second Amended and Restated Operating Agreement of Unipharma, LLC, dated as of November 19, 2020.

"**Borrowing**" means an incurrence by Borrower of any Loan under this Agreement.

"**Borrowing Date**" means any date on which a Loan is made.

"**Borrowing Notice**" has the meaning given in Section 2.03(a).

"**Budget Period**" has the meaning given in Section 4.01(h).

"**Budget Test Period**" has the meaning given in Section 5.02(u).

"**Business**" means the business of Borrower, Guarantor and their respective Subsidiaries of owning, managing and operating a blow-fill-seal manufacturing facility that among other things packages prescription pharmaceutical, over-the-counter pharmaceutical and nutraceutical oral and ophthalmic solutions.

"**Business Day**" means any day other than a Saturday, Sunday or day on which banks in New York City, New York are authorized or required by law to close.

"**Buyer**" has the meaning given in the Stalking Horse APA.

"**Capital Expenditures**" means, for any Person for any period, all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real

WEIL:\97711728\19\64058.0301

property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a consolidated balance sheet of such Person.

"**Capital Lease**" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP, as in effect on the date hereof.

"**Capitalized Interest**", with respect to any Loan, means PIK Interest that has been added to the principal amount of such Loan pursuant to Section 2.05(c)(ii).

"**Capitalized Lease Obligation**" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP, as in effect on the date hereof.

"**Carve Out**" has the meaning given in the Interim Order.

"**Cash Collateral**" has the meaning given in the Interim Order or the Final Order, as applicable.

"**Cash Equivalents**" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's, (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $1,000,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"**Cash Management Services**" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other customary cash management arrangements.

"**Casualty**" means any damage or destruction of any Real Property or any Improvements thereon, in whole or in part, by fire or other casualty.

"**Change of Control**" means an event or series of events by which (a) any Person becomes the "beneficial owner" (when used in this definition, as defined in Rules 13d-3 and 13d5 under the Exchange

4

Act), directly or indirectly, of a number of Equity Interests of either Borrower or Guarantor, such that Permitted Holders cease, collectively, to have "beneficial ownership" (when used in this definition, as defined in Rules 13d-3 and 13d-5 under the Exchange Act) of at least 51% of all Equity Interests in each of Borrower and Guarantor; (b) at any point in time, at least 67% of the members of the board of directors or other equivalent governing body of either Borrower or Guarantor cease to be individuals whose election or nomination to that board or other equivalent governing body was approved by Permitted Holders; (c) any "change in control" (or comparable term) or mandatory redemption event or similar event occurs under any Shareholder Loan Agreement or any other Indebtedness of Borrower, Guarantor or any of their respective Subsidiaries involving Indebtedness with an aggregate amount of $1,000,000 or more; (d) all or substantially all of Borrower's and its Subsidiaries' or Guarantor's and its Subsidiaries' respective consolidated assets are sold, transferred or disposed; or (e) any of the Equity Interests in Borrower or Guarantor owned and controlled by the Permitted Holders are subjected to any Lien other than Permitted Liens.

"**Closing Date**" means the date (which shall be a Business Day) on which each of the conditions in Section 4.01 is satisfied (or waived in accordance with the terms of this Agreement).

"**Code**" means the New York Uniform Commercial Code, as in effect from time to time.

"**Collateral**" means (i) all "DIP Collateral" (or equivalent term) as defined in the Interim Order (and, when entered, the Final Order) and (ii) all of Borrower's and Guarantor's now owned or hereafter acquired right, title and interest in and to all property, including each of the following:

(a)     all of its Accounts;

(b)     all of its Books;

(c)     all of its Chattel Paper;

(d)     all of its Commercial Tort Claims

(e)     all of its Deposit Accounts, the DIP Funding Account and any and all amounts held in such accounts;

(f)     all of its Equipment and Fixtures;

(g)     all of its General Intangibles;

(h)     all of its Goods;

(i)     all of its Intellectual Property;

(j)     all of its Inventory;

(k)     all of its Investment Property;

(l)     all of its Negotiable Collateral;

(m)     all of its Avoidance Proceeds;

(n)     all of its Supporting Obligations; and

5

(o)    all of its money, Cash Equivalents, and other assets that now or hereafter come into the possession, custody, or control of Lender (or its agent or designee); and (z) all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Goods, Inventory, Investment Property, Negotiable Collateral, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "**Proceeds**"), provided that "Collateral" shall not include any Excluded Property. Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Loan Party from time to time with respect to any of the Investment Property.

"**Commitment**" means Lender's obligation to make Loans to Borrower under this Agreement in an aggregate original principal amount not to exceed $15,600,000, as such commitment may be increased from time to time in the sole and absolute discretion of Lender pursuant to Section 2.08.

"**Commitment Date**" has the meaning given in Section 2.08(a).

"**Commitment Increase**" has the meaning given in Section 2.08.

"**Committee**" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"**Company Benefit Plan**" means each Employee Benefit Plan currently sponsored or maintained by Borrower, Guarantor or any of their respective Subsidiaries or in respect of which Borrower, Guarantor or any of their respective Subsidiaries makes, or has any obligation to make, any contributions or with respect to which Borrower, Guarantor or any of their respective Subsidiaries has or would reasonably be expected to incur any other liabilities of any nature, whether known or unknown, express or implied, primary or secondary, direct or indirect, liquidated, absolute, accrued, contingent or otherwise, and whether due or to become due.

"**Company Intellectual Property**" means any Intellectual Property that is owned by Borrower, Guarantor or any of their respective Subsidiaries, including the Company Software.

"**Company Registered Intellectual Property**" means all of the Registered Intellectual Property that is owned by Borrower, Guarantor or any of their respective Subsidiaries.

"**Company Software**" means all Software that is owned by Borrower, Guarantor or any of their respective Subsidiaries.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Mortgaged Real Property, or any interest therein or right accruing thereto, including any right of access thereto.

WEIL:\97711728\19\64058.0301

"**Confirmation Order**" means an order confirming the Acceptable Chapter 11 Plan, which order shall be acceptable to the Lender.

"**Contracting Parties**" has the meaning given in Section 8.17.

"**Control Affiliates**" means all Affiliates of Borrower other than Persons who have no business relationship with Borrower or Guarantor and are Affiliates of Borrower solely as a consequence of being under the common control of the beneficial owners of Borrower.

"**Control Agreement**" means a control agreement, in form and substance satisfactory to Lender, executed and delivered by Borrower, Lender, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account).

"**Debtor**" and "**Debtors**" have the meaning provided in the recitals to this Agreement.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to the PIK Interest Rate plus an additional 200 basis points; provided that, notwithstanding the foregoing, if the Default Rate exceeds the maximum interest rate allowed by applicable law, then the Default Rate shall instead be the maximum interest rate allowed by applicable law.

"**Destruction Event**" means any Event of Loss (including a Casualty or Condemnation) that Lender reasonably determines is likely to result in (a) a "total loss" of material property or (b) damage to property material to the operation of the Business, which damage is sufficiently severe such that the restoration of such property substantially to its condition immediately prior to Event of Loss in a first-class workmanlike manner using materials substantially equivalent in quality and character to those used for the original improvements, in accordance with Law and free and clear of all liens, encumbrances or other charges other than the Permitted Liens within 360 days is impracticable.

"**DIP Facility**" has the meaning given in the recitals to this Agreement.

"**DIP Superpriority Claim**" has the meaning assigned to such term in the Interim Order (or the Final Order, when applicable).

"**DIP Funding Account**" has the meaning given to "Account" under and as defined in that certain Control Agreement, dated as of August 1, 2019, by and among Borrower, as account holder, Lender, as the secured party, and Morgan Stanley Smith Barney LLC, as the securities intermediary.

"**DIP Funding Withdrawal Notice**" has the meaning given in Section 2.07.

"**Disclosure Statement**" means the disclosure statement in respect of the Acceptable Chapter 11 Plan, in form and substance satisfactory to the Lender and consistent with this Agreement, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and/or other applicable law including, without limitation, all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Disposition**" or "**Dispose**" means the sale, assignment, transfer, conveyance, license, lease or other disposition (including any sale and leaseback transaction and any sale of Equity Interests) of any

property by any Person, including any sale, assignment, transfer, conveyance or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Dollar**" or "$" means lawful money of the United States of America.

"**Employee Benefit Plan**" means, with respect to any Person, each plan, contract, agreement, program, policy or arrangement (whether written or oral) that is at any time sponsored or maintained by such Person or to which such Person is a party or under which such Person makes, or has an obligation to make, contributions or in respect of which such Person has or would reasonably be expected to incur any liability providing for employee benefits or for the remuneration of the current or former employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of such Person or the dependents of any of them, including (a) each profit sharing, bonus, incentive, deferred compensation, retirement (including a 401(k) plan), severance, stock purchase, stock option and other equity or equity based (including phantom equity) compensation plan, (b) each "welfare" plan (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA), (c) each "pension" plan (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is subject to ERISA), (d) each medical, vision and dental plan and (e) each employment, consulting, severance, retention, change in control or other agreement with any of the foregoing persons (including with respect to any Transaction Bonus).

"**Environmental Action**" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority or any third party alleging violations of, or liabilities under, Environmental Law.

"**Environmental Law**" means any law, relating to the protection of relating to protection of natural resources, the environment or occupational health and safety, including statutes, laws, rules, regulations or common law related to the use, generation, management, handling, transport, treatment, disposal, storage, Release or threatened Release of, or exposure to, Hazardous Substances or human health.

"**Environmental Lien**" means any Lien in favor of any Governmental Authority arising under Environmental Laws.

"**Equity Interest**" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act, as in effect from time to time).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"**ERISA Affiliate**" means (a) any Person whose employees are treated as employed by the same employer as the employees of Borrower, Guarantor or their respective Subsidiaries under IRC Section 414(b), (b) any trade or business whose employees are treated as employed by the same employer as the employees of Borrower, Guarantor or their respective Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization that is a member of an affiliated service group of which Borrower, Guarantor or any of their respective Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person that is a party to an arrangement with Borrower, Guarantor or their respective Subsidiaries and

whose employees are aggregated with the employees of Borrower, Guarantor, or their respective Subsidiaries under IRC Section 414(o).

"**ERISA Event**" means with respect to any Loan Party (a) any of the events set forth in Section 4043(c) of ERISA occurs with respect to a Pension Plan, other than events for which the thirty-day notice period has been waived by any law (including common law), rule, regulation, ordinance, order, code interpretation, judgment, decree, directive, guidelines, policy or similar form of decision of any Governmental Authority, ) the withdrawal of any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a substantial cessation of operations by such Loan Party or ERISA Affiliate that is treated as such a withdrawal from a Pension Plan under Section 4062(e) of ERISA; (c) a complete or partial withdrawal (as defined in Section 4203 and 4205 of ERISA, respectively) by any Loan Party or any ERISA Affiliate from a Multiemployer Plan, the assertion by a Multiemployer Plan that a Loan Party or any ERISA Affiliate has incurred withdrawal liabilities (as described in Section 4201 of ERISA), or notification to a Loan Party or ERISA Affiliate by a Multiemployer Plan sponsor that such Multiemployer Plan is or is expected to become insolvent or experience a mass withdrawal (as such terms are defined in Title IV of ERISA); (d) a failure by a Loan Party or any ERISA Affiliate to make required contributions to a Pension Plan or Multiemployer Plan; (e) the filing by the Pension Plan sponsor of a notice of intent to terminate or the treatment by the PBGC of a plan amendment as a termination of a Pension Plan under Section 4041 of ERISA; (I) the institution by the PBGC of proceedings to terminate a Pension Plan; (g) the determination by the Pension Plan or Multiemployer Plan actuary that any Pension Plan is considered an "at-risk" plan or a Multiemployer Plan is in "endangered" or "critical" status within the meaning of Sections 430, 431 and 432 of the IRC or Sections 303, 304 and 305 of ERISA; (h) the imposition of any liability under Title W of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (j) any failure of a Plan intended to meet the requirements of qualification under Section 401(a) of the IRC to so qualify; and (j) any other event that would reasonably be expected to result in a material liability or obligation to any Loan Party under ERISA or the IRC with respect to a Plan, and, in each case described in clause (a) — (j) above, such Loan Party incurs a liability not less than $1,000,000, enforcement of which is not stayed pending appeal within 30 days after the incurrence of such liability.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

"**Excluded Property**" means:

(A)     voting Equity Interests of any direct foreign subsidiary of Borrower or any Guarantor or of any domestic subsidiary that, if pledged in favor of the Lender, would result in excess of 65% of all of the outstanding voting Equity Interests of such foreign subsidiary being pledged in favor of the Lender;

(B)     "intent-to-use" Trademarks until such time as such Loan Party begins to use such Trademarks; and

(C)     rights under any contracts, leases, agreements or other instruments that contain a valid and enforceable prohibition on assignment of such rights (except to the extent that any such prohibition would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction or any other applicable law or principles of equity), or are the subject of a prohibition or restriction on assignment of such rights pursuant to applicable law or regulation, but only for so long as such prohibitions exist and are effective and valid.

"**Existing Budget**" means the "Approved Budget" (under and as defined in the Forbearance Agreement) in effect as of the Closing Date.

9

"**Event of Default**" has the meaning given in <u>Article VI</u>.

"**Event of Loss**" means the theft, loss, physical destruction or damage, seizure, taking or similar event with respect to any property or assets owned by Borrower, Guarantor or their respective Subsidiaries which results in the receipt by any Loan Party or any of its Subsidiaries of any cash insurance proceeds or condemnation award payable by reason thereof, whether by a third party or any Governmental Authority.

"**FDA**" means the U.S. Food and Drug Administration and any successor thereto.

"**FDA Law**" means any (a) adulteration and misbranding provisions of the Federal Food, Drug, and Cosmetic Act of 1938, as amended from time to time; (b) FDA good manufacturing practices, including requirements and guidance for the manufacturing of sterile drug products; (c) import and export laws; (d) FDA reporting obligations, including but not limited to adverse event reporting requirements; (e) the Food Safety Modernization Act of 2011, as amended from time to time; (f) the Drug Supply Chain Security Act of 2013, as amended from time to time; and (g) FDA requirements applicable to manufacturing drugs for clinical trials.

"**FEMA**" means the Federal Emergency Management Agency and any successor thereto.

"**Final Order**" means an order of the Bankruptcy Court acceptable to the Lender in its sole discretion, authorizing and approving on a final basis, among other things, the Loan Documents to which any Debtor is a party and the Transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to Lender) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of Lender, in its sole discretion) as to which no stay has been entered.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989 and the regulations promulgated thereunder, as amended from time to time, and any successor statute thereto."

"**Forbearance Agreement**" means that certain Forbearance Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Borrower, Guarantor and Lender.

"**FTC**" has the meaning given in <u>Section 3.27(a)</u>.

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession, and subject to the following sentence.

"**Governing Documents**" means, with respect to any Person, the certificate or articles of incorporation, formation or conversion, by-laws, limited liability company agreement, limited partnership agreement other organizational documents of such Person.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"**Guarantor**" has the meaning given in the introductory paragraph of this Agreement.

"**Guarantor Operating Agreement**" means the First Amended and Restated Operating Agreement of Tamarac 10200, LLC, dated as of September 28, 2018.

"**Guaranty**" means the guarantee by Guarantor of Borrower's obligations hereunder in favor of Lenders pursuant to Article X.

"**Hazardous Substance**" means any substance or material defined, identified or regulated as toxic or hazardous or as a pollutant or contaminant or words of similar meaning or effect under any Environmental Law, including asbestos, asbestos-containing materials, polychlorinated biphenyls, petroleum, petroleum products and by-products.

"**Hedge Agreement**" means in respect of any Person, any interest rate protection agreement, future agreement, option agreement, swap agreement, cap agreement, collar agreement, hedge agreement, foreign exchange contract, currency swap, commodities futures contract, forward contract, option or similar agreement or arrangement (including derivative agreements or arrangements), as to which such Person is a party or beneficiary.

"**Historical Financial Statements**" means the unaudited consolidated and consolidating financial statements of Borrower and Guarantor (including a balance sheet, income statement and statement of cash flow) (a) for the fiscal year ended December 31, 2018, reviewed by an independent certified public accountant, (b) for each fiscal quarter ended after December 31, 2018, and (c) for each month ended after December 31, 2018 through October 31, 2020.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all Capital Lease Obligations of such Person, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary course of business in respect of nonexclusive licenses), (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), and (g) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (f) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an

identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"**Indemnified Party**" has the meaning given in Section 7.02.

"**Initial Approved Budget**" has the meaning given in Section 4.01(h).

"**Initial Borrowing**" has the meaning given in Section 4.01.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property**" means any or all of the following and all rights arising out of or associated with: (a) all patents and applications therefor including all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof,     ) all inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the foregoing, (c) all works of authorship (whether copyrightable or not), all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto, (d) all industrial designs, all chemical formulations and any registrations and applications therefor, and ( all internet uniform resource locators, domain names, trade names, logos, slogans, designs, trade dress, common law trademarks and service marks, trademark and service mark and trade dress registrations and applications therefor.

"**Interim Order**" means an order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in the form set forth in Exhibit A, or otherwise in form and substance satisfactory to the Lender in its sole discretion, authorizing on an interim basis, among other things, the Loan Documents to which any Debtor is a party and the Transactions contemplated by this Agreement, with only such modifications as are satisfactory to Lender, in its sole discretion.

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Internal IT Systems**" means the computer hardware, Software, computer networks and telecommunications and Internet-related equipment used for information technology or communications operations by the Company or Tamarac.

"**Interest Payment Date**" means the last Business Day of each fiscal quarter of each year, beginning on March 31, 2021.

"**Investment**" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business), or acquisitions of Indebtedness, Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment.

WEIL:\97711728\19\64058.0301

"**IRC**" means the U.S. Internal Revenue Code of 1986, and the United States Treasury Department regulations promulgated thereunder, as amended from time to time, and any successor statute thereto.

"**IRS**" means the U.S. Internal Revenue Service.

"**Junior Debt**" means any Indebtedness of Borrower or Guarantor incurred prior to the Petition Date.

"**Knowledge**" means, solely for purposes of Article III hereunder, with respect to Borrower and/or Guarantor, means all facts known, after reasonably inquiry by the Chief Executive Officer of the Borrower and Guarantor and Chief Financial Officer of the Borrower and Guarantor.

"**Lender**" has the meaning given in the introductory paragraph of this Agreement.

"**Lender Designated Account**" means any account that Lender may designate as such by written notice to Borrower in accordance with the notice procedures set forth in Section 8.09.

"**Liabilities**" has the meaning given in the Stalking Horse APA.

"**Licenses**" means all licenses, permits, certificates, approvals or other similar authorizations issued by any Governmental Authority.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any arrangement limiting the ability of any Loan Party to make any payment with respect to the Obligations or to create or suffer to exist any Lien in favor of Lender on any of such Loan Party's property, any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"**Loan**" means any loan made pursuant to the terms and conditions of this Agreement.

"**Loan Document**" means this Agreement, the Orders, Control Agreements, the Perfection Certificate, the Guaranty, any note or notes executed by Borrower in connection with this Agreement and payable to Lender, and any other instrument or agreement entered into, now or in the future, by any Loan Party, on the one hand, and Lender, on the other hand, in connection with this Agreement.

"**Loan Parties**" means the collective reference to Borrower, Guarantor, and the respective Subsidiaries of Borrower and Guarantor that accede to this Agreement and the other applicable Loan Documents as required by Section 5.01(m); each individually, a "**Loan Party**".

"**Margin Stock**" as defined in Regulation U of the Board of Governors as in effect from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect on (i) the business, assets, performance, operations or financial or other condition of Borrower, Guarantor and their respective Subsidiaries, taken as a whole, (ii) the ability of the Loan Parties and their respective Subsidiaries to pay or perform the Obligations in accordance with the terms of the Loan Documents, (iii) the legality, validity, enforceability, perfection or priority of the Liens of Lender upon the Collateral, (iv) the Collateral or its value, or (v) the rights and remedies of Lender under the Loan Documents, (b) any failure of any

representation or warranty of any Loan Party contained in <u>Section 3.05</u> or <u>3.06</u> to be true and correct in all respects on and as of the date made, or (c) any breach or default by any Loan Party under <u>Section 5.01(o)</u>.

"**Material Indebtedness**" means (a) the Shareholder Loans and (b) any other Indebtedness, an aggregate amount of $500,000 or more.

"**Maturity Date**" means the earliest to occur of (a) the date that is 120 days after the Petition Date (the "**Scheduled Maturity Date**"); <u>provided</u>, <u>however</u>, that upon Borrower's written request received by the Lender not later than 30 days prior to the original Scheduled Maturity Date such Scheduled Maturity Date can be extended by 60 days subject to (i) no Event of Default existing at the time of such extension and (ii) accuracy of the representations and warranties in all material respects at the time of such extension and after giving effect thereto, (b) 30 days after entry by the Bankruptcy Court of the Interim Order approving the Loans (the "**Interim DIP Period**"), if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such 30-day period, (c) the effective date of an Acceptable Chapter 11 Plan, (d) without Lender's prior written consent, the date of filing or support by Borrower of a plan of reorganization that is not an Acceptable Chapter 11 Plan; or (e) the date of termination of Lender's Commitments and the acceleration of any outstanding Loans, in each case, in accordance with the terms of this Agreement.

"**Milestones**" has the meaning given in <u>Section 5.01(s)</u>.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgaged Real Property**" means the collective reference to each real property owned in fee by Borrower or Guarantor or their respective Subsidiaries as of the Closing Date and listed on Schedule M or required to be mortgaged pursuant to the requirements of Section 5.01(m) of the Prepetition Credit Agreement, including the land and all buildings, improvements, structures and fixtures now or subsequently located thereon and owned by any such Person.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA and subject to Title W of ERISA to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or with respect to which any Loan Party or ERISA Affiliate has or could reasonably be expected to have any liability or obligation.

"**Negotiable Collateral**" means letters of credit, letter-of-credit rights, instruments, promissory notes, drafts and documents (as each such term is defined in the Code).

"**Net Available Cash**" means, from any Disposition or Event of Loss , an amount equal to the cash payments received therefrom, in each case net of (a) all legal, title and recording tax expenses, commissions and other fees and expenses incurred, and (without duplication) all Federal, state, provincial, foreign and local taxes required to be paid or to be accrued as a liability under GAAP, in each case, as a consequence of, or in respect of, such Disposition or Event of Loss and ) any liabilities or obligations (to the extent permitted hereunder) associated with the assets disposed of in such Disposition or involved in such Event of Loss and retained, indemnified or insured by Borrower, Guarantor or any of their respective Subsidiaries after such Disposition or Event of Loss, including pension and other post-employment benefit liabilities, liabilities related to environmental matters, and reasonable reserves with respect to potential liabilities relating to any indemnification obligations associated with such Disposition or Event of Loss to the extent such reserves are required by GAAP.

"**NLRB**" means the means the United States National Labor Relations Board.

14

WEIL:\97711728\19\64058.0301

"**Nonparty Affiliates**" has the meaning given in <u>Section 8.17</u>.

"**Note**" has the meaning given in <u>Section 2.02(b)</u>.

"**Notice of Increase**" has the meaning given in <u>Section 2.08(a)</u>.

"**Obligations**" means all Loans, debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), premiums, liabilities, obligations (including indemnification obligations), fees, expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties and all covenants and duties of any other kind and description owing by any Loan Party arising out of, under, pursuant to, in connection with, or evidenced by this Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that any Loan Party is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents. Without limiting the generality of the foregoing, the Obligations of Borrower under the Loan Documents include the obligation to pay (a) the principal amount of the Loans, (b) interest accrued on the Loans, (c) amounts owing pursuant to <u>Section 7.01</u> or 7.02, (d) fees payable under this Agreement or any of the other Loan Documents and (e) indemnities and other amounts payable by Borrower under any Loan Document. Any reference in this Agreement or in the Loan Documents to the Obligations shall also include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Orders**" means the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"**Parties**" has the meaning given in the introductory paragraph of this Agreement.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title W of ERISA (or any successor thereto).

"**Pension Plan**" shall mean any employee pension benefit plan within the meaning of Section 3(2) of ERISA (other than a Multiemployer Plan) that is maintained or is contributed to by a Loan Party or any ERISA Affiliate and is either covered by Title W of ERISA or is subject to the minimum funding standards under Section 412 of the IRC.

"**Perfection Certificate**" means each perfection certificate executed and delivered by any Loan Party to Lender, substantially in the form of <u>Exhibit B</u> hereto.

"**Permitted Dispositions**" means:

(a)     the disposition of surplus, obsolete, damaged or worn-out property or other property no longer used or useful in the business of Borrower;

(b)     the sale of inventory in the ordinary course of business;

(c)       the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(d)       the sale or disposition of delinquent accounts receivable in connection with the compromise or collection thereof in the ordinary course of business and not part of any accounts receivable financing transaction;

(e)       the granting of Permitted Liens; and

(f)       the making of Permitted Investments.

"**Permitted Expenditures Budget Variance**" has the meaning given in Section 5.02(u).

"**Permitted Holders**" means (a) with respect to Borrower, Raimundo José Santamarta, Reinaldo Santamarta, Raimundo Esteban Santamarta, Yohana Santamarta, International Supply and their respective Permitted Transferees (as defined in the Borrower Operating Agreement), (b) with respect to Guarantor, Raimundo José Santamarta and International Supply Group Corp., a Florida corporation, and their respective Permitted Transferees (as defined in the Borrower Operating Agreement, and (c) with respect to any Loan Party, (x) Lender or any of its affiliates and (y) any Person acceptable to Lender in its sole and absolute discretion.

"**Permitted Indebtedness**" means:

(a)       Indebtedness evidenced by this Agreement or the other Loan Documents;

(b)       Shareholder Loans existing as of the date hereof;

(c)       Indebtedness evidenced by the Prepetition Credit Agreement;

(d)       Indebtedness created after the date hereof that is reflected in the Approved Budget;

(e)       endorsement of instruments or other payment items for deposit;

(f)       Indebtedness owed to any Person providing property, casualty, liability or other insurance to Borrower, Guarantor or any of their respective Subsidiaries, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year;

(g)       Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards," "procurement cards" or "p-cards") or Cash Management Services;

(h)       Indebtedness composing Permitted Investments;

(i)       unsecured Indebtedness incurred in respect of netting services, overdraft protection and other like services, in each case, incurred in the ordinary course of business;

16

(j)       Indebtedness that may be deemed to exist pursuant to any performance, surety, appeal or similar bonds or statutory obligations incurred in the ordinary course of business, and guarantee obligations in respect of any such Indebtedness; and

(k)       guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of Borrower or Guarantor.

"**Permitted Investments**" means:

(a)       Investments in cash and Cash Equivalents;

(b)       Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)       Investments existing on the date hereof; and

(d)       deposits of cash made in the ordinary course of business to secure performance of operating leases or otherwise in accordance with the Approved Budget.

"**Permitted Liens**" means:

(a)       Liens granted to, or for the benefit of, Lender to secure the Obligations;

(b)       Liens granted to, or for the benefit of, the Prepetition Lender to secure the Prepetition Obligations;

(c)       Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over Lender's Liens and the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests;

(d)       judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 6.01(i);

(e)       Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests;

(f)       Liens on amounts deposited to secure Borrower's and Guarantor's obligations in connection with worker's compensation or other unemployment insurance;

(g)       Liens on amounts deposited to secure Borrower's and Guarantor's obligations in connection with the making or entering into of bids or tenders in the ordinary course of business and not in connection with the borrowing of money;

(h)       Liens on amounts deposited to secure Borrower's and Guarantor's reimbursement obligations with respect to surety or appeal bonds obtained in the ordinary course of business;

(i)       with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof;

WEIL:\97711728\19\64058.0301

(j)      rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts and Cash Management Services in the ordinary course of business; and

(k)      Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness.

"**Permitted Protest**" means the right of Borrower, Guarantor or any of their respective Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment; provided that (a) a reserve with respect to such obligation is established on Borrower's, Guarantor's and their respective Subsidiaries' books and records in such amount as is required under GAAP, except with respect to Property Taxes which must be paid in full prior to the commencement of any protest, (b) any such protest is instituted promptly and prosecuted diligently by Borrower, Guarantor or the appropriate Subsidiary, as applicable, in good faith, and (c) Lender is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"**Person**" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"**PIK Interest**" has the meaning given in Section 2.05(a).

"**PIK Interest Rate**" means 10% per annum.

"**Pledged Interests**" has the meaning given in the definition of "Collateral" in this Section 1.01.

"**Prepetition Closing Date**" means September 28, 2018.

"**Prepetition Credit Agreement**" means that certain Loan Agreement, dated as of September 28, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof), by and among Borrower, as borrower, Guarantor, as guarantor, the Prepetition Pledgors, as pledgors, and Prepetition Lender, as lender.

"**Prepetition Lender**" means NHTV ULM Holdings LLC, a Delaware limited liability company, in its capacity as "Lender" under and as defined in the Prepetition Credit Agreement.

"**Prepetition Loans**" means any loans of Lender under the Prepetition Credit Agreement.

"**Prepetition Obligations**" means the Indebtedness evidenced by the Prepetition Credit Agreement.

"**Prepetition Pledgor**" means any "Pledgor" under and as defined in the Prepetition Credit Agreement.

"**Proceeds**" has the meaning given in the definition of Collateral in this Section 1.01.

"**Product Liability**" has the meaning given in the Stalking Horse APA.

18

"**Property Taxes**" means all taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Mortgaged Real Property or any part thereof, together with all interest and penalties thereon.

"**Qualified Sale**" has the meaning given in Section 2.07(g).

"**Real Property**" means any estates or interests in real property now owned or hereafter acquired by Borrower, Guarantor or their respective Subsidiaries, including the land and all buildings, improvements, structures and fixtures now or subsequently located thereon and owned by any such Person.

"**Registered Intellectual Property**" means all (a) patents and patent applications (including provisional applications), ) registered trademarks and service marks, trade dress, and applications to register trademarks and service marks and trade dress, intent-to-use applications, or other registrations or applications related to trademarks and service marks and trade dress, (c) registered copyrights and applications for copyright registration and (d) domain name registrations.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, partners, agents, trustees, administrators, managers, advisors and representatives of such Person and its Affiliates.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, dumping or disposing into the environment.

"**Remedies Notice Period**" has the meaning given in Section 6.01.

"**Representation Date**" means, with respect to any Person that is a corporation, limited liability company, limited partnership, general partnership, limited liability partnership, trust, or other legal entity, the date such legal entity was formed.

"**Requested Increase Amount**" has the meaning given in Section 2.08(a).

"**Requested Increase Date**" has the meaning given in Section 2.08(a).

"**Responsible Officer**" means the chief executive officer, president, chief restructuring officer, chief financial officer, treasurer, assistant treasurer or controller of Borrower.

"**Restricted Payment**" means, with respect to any Person, to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by such Person (including any payment in connection with any merger or consolidation involving such Person) or to the direct or indirect holders of Equity Interests issued by such Person in their capacity as such issued by such Person, or ) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving such Person) any Equity Interests issued by such Person, or (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of such Person now or hereafter outstanding, or (d) make, or cause or suffer to permit any of Borrower, Guarantor or their respective Subsidiaries to make, any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Junior Debt.

"**Restructuring Fees**" has the meaning given in the Forbearance Agreement or the professional fees and expenses incurred by the professionals retained in the Cases by (a) the Lender, (b) the Prepetition

19

Lender, or (c) the Debtors or the Committee under sections 327 or 363 of the Bankruptcy or otherwise by order of the Bankruptcy Court.

"**Roll-Up Loans**" means the roll-up loans deemed made on the Closing Date pursuant to Section 2.01(b).

"**S&P**" means S&P Global Ratings.

"**Sale Order**" means a final non-appealable order, in form and substance acceptable to Lender in its sole discretion approving (i) the Stalking Horse Transaction on the terms set forth in the Stalking Horse APA or (ii) another sale pursuant to the Bidding Procedures Order of substantially all of the assets of the Debtors.

"**Sanctioned Jurisdiction**" means a country or territory that is, or whose government is, the subject of comprehensive territorial sanctions, currently including, without limitation, Crimea, Cuba, Iran, North Korea, Syria and Venezuela.

"**Sanctions Laws**" means economic, financial or trade sanctions, restrictive measures or embargoes imposed, administered, or enforced from time to time by any of OFAC or the U.S. Department of State.

"**Sanctions Lists**" means OFAC's Specially Designated Nationals and Blocked Persons List, OFAC's Sectoral Sanctions Identifications List, the list of Sanctioned Jurisdictions and any similar lists of sanctioned persons issued or administered by relevant United States authorities.

"**SEC**" means the United States Securities and Exchange Commission and any successor thereto.

"**Sellers**" has the meaning given in the Stalking Horse APA.

"**Sellers' Disclosure Schedule**" has the meaning given in the Stalking Horse APA.

"**Shareholder Loan Agreements**" mean (a) the Promissory Note, dated September 28, 2018, made by Borrower in favor of Raimundo J. Santamarta and (b) the Promissory Note, dated September 28, 2018, made by Borrower in favor of Global Capital Invest Finance Ltd., a British Virgin Islands limited company.

"**Shareholder Loans**" mean all Indebtedness and other obligations of Borrower under the Shareholder Loan Agreements.

"**Software**" means all computer software programs, together with any error corrections, updates, modifications or enhancements thereto, in both machine-readable form and human-readable form, including all comments and any procedural code.

"**Stalking Horse APA**" means that certain Asset Purchase Agreement, dated as of the Petition Date, filed with the Bidding Procedures motion among NHTV (AIV) ULM Bidco LLC, a Delaware limited liability company, as buyer, and such buyer shall be designated by and acceptable to the Lender in its sole discretion, and the Debtors, as sellers.

"**Stalking Horse Transaction**" means the sale of substantially all of the assets of the Debtors pursuant to the Stalking Horse APA.

"**Subsidiary**" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary

voting power to elect a majority of the board of directors (or other equivalent governing body) of such corporation, partnership, limited liability company, or other entity.

"**Taxes**" means all federal, state, local or non-U.S. taxes, charges, duties, fees, levies or other assessments, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, escheats, abandoned or unclaimed property, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, imposed by any Governmental Authority, and including any interest, penalty or addition associated therewith, whether disputed or not, and including any obligation to indemnify or otherwise assume or succeed to the Tax liabilities of any other Person.

"**Transaction Bonus**" means any change-in-control payment, retention payment, stay payment, transaction bonus or similar payment or obligation to any employee of Borrower, Guarantor or any of their respective Subsidiaries that becomes payable or is increased or accelerated as a result of the transactions contemplated herein.

"**Transactions**" means the transactions contemplated by this Agreement and the other Loan Documents.

"**U.S. Trustee**" means the United States Trustee applicable in the Cases.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107 56 (signed into law October 26, 2001)).

"**Variance Report**" has the meaning given in Section 5.01(q).

"**Warranty Liability**" has the meaning given in the Stalking Horse APA.

Section 1.02    Uniform Commercial Code. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided that, to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

## ARTICLE II
The Loans

Section 2.01    Loans.

(a)    Subject to the terms and conditions of this Agreement and in the Orders and in reliance upon the representations and warranties of the Loan Parties contained herein, Lender agrees to make Loans in an aggregate principal amount not to exceed the Commitments. Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed.

(b)    Subject to the terms and conditions set forth herein and in the Orders, on the Closing Date and without any further action of any Person, the Lender shall be deemed to have made Roll-Up Loans hereunder on a dollar-for-dollar basis with the proceeds thereof being applied to the Prepetition Obligations in respect of Lender's then-outstanding Prepetition Loans; provided, that the aggregate amount of Roll-Up Loans made on such date shall not exceed $1,300,000.

WEIL:\97711728\19\64058.0301

(c)     The issue price of the Loans shall be 99.3667%; provided, that such original issue discount, for the avoidance of doubt, may be net funded out of the Initial Borrowing to account therefor.

Section 2.02     Evidence of Debt.

(a)     Accounts. Lender shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable from Borrower to Lender hereunder and (iii) the amount of any sum received from Borrower by Lender. The entries made in such accounts shall be conclusive and controlling, subject to manifest error; provided that the failure of Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of Borrower to repay the Loans in accordance with the terms of this Agreement.

(b)     Notes. Borrower agrees that, upon the request of Lender, Borrower shall execute and deliver to Lender a promissory note substantially in the form of Exhibit C hereto (each, as amended, supplemented, replaced or otherwise modified from time to time, a "**Note**" and, collectively, the "**Notes**"**),** in each case with appropriate insertions therein as to payee, date and principal amount, payable to Lender and in a principal amount equal to the unpaid principal amount of the applicable Loans made (or acquired by assignment pursuant to Section 8.05) by Lender to Borrower. Each Note shall be payable as provided in Section 2.04(f) and provide for the payment of interest in accordance with Section 2.05.

Section 2.03     Procedure for Borrowing. From time to time prior to the Maturity Date, Borrower may request a Borrowing of Loans by delivering a written notice to Lender (a "**Borrowing Notice**"), which notice must be received (x) in the case of a requested Borrowing on the Closing Date, two Business Days prior to the Closing Date, and (y) in the case of a requested Borrowing after the Closing Date, on the Wednesday immediately prior to the requested Borrowing Date, specifying (i) the aggregate principal amount of Borrowing to be made on the Borrowing Date, (ii) the requested Borrowing Date (which shall be a Business Day and, in the case of any Borrowing after the Closing Date, the Wednesday immediately following the date the Borrowing Notice was delivered) and (iii) the proposed use of the proceeds of such Borrowing in reasonable detail; provided, that the amount of each such proposed withdrawal shall not exceed 110% of the budgeted disbursements set forth in the Approved Budget for the cumulative period commencing on the Petition Date through the two calendar weeks following immediately after the date of the Borrowing notice, on a cumulative basis (other than Restructuring Fees). No more than one such request may be made during each two calendar week period prior to the Maturity Date. On each Borrowing Date, Lender shall make available to Borrower in Dollars in immediately available funds the amount of the Loans to be made by Lender on such Borrowing Date by wiring such funds to the DIP Funding Account.

Section 2.04     Loan Payments; Maturity.

(a)     Optional. Borrower may from time to time prepay all or any of the Loans (including Capitalized Interest accrued thereon).

(b)     Mandatory.

(i)     Debt Issuances. Upon receipt by any Loan Party or any of its Subsidiaries of proceeds from any Indebtedness other than Permitted Indebtedness, Borrower shall promptly pay to Lender, to be applied in accordance with clause (viii) below, an aggregate amount equal to 100% of the proceeds of such Indebtedness received by the Loan Parties or any of its Subsidiaries.

(ii)     [Reserved].

22

(iii) <u>Issuances or Sales of Equity Interests</u>. Upon receipt by any Loan Party or any of their Subsidiaries of proceeds from any issuance or sale of any Equity Interests or the receipt of any capital contribution, Borrower shall promptly pay to Lender, to be applied in accordance with <u>clause (viii)</u> below, an aggregate amount equal to 100% of the proceeds of such issuance or sale of Equity Interests or capital contribution received by the Loan Parties or any of its Subsidiaries.

(iv) <u>Dispositions or Events of Loss</u>. Upon receipt by any Loan Party of proceeds in connection with any Disposition or any Event of Loss, Borrower shall promptly pay to Lender, to be applied in accordance with <u>clause (viii)</u> below, an amount equal to 100% of the Net Available Cash from such Disposition or Event of Loss.

(v) <u>Destruction Events</u>. Upon receipt by any Loan Party of proceeds in connection with a Destruction Event, Borrower shall promptly pay to Lender to be applied in accordance with <u>Section 6.04</u>, an amount equal to 100% of the Net Available Cash from such Destruction Event.

(vi) <u>Change of Control</u>. Upon a Change of Control, Borrower shall promptly prepay 100% of the outstanding principal amount of the Loans, together with all accrued and unpaid interest thereon and all fees and expenses due and owing hereunder.

(vii) [Reserved].

(viii) <u>Application of Certain Proceeds</u>. All proceeds received by Lender pursuant to clauses (i) through (iv) of this <u>Section 2.04(b)</u> shall be applied to the prepayment of an aggregate principal amount of Loans which, when taken together with (x) all Capitalized Interest in respect of each such Loan so prepaid and (y) all accrued and unpaid interest on the Loans and Capitalized Interest so prepaid equals the aggregate amount of such proceeds.

(c) <u>Officer's Certificate; Declined Payments</u>. (i) Borrower will give Lender written notice of any prepayment under <u>Section 2.04</u> not less than five Business Days before the prepayment date, specifying the aggregate principal amount of, and the aggregate amount of accrued and unpaid interest on, the Loans to be prepaid on such date. (ii) Notwithstanding anything contained in this <u>Section 2.04</u> to the contrary, Lender has the option, and may (in its sole discretion), elect to decline any such prepayment by giving notice of such election in writing to Borrower, on the date that is two Business Days (or such shorter period as may be agreed by Lender and Borrower) prior to such prepayment date. Upon receipt of such notice electing to decline any such prepayment, Borrower, Guarantor or their respective Subsidiaries may retain such declined amount by depositing such amount into the DIP Funding Account.

(d) [Reserved].

(e) <u>Payment at Maturity</u>. Borrower shall repay the full outstanding principal amount of the Loans, together with all accrued and unpaid interest thereon and all fees and expenses due and owing hereunder, on the Maturity Date.

(f) <u>Payments Generally</u>. Borrower shall make each payment required to be made by it hereunder not later than 1:00 pm New York City, New York time on the date when due in Dollars in immediately available funds by wire transfer to the Lender Designated Account. All such payments shall be made without set-off, counterclaim, deduction or withholding, other than for taxes required to be deducted or withheld by law. If any taxes are required to be deducted or withheld from any amounts payable

by Borrower hereunder, the amounts so payable shall be increased to the extent necessary so that the net amount actually received (after deduction or withholding of all such taxes) will be equal to the full amount that would have been received had no such deduction or withholding been required. Borrower shall pay (or, to the extent paid by Lender, reimburse Lender for) all stamp, court, documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, or from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

Section 2.05    Interest.

(a)    Interest shall accrue on the outstanding principal amount of each Loan from and including the date of such Loan (or, in the case of Capitalized Interest, on the date on which such Capitalized Interest is added to the principal amount of such Loan pursuant to Section 2.05(c)) to but excluding the date of payment, at the PIK Interest Rate (such accrued interest, the "**PIK Interest**"); provided that from and after an Event of Default, interest shall accrue on the outstanding principal amount of each Loan at the Default Rate and shall be (i) payable in cash on demand or (ii) if no such demand is made, on the last day of each fiscal quarter either in cash or in kind as determined by Lender in its sole and absolute discretion, in each case, in accordance with Section 2.04(f).

(b)    All interest hereunder shall be calculated on the basis of a 365-day year and paid for the actual number of days elapsed.

(c)    On each Interest Payment Date, any PIK Interest shall be paid in respect of each Loan then outstanding by adding the amount of such unpaid PIK Interest to the principal amount of such Loan; provided that all interest payable on or after the Maturity Date or upon an Event of Default shall be payable in cash upon demand or, if no such demand is made, on the last day of each fiscal quarter, and in accordance with Section 2.04(f). Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any Insolvency Proceeding.

(d)    Following an increase in the outstanding principal amount of the Loan as a result of a payment of PIK Interest pursuant to Section 2.05(c)(ii), the Loans shall accrue interest on such increased outstanding principal amount from and after the related Interest Payment Date of such PIK Interest. Unless otherwise explicitly provided, references herein and in the other Loan Documents to the "principal" or "principal amount" of each Loan shall include all Capitalized Interest in respect of such Loan.

(e)    Any interest at the Default Rate that is not paid by Borrower in cash when due on any Business Day shall be paid by adding the amount of such unpaid Default Interest to the principal amount of the Loans on such Business Day.

Section 2.06    Termination or Reduction of Commitments.  Commitments shall be reduced by the amount of Loans funded. Any remaining Commitments shall terminate on the Maturity Date.

Section 2.07    Withdrawal of Funds from the DIP Funding Account.

(a)    So long as no Event of Default (other than the "Designated Defaults" under and as defined in the Forbearance Agreement) has occurred and is continuing, Borrower shall have the right to request that Lender permit the withdrawal of funds on deposit in the DIP Funding Account from time to time (but not more frequently than one time in any week period) by delivering a written request to Lender in form and substance acceptable to Lender (such request, a "**DIP Funding Withdrawal Notice**") (x) in the case of a withdrawal of funds on the Closing Date, two Business Days prior to the Closing Date, and (y) in the case of a withdrawal of funds after the Closing Date, on the Wednesday immediately prior to the

24

date of such proposed withdrawal; <u>provided</u>, that the amount of each such proposed withdrawal shall not exceed 110% of the budgeted disbursements set forth in the Approved Budget for the cumulative period commencing on the Petition Date through the calendar week following immediately after the date of the DIP Funding Withdrawal Notice, on a cumulative basis (other than Restructuring Fees).

(b)    Each DIP Funding Withdrawal Notice shall specify the following information:

(i)    the amount of such withdrawal;

(ii)    the date of such proposed withdrawal (which, in the case of a withdrawal of funds after the Closing Date, shall be on the Wednesday of each week following the delivery of a DIP Funding Withdrawal Request); and

(iii)    the wiring instructions of the account of Borrower to which the proceeds of such withdrawal are to be disbursed, which account shall be the "Account" (under and as defined in that certain Blocked Account Agreement, dated as of February 13, 2019, by and among Borrower, Guarantor, Prepetition Lender and JPMorgan Chase Bank, N.A.) in the name of Borrower with the account number 521553110.

(c)    On the withdrawal date specified in the DIP Funding Withdrawal Notice, subject to the satisfaction of all conditions precedent to a withdrawal and disbursement from the DIP Funding Account set forth in this Section 2.07, Lender shall direct the applicable bank to disburse funds from the DIP Funding Account in an aggregate principal amount equal to the amount specified in such DIP Funding Withdrawal Notice to the account of Borrower specified in such DIP Funding Withdrawal Notice.

(d)    With respect to any disbursement, withdrawal, transfer, or application of funds from the DIP Funding Account hereunder, Lender shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, any DIP Funding Withdrawal Notice submitted by Borrower as evidence that all conditions precedent to a withdrawal and disbursement from the DIP Funding Account to Borrower have been satisfied. Notwithstanding anything herein to the contrary, Lender shall have no obligation to direct the applicable depository bank to disburse any amount from the DIP Funding Account in excess of the amounts then held in the DIP Funding Account. Lender shall have no duty to inquire or investigate whether any condition precedent to a withdrawal from the DIP Funding Account has been satisfied, and shall not be deemed to have any knowledge that a condition is not satisfied unless it has received notice thereof from Borrower.

(e)    For the avoidance of doubt, all proceeds funded by Lender into the DIP Funding Account shall constitute proceeds of funded Loans for all purposes hereunder and, notwithstanding that the proceeds of such Loans are held in the DIP Funding Account, shall bear interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Loan Documents to the same extent as all other Loans.

(f)    Notwithstanding the foregoing or anything to the contrary herein, immediately prior to the occurrence of the Maturity Date, Borrower shall have the right, after submitting a DIP Funding Withdrawal Notice, to withdraw amounts from the DIP Funding Account not to exceed the lesser of (x) any and all remaining amounts in the DIP Funding Account and (y) an amount equal to the sum of all accrued and unpaid professional fees, with such amounts to be used for the administration of the Cases and the payment of professional fees.

Section 2.08    Increase of Commitments. Borrower may from time to time after the Closing Date request that the aggregate Commitments hereunder be increased (a "**Commitment Increase**") in accordance with the following provisions and subject to the following conditions:

(a)    Borrower shall give Lender at least ten Business Days' prior written notice (a "**Notice of Increase**") of any such requested increase specifying the aggregate amount by which the Commitments are to be increased (the "**Requested Increase Amount**"), which shall be at least $100,000, the requested date of increase (the "**Requested Increase Date**") and the date by which Lender is requested to increase the amount of its Commitments (the "**Commitment Date**").

(b)    Following each Commitment Date, Lender shall notify Borrower as to the amount, if any, by which Lender, in its sole and absolute discretion, is willing to participate in the requested Commitment Increase.

(c)    Effective on the Requested Increase Date, subject to the terms and conditions hereof, the Commitments shall be deemed to be amended to reflect the increases contemplated hereby.

(d)    Anything in this Section 2.08 to the contrary notwithstanding, no increase in the Commitments hereunder pursuant to this Section 2.08 shall be effective unless:

(i)    as of the date of the relevant Notice of Increase and on the relevant Requested Increase Date and after giving effect to such increase, (x) no Default or Event of Default shall have occurred and be continuing and (y) the conditions set forth in Section 4.02 shall be be satisfied;

(ii)    to the extent requested by Lender, receipt by Lender of (A) customary legal opinions, board resolutions and officers' certificates consistent with the documentation delivered on the Closing Date, if any, and (B) any reaffirmation or similar documentation as requested by Lender; and

(iii)    after giving effect to such Commitment Increases, the aggregate amount of all such Commitment Increases entered into after the Closing Date shall not exceed $2 million.

ARTICLE III
Representations and Warranties

Each Loan Party represents and warrants to Lender on the date hereof (and solely with respect to the representations and warranties contained in Sections 3.05 and 3.06, each Loan Party represents and warrants on each Borrowing Date) that:

Section 3.01    Corporate Existence; Power and Authority.

(a)    Each Loan Party is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and has all requisite power and authority to own, lease and operate its properties, rights and assets and to carry on in all material respects its business as currently conducted. Each Loan Party is duly qualified or registered to transact business in, and is in good standing under the laws of, each jurisdiction where their activities or the properties, rights or assets owned or leased by them requires such qualification or registration, except where the failure of such qualification or registration would not reasonably be expected to be, individually or in the aggregate to have a Material Adverse Effect. Each Loan Party has delivered to Lender true, complete and correct copies of its respective Governing

26

Documents as currently in effect, and no Loan Party is in violation of any provision of such Governing Documents.

(b)    Subject to the entry of the Orders, each Loan Party has the requisite power and authority, and has been duly authorized by all necessary actions on the part of such Loan Party, to execute, deliver and perform each Loan Document to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to the entry of the Orders, the execution, delivery and performance of each Loan Document to which each Loan Party is a party, the performance of their respective obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action of such Loan Party.

Section 3.02    <u>Enforceability</u>. Each Loan Document has been duly executed and delivered by each Loan Party and, when duly executed and delivered by each Loan Party, shall constitute the legal, valid and binding agreement of each such Loan Party, enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 3.03    <u>Perfected Liens</u>.

(a)    Subject to the entry of the Orders, Lender will have upon entry of the Interim Order, a valid Lien on all of the Debtors' right, title and interest in and to the Collateral described therein and herein and the proceeds thereof, and subject to the entry of the Orders, Lender will have upon entry of the Interim Order, a perfected Lien on, and security interest in, all right, title and interest of the Debtors in such Collateral and, to the extent applicable subject to Section 9-315 of the Code, the proceeds thereof, in each case prior and superior in right to any other person, subject to the Permitted Liens having priority under applicable Law or the Orders.

(a)    Lender's Liens on the Collateral are validly created, perfected, and subject only to the filing of financing statements, first-priority Liens, subject only to Permitted Liens which are non-consensual Permitted Liens.

Section 3.04    <u>No Violation; Compliance with Laws; Governmental Consents</u>.

(a)    The execution, delivery and performance of by each Loan Party of the Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) conflict with or result in any breach of any provision of the Governing Documents of such Loan Party or any of its Subsidiaries; (ii) require any filing with, or the obtaining of any permit, authorization, consent, waiver, registration, declaration or approval of, or notification to, any Governmental Authority; (iii) violate, conflict with, result in a breach of, or default (or any event which, with notice or lapse of time or both, would constitute a default) under, result in or give rise to any right of termination, assignment, cancellation or acceleration under, require a consent, notice, notification, waiver or the payment of any penalty pursuant to, or result in the creation or imposition of any Lien (other than Permitted Liens) on any property, right or asset of such Loan Party or any of its Subsidiaries, any of the terms, conditions or provisions of any note, mortgage, other evidence of Indebtedness, any license or any material contract; or (iv) violate any material provision of federal, state or local law or regulation applicable to such Loan Party or any of its Subsidiaries, arbitration award, judgment, order, injunction or decree of any court or other Governmental Authority applicable to such Loan Party or any of its Subsidiaries; excluding from the foregoing clauses (ii) and (iii) such requirements, violations, conflicts, defaults or rights which would

27

not reasonably be expected to be, individually or in the aggregate, materially adverse to the Business, taken as a whole.

(b)    No Loan Party or any of its Subsidiaries (i) is in violation of (A) any applicable laws (including, for the avoidance of doubt, Environmental Laws and FDA Laws), rules, regulations, executive orders, or codes, ) the Governing Documents of such Person or its Subsidiaries or (C) any material agreement of such Person or its Subsidiaries, (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (iii) is subject to any obligation arising under an administrative or regulatory action, consent order, inspection, warning letter, notice of violation letter, or other notice, response or commitment made to or with any Governmental Authority or (iv) is under investigation by any Governmental Authority with respect to any material violation of any applicable laws (including, for the avoidance of doubt, Environmental Laws or FDA Laws). No Default or Event of Default has occurred and is continuing.

(c)    The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party and the consummation of the transactions contemplated by the Loan Documents, does not and will not require any registration with, consent, or approval to, or notice to, or other action with or by, any Governmental Authority, other than the entry of the Orders and registrations, consents, approvals, notices, or other actions that have, as of the relevant time, been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Lender for filing or recordation, as of the Closing Date.

Section 3.05    <u>Foreign Assets Control Regulations</u>.

(a)    None of the Loan Parties or any of their respective Control Affiliates or other equity holders, subsidiaries, affiliates, directors, officers, employees, distributors, agents, or representatives is a Person that is, or is owned or controlled by Persons that are, (i) the subject or target of any Sanctions Laws, or (ii) located, organized or resident in a Sanctioned Jurisdiction.

(b)    Each of the Loan Parties and each of their respective Subsidiaries and Affiliates have conducted their business in compliance with the Anti-Corruption Laws, the Anti-Money Laundering Laws and the Sanctions Laws.

(c)    No part of the proceeds from the Loans and extensions of credit made hereunder constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used, directly by Borrower, Guarantor, any of their respective Subsidiaries or indirectly through any Control Affiliate, in connection with any investment in, or any transactions or dealings with a Blocked Person.

(d)    No Loan Party will, directly or indirectly, (i) use any proceeds that are provided to them in connection with this Loan Agreement or any other agreement between the parties hereto to lend, contribute or otherwise make available such proceeds to any subsidiary, affiliate, joint venture partner or other Person (x) to fund or facilitate any activities or business of or with any Person, who at the time of such funding or facilitation, is the subject of any Sanctions Laws or located, organized, or resident in any Sanctioned Jurisdiction or (y) in any other manner that would result in a violation of the Anti-Corruption Laws or Sanctions Laws by any Person, including any Person participating in this Agreement or (ii) engage in any dealings or transactions (x) with any Person that is the subject or target of Sanctions Laws or is on any Sanctions List or (y) with, in, or involving Venezuela or any other Sanctioned Jurisdiction.

(e)    No Loan Party nor any of their respective Control Affiliates or any of their respective equity holders, subsidiaries, affiliates, directors, officers, employees, distributors, agents, or

WEIL:\97711728\19\64058.0301

representatives is or has been the subject of any investigation, inquiry or enforcement proceedings regarding any offense or alleged offense under any of the Anti-Corruption Laws, the Anti-Money Laundering Laws or the Sanctions Laws, and no such investigation, inquiry or proceedings have been threatened or are pending and there are no circumstances or allegations likely to give rise to any such investigation, inquiry or proceedings.

(f)    No part of the proceeds from the Loans and extensions of credit made hereunder will be used by Borrower or its Control Affiliates, directly or indirectly, directly or indirectly, for any illegal payments to any governmental official or employee, political party, official of a political party, candidate for political office, official of any public international organization or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage.

(g)    None of Borrower or Guarantor or any of their respective Subsidiaries, Control Affiliates, equity holders, subsidiaries, affiliates, directors, officers, employees, distributors, agents, or representatives has, directly or indirectly: (i) circumvented the internal accounting controls of Borrower, Guarantor or any of their respective Subsidiaries; (ii) falsified any of the books, records or accounts of Borrower or Guarantor; or (iii) made any false or misleading statements to, or attempted to coerce or fraudulently influence, any accountant in connection with any audit, review or examination of the financial statements of Borrower or Guarantor.

(h)    None of the Loan Parties is owned or controlled, directly or indirectly, by (i) any Person formed under the laws of Venezuela or (ii) the Government of Venezuela, any political subdivision, agency or instrumentality thereof, or any Person owned or controlled by, or acting for or on behalf of, the Government of Venezuela.

Section 3.06    <u>USA PATRIOT Act</u>. Each Loan Party is in compliance in all material respects with the material provisions of the USA PATRIOT Act, and each Loan Party has provided to Lender (a) all information related to it (including names, addresses and tax identification numbers (if applicable) reasonably requested in writing by Lender not less than 10 Business Days prior to the Closing Date and mutually agreed to be required under "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to be obtained by Lender and (b) to the extent Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification to the extent such Beneficial Ownership Certification is required for Lender to satisfy the requirements of the Beneficial Ownership Regulation.

Section 3.07    <u>Title to Assets; No Encumbrances</u>.

(a)    Borrower and Guarantor, as applicable, have (i) good, valid and marketable title and (u) valid leasehold interests in (in the case of leasehold interests in real or personal property) to all of its respective assets (A) reflected in its most recent financial statements delivered pursuant to <u>Section 5.01</u>, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby and (B) all of the other material assets, properties and rights used or held for use by Borrower, Guarantor or their respective Subsidiaries necessary for the operation of the Business, in each case, free and clear of all Liens other than Permitted Liens. Any Permitted Liens on such assets or other assets, properties or rights, individually or in the aggregate, do not materially interfere with the current use of any such asset, property or right by Borrower or materially detract from the value of any such asset, property or right.

(b)    The assets, properties and rights owned by Borrower and Guarantor constitute all of the assets, properties and rights that are reasonably necessary for, and are sufficient in all material

respects for, Borrower to, immediately following the Closing Date, conduct the Business in a manner consistent with past practice.

(c)     Each of the assets, properties and rights of Borrower and Guarantor are in all material respects adequate for the purposes for which such assets, properties and rights are used or held for use by the Business and are, taken as a whole, in reasonably good repair and operating condition (subject to normal wear and tear); provided, that some of the manufacturing equipment owned by Borrower is not currently in operating condition.

(d)     Borrower or Guarantor do not own or hold any patient records or other health information protected by law relating to any individual.

Section 3.08     Jurisdiction of Organization; Location of Chief Executive Office; Commercial Tort Claims.

(a)     The name of (within the meaning of Section 9-503 of the Code) and jurisdiction of organization of each Loan Party is set forth on Schedule 3.08(a) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement).

(b)     The chief executive office of each of Borrower amd Guarantor, in each case, is located at the address indicated on Schedule 3.08(b) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement.

(c)     Neither Borrower nor Guarantor nor any of their respective Subsidiaries holds any commercial tort claims, except as set forth on Schedule 3.08(c) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement).

Section 3.09     Litigation. Except for the Cases or as set forth on Schedule 3.09, there is no action, suit, claim (or counterclaim), arbitration, grievance, mediation, or proceeding pending or, to the Knowledge of Borrower and Guarantor, after due inquiry, threatened against any Loan Party, any of their respective Subsidiaries, or any of their respective properties, rights or assets or affecting the Business, including any audit, investigation or proceeding brought, conducted or heard by or before any Governmental Authority and no Loan Party has been subject to any settlement agreements or similar written agreements with any Governmental Authority or any outstanding order, writ, judgment, award, injunction, stipulation, determination or decree of any Governmental Authority of competent jurisdiction or any arbitrator or arbitrators.

Section 3.10     Financial Statements; No Material Adverse Effect.

(a)     All historical financial statements (including the Historical Financial Statements) relating to Borrower, Guarantor and their respective Subsidiaries that have been delivered to Lender have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments), present fairly in all material respects, Borrower's, Guarantor's and their respective Subsidiaries' consolidated financial condition as of the date thereof and results of operations for the period then ended. None of the Loan Parties nor any of their respective Subsidiaries has any contingent obligations or liability for taxes except (i) as disclosed in the most recent audited financial statements (including the notes thereto) furnished by Borrower to Lenders prior to the Closing Date or (ii) such liabilities incurred in the ordinary course of the business since the date of the financial statements. Other than the Cases and the occurrence of the exercise of certain proxy rights by the Prepetition Lender on or about October 18, 2020 involving the Debtors, no event, circumstance, or

30

change has occurred that has had or could reasonably be expected to result in a Material Adverse Effect with respect to any Loan Party or their respective Subsidiaries.

(b)    Borrower and Guarantor have maintained systems of internal accounting controls during the periods reflected in the Historical Financial Statements that are sufficient in all material respects to provide reasonable assurances that all material transactions have been recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

(c)    All of the accounts receivable and other receivables of Borrower and Guarantor are valid and enforceable claims, arose out of bona fide transactions in the ordinary course of business consistent with past practice and are not subject to any set-off or counterclaim with respect thereto.

Section 3.11    [Reserved].

Section 3.12    Employee Benefits.

(a)    Schedule 3.12(a) contains a true, complete and correct list of each Company Benefit Plan. With respect to each Company Benefit Plan, the Loan Parties have provided or made available to Lender (to the extent applicable) true, complete and correct copies of (i) the governing plan document, including all amendments thereto and all related trust agreements, insurance contracts or other funding arrangements (if any), (E) a written description of any Company Benefit Plan that is not set forth in a written document, (iii) the most recent summary plan description together with the summary or summaries of material modifications thereto, (iv) any correspondence with the IRS or any other Governmental Authority regarding the compliance or qualification of such Company Benefit Plan and (y) the two most recent annual reports (Form 5500 series and all schedules and financial statements attached thereto) and actuarial reports (if any). Neither Borrower, Guarantor nor any of their respective Subsidiaries has communicated to any current or former employee, officer, director, consultant or independent contractor any intention or commitment to materially amend or modify any Company Benefit Plan or to establish or implement any other employee or retiree benefit or compensation plan or arrangement.

(b)    No Company Benefit Plan is (and, within the last six years, none of Borrower, Guarantor or their respective Subsidiaries has sponsored, maintained or contributed to) any Employee Benefit Plan that is subject to Title W of ERISA or Section 412 of the IRC or Section 302 of ERISA, including any "multiemployer plan" (as defined in Sections 3(37) or 4001(a)(3) of ERISA). No event has occurred and to the Knowledge of Borrower and Guarantor, no condition exists with respect to the Business that would reasonably be expected to subject Borrower, Guarantor or any of their respective Subsidiaries to any material liability by reason of being an ERISA Affiliate of any other Person.

(c)    Each Company Benefit Plan has been established, administered and maintained in all material respects in accordance with its terms and in compliance in all respects with applicable laws, including ERISA and the IRC. All amendments and actions required to bring each such Company Benefit Plan into conformity with the applicable provisions of ERISA, the IRC and other applicable law have been made or taken, except to the extent such amendments or actions are not required by law to be made or taken until after the Closing Date. All contributions, reserves and premiums required to have been paid by Borrower, Guarantor or any of their respective Subsidiaries to any such Company Benefit Plan under the terms of any such plan or its related trust, insurance contract or other funding arrangement, or pursuant to any applicable law (including ERISA and the IRC) have been paid within the time prescribed by any such plan, agreement or applicable law.

(d)    Except as set forth on Schedule 3.12(d), no Company Benefit Plan is or is intended to be "qualified" within the meaning of Section 401(a) of the IRC and no trusts maintained thereunder are or are intended to be exempt from taxation under Section 501(a) of the IRC.

(e)    Borrower does not have any liability in respect of post-retirement health, medical or life insurance benefits for former or current employees or service providers of Borrower, other than continuation coverage as may be required under section 4980B of the IRC or Part 6 of Title I of ERISA.

(f)    With respect to each Company Benefit Plan: (i) there is no pending or, to the Knowledge of Borrower and Guarantor, threatened action, suit, dispute, claim (other than a routine claim for benefits), examination, audit, investigation or other proceeding, and (ii) to the Knowledge of Borrower and Guarantor, no facts or circumstances exist that would reasonably be expected to give rise to any such actions, suits, disputes or claims. There is no pending or, to the Knowledge of Borrower and Guarantor, threatened claim by any current or former employee or service provider of Borrower, Guarantor or any of their respective Subsidiaries or any Affiliate relating to such Person's compensation, terms and conditions of employment or the provision of services, or employee benefits.

(g)    Except as set forth in Schedule 3.12(g), the execution, delivery and performance of the Loan Documents by the Loan Parties and the consummation of the transactions contemplated by the Loan Documents will not (alone or in combination with any other event) (i) entitle any current or former employee, consultant, independent contractor, officer or director of Borrower, Guarantor or any of their respective Subsidiaries to severance pay or any other payment, (ii) result in any payment becoming due, accelerate the time of payment or vesting of benefits under any Company Benefit Plan or increase the amount of compensation or benefits due to any such employee, consultant, officer or director, (iii) result in any forgiveness of indebtedness, trigger any funding obligation under any such Company Benefit Plan or impose any restrictions or limitations on Borrower's rights to administer, amend or terminate any such Company Benefit Plan, (iv) result in the payment or vesting of any Transaction Bonus or (v) result in any payment (whether in cash or property or the vesting of property) to any "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) that could reasonably be construed, individually or in combination with any other such payment, to constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the IRC). No person is entitled to receive any additional payment (including any tax gross-up or other payment) from Borrower, Guarantor or any of their respective Subsidiaries as a result of the imposition of the excise taxes required by Section 4999 of the IRC or any taxes required by Section 409A of the IRC.

Section 3.13    Environmental Matters.

(a)    Borrower, Guarantor and their respective Subsidiaries are, and since January 1, 2019 have been in compliance in all material respects with applicable Environmental Laws, and in possession of, and compliance in all material respects with, all Licenses required under applicable Environmental Laws.

(b)    There has been no claim, action, investigation or proceeding pending or, to the Knowledge of Borrower and Guarantor, threatened against Borrower, Guarantor or any of their respective Subsidiaries, or affecting any of the assets, properties or rights thereof, alleging violations of or liability under any Environmental Law.

(c)    There are no outstanding orders, judgments, awards, injunctions, determinations or decrees of any Governmental Authority arising under Environmental Laws against Borrower, Guarantor or any of their respective Subsidiaries or affecting any of the assets, properties or rights thereof.

(d)        No Release of Hazardous Substances has occurred at any real property currently or formerly owned, leased, operated or used by Borrower, Guarantor or any of their respective Subsidiaries that has resulted or would reasonably be expected to result in material liabilities to Borrower, Guarantor or any of their respective Subsidiaries under an Environmental Law.

(e)        The Loan Parties have made available to Lender copies of all environmental reports prepared by or on behalf of any Loan Party in the possession, custody or control of any Loan Party or any Subsidiary of Borrower or Guarantor concerning any real property currently or formerly owned or leased by Borrower or Guarantor.

Section 3.14        Intellectual Property.

(a)        Schedule 3.14 contains a list of (i) all Company Registered Intellectual Property, (ii) all Company Software and g) all common law trademarks owned by Borrower, Guarantor or their respective Subsidiaries that are material to the Business.

(b)        Borrower, Guarantor or such Subsidiary, as the case may be, is the exclusive owner of any Company Intellectual Property by assignment or as a matter of law, free and clear of all Liens, other than Permitted Liens, and all Company Registered Intellectual Property is subsisting and has not been declared invalid, and, to the Knowledge of Borrower and Guarantor, is valid.

(c)        Borrower, Guarantor or such Subsidiary, as the case may be, has paid all maintenance fees, renewal fees or annuity expenses due for payment prior to the date hereof for maintenance of the Company Registered Intellectual Property.

(d)        The Company Intellectual Property, together with any Intellectual Property licensed to Borrower, Guarantor or any of their respective Subsidiaries, constitutes all the Intellectual Property necessary to carry on the Business, and is sufficient to carry on the Business, immediately following the Closing, in all material respects as it is being conducted as of the date hereof and will be conducted immediately prior to the Closing

(e)        There has been no settlement, forbearance to sue, consent, judgment or order to which the Company is a party or with respect to which Borrower, Guarantor or any of their respective Subsidiaries is bound that (i) materially restricts the rights of Borrower, Guarantor or such Subsidiary to use, license, sell, distribute or otherwise fully exploit any Company Intellectual Property or (ii) permits any third party to use any Company Intellectual Property other than on behalf of Borrower, Guarantor or such Subsidiary.

(f)        Neither (i) the use by Borrower, Guarantor or any of their respective Subsidiaries of any Company Intellectual Property nor (ii) the conduct of the Business by Borrower, Guarantor or any of their respective Subsidiaries, misappropriates, infringes or dilutes any Intellectual Property rights of any third party. During the two-year period prior to the date hereof, no party has filed or made a written claim (or, to the Knowledge of Borrower and Guarantor, threatened to file or make a claim) against Borrower, Guarantor or any of their respective Subsidiaries alleging that it has violated, misappropriated or infringed rights on Intellectual Property rights of any party.

(g)        Borrower, Guarantor and each of their Subsidiaries has taken commercially reasonable measures to protect the confidentiality of trade secrets and other confidential information that is material to the Business.

WEIL:\97711728\19\64058.0301

(h)     Borrower possesses a correct and complete list of each of the customers of the Business that have purchased goods and/or services from the Business during the three year period prior to the date hereof. Borrower, Guarantor and their respective Subsidiaries has taken all commercially reasonable steps to maintain the confidentiality of the customer lists of the Business and, to the Knowledge of Borrower and Guarantor, no third party is in possession of such customer lists.

(i)     The Internal IT Systems used by the Business (i) are in good repair and operating condition and are adequate and suitable in all material respects for the conduct of the Business and (ii) have not been subject to any continued failures, breakdowns or outages since the Representation Date. Since the Representation Date, each of Borrower, Guarantor and each of their respective Subsidiaries has been in compliance in all material respects with all applicable law, contracts and policies applicable to the Business with respect to the collection, use, storage, distribution, transfer, protection or disclosure of any information or data. Since the Representation Date, there have not been any breaches in security for the Internal IT Systems that have resulted in the loss, or unauthorized access, disclosure or use of any such information or data.

Section 3.15     Leases. Each of Borrower, Guarantor and each of their respective Subsidiaries enjoy peaceful and undisturbed possession under all leases material to their business and to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no material default by Borrower, Guarantor or their respective Subsidiaries exists under any of them.

Section 3.16     Deposit Accounts and Securities Accounts. Set forth on Schedule 3.16 (as updated from time to time to reflect changes permitted under this Agreement) is a listing of all of Borrower's, Guarantor's or any of their respective Subsidiaries' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

Section 3.17     Collateral Reports. Each Perfection Certificate and, to the Knowledge of Borrower and Guarantor, Third Party Report is true, complete and correct in all material respects as of the date delivered to Lender and does not fail to reflect any material matter affecting the Collateral.

Section 3.18     Indebtedness. Set forth on Schedule 3.18 is a true and complete list of all Indebtedness of each of Borrower, Guarantor and each of their respective Subsidiaries outstanding immediately prior to the Closing Date that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date. None of the Loan Parties or any of their respective Subsidiaries has any ongoing off-balance-sheet liabilities.

Section 3.19     Payment of Taxes. Except as otherwise permitted under Section 5.01(g) or pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, all material tax returns required to be filed by, on behalf of or with respect to Borrower, Guarantor and their respective Subsidiaries have been duly and timely filed and are true, correct and complete in all material respects. Except for Taxes that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, all material Taxes (whether or not reflected on such tax returns) and all assessments, fees and other governmental charges upon Borrower, Guarantor and their respective Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable and required to be paid with respect to, or that could give rise to a Lien on the assets of, Borrower, Guarantor or any of their respective Subsidiaries have been duly and timely paid. All material Taxes required to be withheld by Borrower, Guarantor or any of their respective Subsidiaries have been duly and timely withheld, and such withheld Taxes have been either duly and timely paid to the proper Governmental Authority or properly set aside in accounts for such purpose. Each of Borrower, Guarantor and each of their respective Subsidiaries have made adequate

34

provision in accordance with GAAP for all Taxes not yet due and payable. To the Knowledge of Borrower and Guarantor, there are no proposed tax assessment against Borrower, Guarantor or any of their respective Subsidiaries that is not being actively contested by Borrower, Guarantor or such Subsidary diligently, in good faith, and by appropriate proceedings; provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

Section 3.20    Margin Stock. None of the Loan Parties or any of their respective Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

Section 3.21    Governmental Regulation. None of the Loan Parties or any of their respective Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. None of the Loan Parties or any of their respective Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

Section 3.22    Employee and Labor Matters.

(a)    None of the employees of Borrower, Guarantor or their respective Subsidiaries are represented by a labor organization or group that was either voluntarily recognized or certified by any labor relations board (including the NLRB), and, to the Knowledge of Borrower and Guarantor, no organizational attempt has been made or threatened by or on behalf of any labor union, employee or labor organization, or collective bargaining unit with respect to any such employees.

(b)    None of the employees of Borrower, Guarantor or any of their respective Subsidiaries is a signatory to a collective bargaining agreement or other labor contract with any trade union, labor organization or group.

(c)    To the Knowledge of Borrower and Guarantor, no material organized labor dispute, labor grievance, unfair labor practice, walk out, strike, hand billing, picketing, organizing, campaigning, work stoppage or other similar organized labor activity involving the employees Borrower, Guarantor or any of their respective Subsidiaries is in progress or, has been threatened in the last three years.

(d)    Borrower, Guarantor and each of their respective Subsidiaries is in compliance in all material respects with all applicable laws respecting labor, employment, fair employment practices, terms and conditions of employment, overtime compensation, workers' compensation, occupational safety and health requirements, plant closings, wages and hours, withholding of taxes, employment discrimination, immigration matters, disability rights or benefits, equal opportunity, labor relations, employee leave issues and unemployment insurance and related matters.

(e)    To the Knowledge of Borrower and Guarantor, all individuals who provide services to Borrower, Guarantor or any of their respective Subsidiaries have at all times been accurately classified by Borrower, Guarantor or such Subsidiary, as applicable, or with respect to such services as exempt or non-exempt from overtime compensation or as employee or a non-employee in accordance with applicable law.

(f)    To the Knowledge of Borrower and Guarantor, there is no officer, executive, key employee or group of employees of Borrower, Guarantor or any of their respective Subsidiaries who has or

35

have indicated in writing or, to the knowledge of Borrower, Guarantor and each of their respective Subsidiaries, otherwise indicated an intention to terminate his, her or their employment with Borrower, Guarantor or any such Subsidiary in the last year.

(g)     There is no pending or, to the Knowledge of Borrower and Guarantor, threatened claim or litigation against Borrower, Guarantor or any of their respective Subsidiaries or with respect to allegations of sexual harassment or sexual misconduct, and in the last three years (i) to the Knowledge of Borrower and Guarantor, there have been no reported internal or external complaints accusing any supervisory or managerial employee of Borrower, Guarantor or any of their respective Subsidiaries of sexual harassment or sexual misconduct and (ii) there has been no settlement of, or payment arising out of or related to, any claim, litigation or complaint with respect to sexual harassment or sexual misconduct.

Section 3.23     Guarantor. Guarantor does not have any material liabilities (other than liabilities arising under the Loan Documents and Permitted Indebtedness), own any material assets (other than the Mortgaged Real Property) or engage in any operations or business.

Section 3.24     Investments. As of the Closing Date, none of the Loan Parties has any Subsidiaries. No Loan Party owns any Investments except for Permitted Investments.

Section 3.25     Perfection. Upon the execution and delivery thereof by the parties thereto, the Loan Documents will be effective to create (to the extent described therein), in favor of Lender, a valid and enforceable security interest in the Collateral described therein, except as to enforcement, as may be limited by applicable domestic or foreign bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing. The security interests granted pursuant to the Loan Documents shall constitute (to the extent described therein) a first-priority perfected security interest in, all right, title and interest of each Loan Party party thereto in the Collateral described therein with respect to such Loan Party.

Section 3.26     Location of Collateral. Except as permitted pursuant to Section 5.02(p), the Collateral (other than the Collateral in the possession of Lender or a custodian for the benefit of Lender) is not stored with a bailee, warehouseman or similar party and is located only at, or in-transit between, the locations identified on Schedule 3.26 (as such Schedule may be updated pursuant to Section 5.01(k)).

Section 3.27     Food and Drug Administration.

(a)     To the Knowledge of Borrower and Guarantor, none of Borrower, Guarantor or their respective Subsidiaries has since the Representation Date received any Form FDA-483, notice of adverse finding, FDA warning letter, notice of violation, notice of FDA action for import detentions or refusals, or any other written correspondence from the FDA, the Federal Trade Commission (**"FTC"),** or other Governmental Authority alleging or asserting noncompliance with any applicable law (including any FDA Law) or requiring material changes to any product, product claim, or manufacturing sites or manufacturing processes, and, to the Knowledge of Borrower and Guarantor, there are no facts or circumstances that, now or with the passage of time, would create a basis for the giving of any such notice, except where any violation or failure to comply with such applicable laws would not be, individually or in the aggregate, materially adverse to the business of Borrower, taken as a whole.

(b)     Borrower and Guarantor are not subject to any obligation arising under an administrative or regulatory action, consent order, inspection, warning letter, notice of violation letter, or other notice, response or commitment made to or with the FDA, the FTC, or any Governmental Authority

36

with respect to a violation, and to the Knowledge of Borrower and Guarantor, no such proceedings have been threatened.

(c)     To the Knowledge of Borrower and Guarantor, no products manufactured, distributed, or sold by or on behalf of Borrower, Guarantor or their respective Subsidiaries have been seized, withdrawn, recalled, detained, or subject to a suspension of manufacturing or distribution since the Representation Date, and there are no facts or circumstances reasonably likely to cause (i) the seizure, denial, withdrawal, recall, detention, field notification, field correction, safety alert, or suspension or termination of manufacturing, marketing or distribution relating to any products; or (ii) a change in the labeling of any products.

(d)     None of Borrower, Guarantor or their respective Subsidiaries, nor, to the Knowledge of Borrower and Guarantor, any of Borrower's or Guarantor's respective officers, employees, directors or agents, has committed any act, made any statement or failed to make any statement that would reasonably be expected to provide a basis for the FDA or any other Governmental Authority to invoke its policy with respect to "Fraud, Untrue Statements of Material Facts, Bribery and Illegal Gratuities", or similar policies, set forth in any applicable laws, except as otherwise disclosed in writing by Borrower to Lender prior to the Petition Date.

(e)     None of Borrower, Guarantor or their respective Subsidiaries, or any of their respective officers managers, or to the Knowledge of Borrower and Guarantor, their respective employees, intermediaries or third-party agents, is debarred or has been convicted of any crime or engaged in any conduct that has resulted, or would reasonably be expected to result, in debarment under applicable law, including, without limitation, 21 U.S.C. Section 335a. No claims, actions, proceedings or investigations that would reasonably be expected to result in such debarment are pending or, to the Knowledge of Borrower and Guarantor, threatened against Borrower or Guarantor or any of their respective Subsidiaries, officers or managers. To the Knowledge of Borrower and Guarantor, no claims, actions, proceedings or investigations that would reasonably be expected to result in such debarment are pending or threatened against any of Borrower's, Guarantor's or any of their respective Subsidiaries', employees, intermediaries or third-party agents.

Section 3.28     <u>Mortgaged Real Property</u>.

(a)     No Condemnation or other proceeding has been commenced or, to the Knowledge of Borrower and Guarantor, is threatened in writing with respect to all or any portion of the Mortgaged Real Property or for the relocation of roadways providing access to the Mortgaged Real Property.

(b)     There are no contemplated Improvements to the Mortgaged Real Property that may result in any special or other assessments. All costs and expenses of any and all labor, materials, supplies and equipment used in the construction maintenance or repair of the Improvements have been paid in full or will be paid in full when due. To the Knowledge of Borrower and Guarantor, there are no claims for payment for work, labor or materials affecting the Mortgaged Real Property which are or may become a lien prior to, or of equal priority with, the Liens created by the Loan Documents, other than matters for which the Title Policy insures over.

(c)     No claims have been made under any of the insurance policies other than such claims which are covered by insurance or which would not reasonably be expected to have a material adverse effect on the value, use or operation of the Mortgaged Real Property, the condition (financial or otherwise) or business of any Loan Party or Borrower's ability to repay the Loan, and to the Knowledge of Borrower and Guarantor, no Person, including any Loan Party, has done, by act or omission, anything which would impair the coverage of any insurance policies.

(d)        All certifications, permits, licenses and approvals, including, without limitation, certificates of completion or occupancy (except as otherwise disclosed in writing to the Lender prior to the Petition Date) required for the legal use, occupancy and operation of the Mortgaged Real Property for the purpose intended to operate the business of the Loan Parties, have been obtained and are valid and in full force and effect, except to the extent the failure to so obtain or to be so valid and in full force and effect would not reasonably be expected to have a material adverse effect on the value, use or operation of the Mortgaged Real Property, the condition (financial or otherwise) or business of the Loan Parties or Borrower's or any Loan Party's ability to repay the Loan; provided, that a certain portion of the building owned by Guarantor has not received a certificate of occupancy from the applicable Governmental Authority as of the Closing Date. The Loan Parties shall keep and maintain (or cause to be kept and maintained) all material licenses necessary for the operation of the Mortgaged Real Property for the conduct of the business. The use being made of the Mortgaged Real Property is in conformity with any Licenses issued for the Mortgaged Real Property, except to the extent such nonconformity would not reasonably be expected to have a material adverse effect on the value, use or operation of the Mortgaged Real Property, the condition (financial or otherwise) or business of the Loan Parties or Borrower's or any Loan Party's ability to repay the Loan.

(e)        None of the Improvements on the Mortgaged Real Property are located in an area identified by FEMA as an area having special flood hazards, or, if any portion of the Improvements is located within such area, the Loan Parties have obtained the insurance prescribed in Section 5.01(f).

(f)        To the Knowledge of Borrower and Guarantor, the Mortgaged Real Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects. To the Knowledge of Borrower and Guarantor, there exists no structural or other material defects in or damages to the Mortgaged Real Property, as a result of a Casualty or otherwise, and whether latent or otherwise. No Loan Party has received written notice from any insurance company or bonding company of any defects or inadequacies in the Mortgaged Real Property, or any part thereof, which would adversely affect, in any material respect, the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(g)        To the Knowledge of Borrower and Guarantor, (i) none of the Improvements which were included in determining the appraised value of the Mortgaged Real Property lie outside the boundaries and building restriction lines of the Mortgaged Real Property to any material extent, and (li) no improvements on adjoining properties encroach upon the Mortgaged Real Property and no easements or other encumbrances upon the Mortgaged Real Property encroach upon any of the Improvements so as to materially affect the value or marketability of the Real Property.

(h)        No Loan Party is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Real Property or any interest therein.

(i)        Each Mortgage has been, or will be by the title company, duly recorded and any other formal requirements of state or local law applicable to the recording of real property mortgages in the applicable jurisdiction generally have been, or will be, complied with and each Mortgage shall constitute a valid and enforceable Lien on all of the applicable Loan Party's right, title and interest in and to the Mortgaged Real Property thereunder and any proceeds thereof.

ARTICLE IV

Conditions Precedent

Section 4.01    Conditions Precedent to Initial Borrowing. The occurrence of the Closing Date and the obligation of Lender to make Loans on the Closing Date (the Borrowing on the Closing Date, the "**Initial Borrowing**") are subject to satisfaction of the following conditions precedent:

(a)    Receipt by Lender of:

(i)    duly executed counterparts of this Agreement and the other Loan Documents (which shall be in form and substance satisfactory to Lender) from Borrower and Guarantor;

(ii)    certificates of a Responsible Officer of each of Borrower and Guarantor in form and substance reasonably satisfactory to Lender, attaching each of the following documents and certifying that each is true, correct and complete and in full force and effect as of the Closing Date:

(A)    copies of its Governing Documents, as amended, supplemented or otherwise modified on or prior to the Closing Date;

(B)    copies of its resolutions approving and adopting this Agreement, the transactions contemplated herein, and authorizing the execution and delivery hereof;

(C)    evidence of incumbency and the signature of authorized signatories;

(D)    long-form certificates of good standing or the equivalent from its jurisdiction of organization or formation certified within 10 days of the Closing Date by the appropriate Governmental Authority; and

(E)    certificates of status issued by the appropriate officer of each jurisdiction (other than such Person's jurisdiction of organization or formation) in which failure to be duly qualified or licensed would cause a Material Adverse Effect, which certificates shall indicate that such Person is in good standing in such other jurisdiction and be certified within 10 days of the date thereof;

(iii)    a closing certificate from the Loan Parties in form and substance reasonably satisfactory to Lender certifying as to the matters set forth in Sections 4.01(e), (f) and (k);

(iv)    [reserved];

(v)    (A) all documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the USA PATRIOT Act and (B) if Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification; and

(vi)    each Uniform Commercial Code financing statement required or reasonably requested by Lender to be filed, registered or recorded to create in favor of

39

Lender a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Permitted Liens permitted to be superior to the Liens in favor of Lender pursuant to this Loan Agreement), in proper form for filing, registration or recordation.

(b)        [Reserved].

(c)        Receipt by Lender of a valid Borrowing Notice.

(d)        All Governmental Approvals and consents and approvals of, or notices to, any other Person required in connection with the Transactions, the execution and performance of the Loan Documents, the continuing operations of the Loan Parties and their respective Subsidiaries, the operations of the Loan Parties and their respective Subsidiaries as expected to result from the Transactions and the other transactions contemplated hereby shall have been obtained and be in full force and effect (including regulatory approvals and other consents), and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that could reasonably be expected to restrain, prevent or otherwise impose burdensome conditions on the Transactions or the financing contemplated hereby.

(e)        Each representation or warranty of such Loan Party set forth in Article III (other than the representations and warranties set forth in Section 3.05 and 3.06, each of which shall be true and correct in all respects) and in each other Loan Document shall be true and correct in all material respects or in all respects if the applicable representation or warranty is qualified as to "materiality," "material adverse effect" or similar language, except to the extent any such representation or warranty expressly relates to an earlier date, in which case such representation or warranty shall be true and correct in all material respects or in all respects if the applicable representation or warranty is qualified as "materiality," "material adverse effect" or similar language on and as of such earlier date.

(f)        (i) No Material Adverse Effect shall exist on the date of such Borrowing or result from such Borrowing and (ii) since December 31, 2018, there shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Cases and the occurrence of the exercise of certain proxy rights by the Prepetition Lender on or about October 18, 2020 involving the Debtors) or threatened in any court or before any arbitrator or governmental authority that, in the opinion of the Lender, affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting the businesses, assets, operations or condition (financial or otherwise) of any of the Debtors and their respective direct and indirect subsidiaries or any of the transactions contemplated hereby.

(g)        Borrower shall have paid all fees and expenses required to be paid pursuant to this Agreement (including all fees and expenses of Weil, Gotshal & Manges LLP and any other counsel to Lender, and Six Sigma Academy International LLC as financial advisor to the Lender, arising before the Petition Dates) and the other Loan Documents and all other expenses payable to Lender as have been separately agreed shall have been paid in full in cash (which amounts may be offset against the proceeds of the Initial Borrowing.

(h)        Lender shall have received (i) an Existing Budget which has been updated to reflect a cash flow forecast for the 17-week period beginning on December 6, 2020, certified by an officer reasonably acceptable to the Lender as being prepared in good faith and fairly presenting in all material respects the information set forth therein, in excel and PDF format and otherwise in form and substance acceptable to Lender (as may be updated, modified or supplemented with the consent of Lender in its sole discretion, the "**Initial Approved Budget**") reflecting, for such period (the "**Budget Period**"), projected

40

weekly disbursements of Borrower and balances of the Loans and the Prepetition Loans (in each case, in line item detail) and ending cash for each week during the Budget Period and (ii) projected monthly revenues and gross profits for the period through December 31, 2021, in each case, with the results and assumptions set forth in all of such projections in form and substance reasonably satisfactory to Lender.

(i)       Lender shall be satisfied with the amount, types and terms and conditions of all insurance and bonding maintained by the Debtors.

(j)       Lender shall have a valid and perfected lien on and security interest in the Collateral with the priority described herein (subject in the case of any actions and documentation outside of the United States to post-closing periods and mechanics to be agreed). Subject to the immediately preceding parenthetical, all filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

(k)       No default or Event of Default shall exist under the Loan Documents.

(l)       Bankruptcy Related Items.

(i)       No later than two business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

(ii)      The Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(iii)     The Stalking Horse APA shall have been executed.

(iv)     The Bidding Procedures Motion shall have been filed in the Cases within one day after the Petition Date.

(v)      A motion, in form and substance satisfactory to Lender, seeking approval of the DIP Facility, shall have been filed in the Cases within one day after the Petition Date.

(vi)     All "first day" orders and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Bankruptcy Court and shall be in form and substance acceptable to Lender.

(vii)    The Loan Parties shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is made pursuant to "first day" orders reasonably acceptable to Lender in its sole discretion.

(viii)   No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Cases.

(m)      There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that would reasonably be expected to have a Material Adverse Effect.

(n)      The Petition Date shall have occurred, and each Loan Party shall be a debtor and debtor-in-possession in the Cases.

WEIL:\97711728\19\64058.0301

Section 4.02    <u>Conditions Precedent to Borrowings subsequent to the Closing Date</u>. The obligation of Lender to fund any Borrowing hereunder subsequent to the Closing Date is subject to the following conditions precedent:

      (a)      The Closing Date shall have occurred.

      (b)      Receipt by Lender of a valid Borrowing Notice.

      (c)      At all times prior to the Final Order Entry Date, the Interim Order shall be in full force and effect, shall not have been vacated or reversed and shall not have been modified or amended, shall not be subject to a stay and shall not have been modified or amended in any respect without the prior written consent of Lender.

      (d)      On the date of the such Borrowing, (i) no default or Event of Default shall exist under the Loan Documents and (ii) each representation or warranty of each Loan Party set forth in Article III (other than the representations and warranties set forth in <u>Section 3.05</u> and <u>3.06</u>, each of which shall be true and correct in all respects) and in each other Loan Document shall be true and correct in all material respects or in all respects if the applicable representation or warranty is qualified as to "materiality," "material adverse effect" or similar language, except to the extent any such representation or warranty expressly relates to an earlier date, in which case such representation or warranty shall be true and correct in all material respects or in all respects if the applicable representation or warranty is qualified as "materiality," "material adverse effect" or similar language on and as of such earlier date.

      (e)      No change in the business, assets, management, operations, financial condition or prospects of the Loan Parties, other than the filing of the Cases, shall have occurred since December 31, 2018, which change has had or would reasonably be expected to have a Material Adverse Effect.

      (f)      Solely with respect to any proposed Borrowing on or after the date that is 21 calendar days after the Petition Date, the Final Order Entry Date shall have occurred concurrently with or prior thereto, and the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay, shall not have been modified or amended in any respect without the prior written consent of Lender, and Lender shall have received a signed copy of the Final Order entered by the Bankruptcy Court.

Each Borrowing Notice submitted by Borrower subsequent to the Closing Date shall be deemed to be a representation and warranty that the conditions specified in this <u>Section 4.02</u> shall have been satisfied on and as of the date of the requested Borrowing.

Section 4.03    <u>Conditions Subsequent</u>. The obligation of Lender to make Loans (or otherwise extend credit hereunder) is subject to receipt by Lender within 30 days (plus any reasonably necessary additional time with respect to requests under clauses (iv) and (x) below) of the Closing Date of endorsements naming Lender as additional insured and lender's loss payable under all insurance policies to be maintained with respect to the properties of the Debtors forming part of the Collateral. The failure by any Loan Party to so perform or cause to be performed such conditions subsequent as and when required (unless such date is extended, in writing, by Lender) shall constitute an Event of Default.

ARTICLE V
Covenants

Section 5.01    <u>Affirmative Covenants</u>. For so long as any Loan is outstanding, each of Borrower and Guarantor shall, and shall cause each of Borrower's and Guarantor's respective Subsidiaries to:

42

(a)    <u>Financial Reporting.</u> Cause to be delivered to Lender, in each case accompanied by a discussion and analysis from the management of Borrower and Guarantor on Borrower and Guarantor's consolidated financial condition:

(i)    as soon as possible, but in any event within 90 days after the end of such entity's fiscal year, consolidated financial statements of each of Borrower and Guarantor for such fiscal year (such financial statements to include a balance sheet, income statement, statement of cash flow and footnotes and, if prepared, such accountants' letter to management) setting forth in comparative form the figures for and as of the end of the previous year, (A) certified, without any qualifications or exceptions, to have been prepared in accordance with GAAP and (B) for each fiscal year ending after December 31, 2020, audited by an auditing firm approved by Lender in its reasonable discretion, or such other independent certified public accountants reasonably acceptable to Lender, and certified, without any qualifications or exceptions, by such accountants to have been prepared in accordance with GAAP;

(ii)    as soon as possible, but in any event within 45 days after the end of each of the quarterly periods of each fiscal year commencing with the fiscal quarter ending December 31, 2020, the unaudited consolidated balance sheets of Borrower as at the end of such quarter and the related unaudited consolidated statements of income and changes in cash flows of Borrower for such quarter and the portion of the fiscal year through the end of such quarter, in each case setting forth in comparative form the figures for and as of the corresponding periods of the previous year, in each case certified by a Responsible Officer of Borrower as being fairly stated in all material respects (subject to normal year-end audit and other adjustments); and

(iii)    as soon as possible, but in any event within 30 days after the end of each calendar month during each fiscal year commencing with the month ending November 30, 2020, the unaudited consolidated balance sheets of Borrower as at the end of such month and the related unaudited consolidated statements of income and changes in cash flows of Borrower for such month and the portion of the fiscal year through the end of such month, in each case setting forth in comparative form the figures for and as of the corresponding periods of the previous year, in each case certified by a Responsible Officer of Borrower as being fairly stated in all material respects (subject to normal year-end audit and other adjustments).

(b)    <u>Other Information.</u> Cause to be delivered to Lender:

(i)    concurrently with the delivery of the financial statements referred to in <u>Section 5.01(a)(i)</u>, an updated Perfection Certificate and updated schedules relating to the Collateral (or a certification by the Loan Parties that there have been no changes to the most recent Perfection Certificate and Collateral schedules delivered by the Loan Parties hereunder);

(ii)    within three Business Days after a Responsible Officer obtains knowledge thereof, written notice of (A) any Default or Event of Default, (B) any matter which has resulted or could reasonably be expected to result in a Material Adverse Effect, (C) any ERISA Event that could result in a material liability to Borrower, Guarantor or any of their respective Subsidiaries, (D) any termination, suspension, material default or any other similar event arising with respect to any customer contracts of any Loan Party or any of its Subsidiaries in existence as of the Closing Date or thereafter, in each case, with an

43

individual or aggregate value of $100,000 or more, (E) the availability, occurrence, event, condition or receiving service of any action, suit or proceeding whether before any Governmental Authority or otherwise, against any Loan Party, which suit or proceeding if decided adversely to such Loan Party or such Subsidiary could reasonably be expected to result in (1) costs or damages to Borrower or Guarantor or their respective Subsidiaries of $250,000 or more or (2) a Material Adverse Effect, or (F) any Event of Loss involving assets with a fair market value of $100,000 or more (as valued at the time of such Event of Loss);

(iii)    within five Business Days of receipt thereof by Borrower or Guarantor, a copy of any definitive letter provided by its certified public accountants citing a "material weakness";

(iv)    promptly (but in any event within three Business Days) after a Responsible Officer of Borrower or Guarantor obtains knowledge (A) that any Governmental Authority is limiting, suspending or revoking any material registration applicable to Borrower, Guarantor or their respective Subsidiaries or any of their products, or material distribution pathway of the products of Borrower, Guarantor or their respective Subsidiaries, (B) of any of Borrower, Guarantor or any of their respective Subsidiaries becoming subject to any material administrative or regulatory enforcement action (including any Form FDA-483, notice of adverse finding, FDA warning letter, notice of violation or "untitled letter," notice of FDA action for import detentions or refusals, or any other written correspondence from the FDA, the FTC, or other Governmental Authority alleging or asserting noncompliance with any applicable law (including any FDA Law) or requiring material changes to any product, product claim, or manufacturing sites or manufacturing processes, and, to the knowledge of any Responsible Officer of Borrower or of Guarantor, that any event, now or with the passage of time, would create a basis for the giving of any such notice), or any material portion of the products of Borrower, Guarantor or any of their respective Subsidiaries being seized, recalled, or subject to a suspension of manufacturing or distribution relating to any products, or the commencement of any proceedings in the United States or any other jurisdiction seeking the recall, suspension, cessation of distribution, or seizure of any material portion of the products of Borrower, Guarantor or any of their respective Subsidiaries, or (c) of any voluntary recall of any material portion of its products by Borrower, Guarantor or any of their respective Subsidiaries;

(v)    promptly, all information required under and pursuant to the Bidding Procedures and the Bidding Procedures Order in accordance with the terms thereof; provided, that notwithstanding anything in this Agreement to the contrary, the Loan Parties shall not be required to share any information related to the matters contemplated by or relating to the Bidding Procedures or the Bidding Procedures Order (A) that the Debtors reasonably determine must remain confidential to not advantage Lender in connection with a bid for any material portion of the assets of the Loan Parties over any other party and (B) to the extent that sharing of such information would be inconsistent with the Bidding Procedures or the Bidding Procedures Order;

(vi)    promptly, written notice upon becoming aware of any breach of any representation and warranty under the Stalking Horse APA (which, for purposes of determining any breach thereof, any knowledge qualifier (e.g., "Knowledge of the Sellers") shall be disregarded); and

(vii)    such other information as Lender may reasonably request from time to time, including, without limitation, information requested by Lender to confirm compliance with any covenants and information related to financial crimes.

(c)    <u>Lender Calls</u>. Host conference calls with Lender and any financial advisor engaged by Borrower to discuss the status of the DIP Facility, the Cases, the financial condition of Borrower and Guarantor, the Stalking Horse Transaction, the Approved Budget, the Variance Report, and any other financial and business information provided to Lender, including, without limitation, any material modification in the status of any material contract, regularly at such times as may be reasonably requested by Lender.

(d)    <u>Inspection</u>. Permit representatives of Lender to visit and inspect any of the properties or assets (including, without limitation, the Collateral) of Borrower or Guarantor, including their respective books of account, and to discuss their respective affairs, finances and accounts (including, without limitation, the Collateral) with Borrower's or Guarantor's officers and their respective independent public accountants, all at such reasonable times and as often as Lender may reasonably request; provided that so long as no Event of Default shall have occurred and is continuing, the costs and expenses of such inspection shall be for the account of Lender.

(e)    <u>Existence; Compliance with Laws</u>.

(i)    At all times, preserve and keep in full force and effect such Person's valid existence and good standing in its jurisdiction of organization and, except as could not reasonably be expected to result in a Material Adverse Effect, good standing with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals (including any permits, licenses, accreditations, authorizations or approvals required under any Environmental Law or FDA Law) material to their businesses; and

(ii)    (x) Comply with the requirements of its Governing Documents and (y) comply in all material respects with all applicable laws, rules, regulations and orders of any Governmental Authority, except, in the case of clause (y), where the failure to comply with such laws, rules, regulations and orders could not reasonably be expected to result in a Material Adverse Effect (it being understood that in the case of any such laws, rules, regulations and orders specifically referred to in any other provision of this Agreement, Borrower and Guarantor and their respective Subsidiaries shall be required also to represent and/or comply with, as applicable, the express terms of such provisions).

(f)    <u>Maintenance of Properties</u>. Maintain and preserve all of its assets that are necessary in the proper conduct of its business in good working order and condition, ordinary wear, tear, casualty and condemnation excepted.

(g)    <u>Taxes</u>. Subject to the Orders, pay in full before delinquency or before the expiration of any extension period all material Taxes imposed, levied, or assessed against it, or any of its assets or in respect of any of its income, businesses, or franchises, including all Property Taxes, except to the extent that the validity of such Tax is the subject of a Permitted Protest; provided that all Property Taxes shall be paid prior to the commencement of any Permitted Protest related thereto if required by applicable law. The Loan Parties shall furnish to Lender receipts for the payment of Property Taxes within five Business Days of Lender's request.

(h)    <u>Insurance</u>. At Borrower's or Guarantor's expense, such parties shall maintain until the Maturity Date, (i) insurance respecting each of Borrower's, Guarantor's and their respective Subsidiaries' assets wherever located, covering liabilities, losses or damages as are customarily insured against by other Persons engaged in the same or similar businesses and similarly situated and located, and (ii) with respect to Borrower, Guarantor and their respective Subsidiaries, property, windstorm, flood, business interruption, general liability, workers' compensation, directors' and officers' liability, key person life insurance, fiduciary liability insurance, and employment practices liability insurance, as well as insurance against larceny, embezzlement and criminal misappropriation. All such policies of insurance shall be with financially sound and reputable insurance companies acceptable to Lender and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to Lender. All property insurance policies covering the Collateral are to be made payable to Lender for the benefit of Lender, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard noncontributory "lender" or "secured party" clause and are to contain such other provisions as Lender may reasonably require to fully protect Lender's interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Lender and shall provide for not less than 30 days (10 days in the case of nonpayment) prior written notice to Lender of the exercise of any right of cancellation. If Borrower, Guarantor or their respective Subsidiaries fail to maintain such insurance, Lender may arrange for such insurance, but at Borrower's or Guarantor's expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage or the collection of claims. Borrower and Guarantor shall give Lender prompt notice of (x) any loss exceeding $100,000 covered by any of its or its Subsidiaries' insurance and (y) any of its insurers having become insolvent or for any claims being defended by an insurance company under a reservations of rights letter, in each case, to the extent any Responsible Officer has knowledge, or has received notice, thereof. Borrower and Guarantor shall be responsible for reporting all claims to the insurance carriers in a timely matter. Upon the occurrence and during the continuation of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)    <u>Environmental</u>.

(i)    keep any property either owned or operated by Borrower, Guarantor or their respective Subsidiaries free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens;

(ii)    comply, in all material respects, with Environmental Laws and provide to Lender documentation of such compliance which Lender may reasonably request from time to time;

(iii)    promptly notify Lender of any release of which Borrower or Guarantor has knowledge of a Hazardous Material required to be reported by Borrower or Guarantor to a Governmental Authority from or onto property owned or operated by Borrower or Guarantor or their respective Subsidiaries and take any commercially reasonable investigative, remedial, corrective or other actions required to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law; and

46

(iv) promptly, but in any event within five Business Days of its receipt thereof, provide Lender with written notice of any of the following:

(A) notice that an Environmental Lien has been filed against any of the real or personal property of Borrower, Guarantor, or their respective Subsidiaries,

(B) commencement of any Environmental Action or written notice that an Environmental Action will be filed against Borrower, Guarantor or their respective Subsidiaries and (C) written notice of a material violation, citation or order from a Governmental Authority concerning any Environmental Law.

(j) <u>Disclosure Updates</u>. Promptly, but in any event within three Business Days after a Responsible Officer of Borrower or Guarantor obtains knowledge thereof, notify Lender if any written information, exhibit, or report furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made and at the time such statements were made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

(k) <u>Location of Collateral</u>. Keep its Collateral only at the locations identified on Schedule 3.26 or with Lender (or a custodian for the benefit of Lender) and their chief executive offices only at the locations identified on Schedule 3.08(b); provided, that Borrower may amend Schedule 3.26 or Schedule 3.08(b) so long as such amendment occurs by written notice to Lender not less than 10 days prior to the date on which such Collateral is moved to such new location or such chief executive office is relocated and so long as such new location is within the continental United States.

(l) <u>Use of Proceeds</u>. Ensure the proceeds of the Loans are used in accordance with the Approved Budget (subject to any Permitted Variances) and the orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Orders): (i) to pay certain costs, premiums, fees and expenses related to the Cases, (ii) with respect to the Initial Borrowing, to make payments pursuant to any Order entered by the Bankruptcy Court pursuant to "first day" motions permitting the payment by the Debtors of any prepetition amounts then due and owing, (iii) to make Adequate Protection Payments, (iv) to fund working capital needs of the Debtors; and (v) make other payments authorized by order(s) of the Bankruptcy Court; provided, that no proceeds of the DIP Facility shall be utilized, directly or indirectly, to prepay, redeem or otherwise discharge any Indebtedness of the Debtors or any of their affiliates incurred prior to the Petition Date except as permitted by clause (ii) above.

(m) <u>Further Assurances</u>. (i) At any time upon the reasonable request of Lender, promptly execute or deliver to Lender any and all financing statements, fixture filings, security agreements, pledges, assignments, mortgages, deeds of trust, opinions of counsel, and all other documents that Lender may reasonably request in form and substance reasonably satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's security interest in the Collateral, (ii) furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports reasonably requested by Lender and (iii) in furtherance of, and not in limitation of, the foregoing, promptly take such actions as Lender may reasonably request from time to time to ensure that the Obligations are secured by substantially all of the assets of Borrower and Guarantor.

47

(n)     <u>Dispositions and Events of Loss</u>. In the event that on or after the Closing Date, (x) Borrower, Guarantor or any of their respective Subsidiaries shall make a Disposition or (y) an Event of Loss (other than a Destruction Event) shall occur, apply an amount equal to 100% of the Net Available Cash from such Disposition or Event of Loss within five Business Days to repay, prepay, make an offer to repay or prepay in accordance with <u>Section 2.04</u> (subject to <u>Section 2.04(c)</u>).

(o)     <u>Foreign Assets Control</u>.

(i)     Each of the Loan Parties and each of their respective Subsidiaries and Affiliates shall cause Borrower, Guarantor and each of their respective Subsidiaries, Affiliates, directors, officers, employees, distributors, agents and representatives to, conduct the businesses of Borrower and Guarantor in compliance with the Anti-Corruption Laws, the Anti-Money Laundering Laws and the Sanctions Laws.

(ii)    As of the Closing Date, each of Borrower and Guarantor has implemented and thereafter shall maintain policies, procedures, internal controls and training designed to promote and achieve compliance by Borrower, Guarantor and each of their respective Subsidiaries, Affiliates, directors, officers, employees, distributors, agents and representatives with the Anti-Corruption Laws, the Anti-Money Laundering Laws and the Sanctions Laws, including policies, procedures and controls related to screening customers and counterparties against Sanctions Lists and otherwise comply with reporting and other obligations required by applicable Law. The Loan Parties shall consult in good faith with, and reasonably consider the advice of, Lender in connection with the adoption, implementation and maintenance of such policies, procedures and controls.

(iii)   In the event that any of the Loan Parties becomes aware (A) of any breach by any of their respective directors, officers, employees, distributors, agents or representatives of any applicable Sanctions Law or Anti-Corruption Law or (B) that any of their respective directors, officers, employees, distributors, agents or representatives is (1) a Person that is, or is owned or controlled by Persons that are, the subject of any Sanctions Laws or (2) located, organized or resident in a Sanctioned Jurisdiction, Borrower shall (x) promptly inform Lender of such breach and the circumstances relating thereto, (y) promptly following the request of Lender, notify the applicable Governmental Authority of any such matter and (z) use reasonable efforts to promptly remediate any such matter.

(iv)    None of Borrower, Guarantor or any of their respective Subsidiaries, Affiliates, directors, officers, employees, distributors, agents or representatives shall take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any Person to improperly influence official action by that Person for the benefit of Borrower, Guarantor or any of their respective Subsidiaries or Affiliates, or to otherwise secure any improper advantage.

(v)     Neither Borrower nor Guarantor may, directly or indirectly, use any proceeds that are provided to either of them or any of their respective Affiliates or Subsidiaries in connection with this Agreement or any other agreement between the Loan Parties and Lender to lend, contribute or otherwise make available such proceeds to any subsidiary, affiliate, joint venture partner or other Person (A) to fund or facilitate any activities or business of or with any Person, that at the time of such funding or facilitation is the subject of any Sanctions Laws or located, organized or resident in any Sanctioned Jurisdiction, or (B) in any other manner that would result in a violation of any of the Anti-

48

Corruption Laws, the Anti-Money Laundering Laws or the Sanctions Laws by any Person including any of the Parties.

(p)    <u>Approved Budget</u>. On or prior to February 7, 2021 and on the last Sunday of each successive 10-week period thereafter, deliver to Lender a cash flow forecast, certified by an officer reasonably acceptable to Lender as being prepared in good faith and fairly presenting in all material respects the information set forth therein, in excel and PDF format and otherwise in form and substance acceptable to Lender (together with the Initial Approved Budget, collectively, as may be updated, modified or supplemented with the consent of the Lender in its sole discretion, the "**Approved Budget**"), which has been updated by adding a cash flow forecast for the 13-week period ending immediately after such date; <u>provided</u>, <u>however</u>, that it is agreed that Borrower shall not be required to project cash receipts in the Approved Budget.

(q)    <u>Variance Report</u>. On the Wednesday of each calendar week ending after the Closing Date, deliver to Lender a report, certified by an officer reasonably acceptable to Lender as being prepared in good faith and fairly presenting in all material respects the information set forth therein, in form and substance reasonably acceptable to Lender (a "**Variance Report**"), reflecting (i) the actual amount of receipts of Borrower and Guarantor for the last full week preceding the date of any such Variance Report (the "**Applicable Report Date**") and on a cumulative basis for the Budget Period, (ii) the actual amount of disbursements of Borrower and Guarantor for the last full week preceding the Applicable Report Date and on a cumulative basis for the Budget Period, (iii) the amount of any variances in the projected disbursements for the last full week preceding the Applicable Report Date as compared to the projected disbursements for the applicable period in the Approved Budget and on a cumulative basis for the Budget Period and an explanation of the cause of any such variances, (iv) the aggregate cash balance held by Borrower and Guarantor as of the end of the last full week preceding the Applicable Report Date, and (v) the balances of the Loans and the Prepetition Loans as of the end of the full prior week prior to the Applicable Report Date.

(r)    <u>Priority of Liens</u>. Each Debtor hereby covenants, represents and warrants that, upon entry of the Interim order (and, when applicable, the Final Order), and in all cases subject to the Carve Out:

(i)    its Obligations hereunder and under the other Loan Documents shall at all times constitute an allowed DIP Superpriority Claim against each of the Debtors on a joint and several basis and shall be secured by Liens in favor of Lender on the Collateral of the Debtors with the priority and other terms as set forth in the Orders; and

(ii)    pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of Lender on the Collateral of the Debtors shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, security agreement, financing statement, assignment or similar instrument.

(s)    <u>Milestones</u>. The Loan Parties shall achieve the following milestones (the "**Milestones**") by the dates set forth below (or such later date as may be agreed by Lender in its sole discretion):

(i)    On the Petition Date, (A) the Debtors shall file a motion with the Bankruptcy Court seeking approval of the DIP Facility and (B) the Debtors shall have entered into the Stalking Horse APA.

(ii)    On or before the date that is one (1) calendar day after the Petition Date, the Debtors shall have filed the Bidding Procedures Motion in the Bankruptcy Court.

49

(iii)     On or before the date that is two (2) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

(iv)     On or before the date that is ten (10) calendar days after the Petition Date, the Debtors shall have filed, in a form acceptable to the Lender, (i) the Acceptable Chapter 11 Plan; and (ii) the Disclosure Statement.

(v)     On or before the date that is no later than fourteen (14) calendar days after the Petition Date, each of the Debtors shall have filed schedules and statements of financial affairs pursuant to rule 1007 of the Federal Rule of Bankruptcy Procedure.

(vi)     On or before the date that is twenty-five (25) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order and the Final Order.

(vii)     On or before the date that is forty-two (42) calendar days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

(viii)     On or before the date that is forty-four (44) calendar days after the Petition Date, the Debtors shall have commenced the Auction, if necessary.

(ix)     On or before the date that is forty-five (45) calendar days after the Petition Date, a hearing shall have occurred in the Bankruptcy Court to consider approval of the (A) Stalking Horse APA and the Stalking Horse Transaction, or another alternative transaction pursuant to the Bidding Procedures and (B) the Disclosure Statement.

(x)     On or before the date that is forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.

(xi)     On or before the date that is sixty (60) calendar days after the Petition Date, the Stalking Horse Transaction or another the sale transaction approved in the Sale Order shall be consummated and closed.

(xii)     On or before the date that is eighty-five (85) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order

(xiii)     On or before the date that is ninety (90) calendar days after the Petition Date, the consummation of the Acceptable Chapter 11 Plan, including all transactions contemplated thereunder, shall have occurred

(t)     <u>Bankruptcy Related Matters</u>. Borrower will and will cause each Debtor (and, with respect to clauses (ii) and (iv) below, each of its other Subsidiaries) to:

(i)     cause all proposed (A) "first day" pleadings, (B) "second day" pleadings, (C) pleadings related to or affecting the Obligations, the Loan Documents and the obligations under the Prepetition Credit Agreement, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto (including for the avoidance of doubt the Bidding Procedures, Bidding Procedures Motion, Disclosure Statement, Acceptable Chapter 11 Plan, and Confirmation Order) (D) pleadings concerning the financial condition Borrower,

50

Guarantor or any of their Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, (E) pleadings authorizing additional payments to critical vendors, and (F) pleadings establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors, to be (x) in accordance with and permitted by the terms of this Agreement and (y) unless otherwise provided for in this Agreement, acceptable to Lender in all respects, it being understood and agreed that (1) the Debtors will undertake best efforts to arrange for drafts of all such orders, pleadings, motions and other filings shall be delivered to Lender at least two (2) Business Days prior to filing in the Cases (unless impracticable, in which case, as soon as reasonably practicable prior to filing or service, as the case may be) for Lender to make the determination pursuant to clause (y) above and (2) the forms of orders approved by Lender prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(ii)       comply in all material respects with each order entered by the Bankruptcy Court in connection with the Cases;

(iii)      comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Interim Order, the Final Order, the Bidding Procedures Order, the Bidding Procedures, the Stalking Horse APA and the Sale Order, as applicable, and any other order of the Bankruptcy Court;

(iv)      undertake best efforts to arrange promptly, but no later than three (3) Business Days prior to distribution, provide Lender with copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports and updated information related to the sale or any other transaction and copies of any such bids and updates, modifications or supplements to such information and materials;

(v)       provide Lender with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions;

(vi)      undertake best efforts to arrange to deliver to counsel to Lender promptly as soon as available but no later than three (3) Business Days prior to distribution, copies of all proposed non-ministerial or administrative pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any Committee or unofficial committee appointed or appearing in the Cases or any other party in interest, in each case, which documents shall be in form and substance acceptable to Lender;

(vii)     undertake best efforts to arrange to deliver to counsel to Lender promptly as soon as available but no later than three (3) Business Days prior to filing thereof, copies of all pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Loan Parties to any Committee or unofficial committee appointed or appearing in the Cases, in each case, which documents shall be in form and substance acceptable to Lender;

(viii)    as soon as available, deliver to Lender and to counsel to Lender promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Credit Parties to any Committee or unofficial committee appointed or appearing in the Cases;

(ix)    undertake best efforts to arrange to provide Lender no less than five (5) Business Days' (or such shorter notice acceptable to Lender in its sole discretion) prior written notice prior to any assumption or rejection of any Loan Party's or any other Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any DIP Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or DIP Superpriority Claims), if Lender informs Borrower in writing within three (3) Business Days of receipt of the notice from Borrower referenced above that it objects to such assumption or rejection, as applicable; and

(x)    promptly provide Lender copies of any monthly or other reporting provided to the Bankruptcy Court or the U.S. Trustee.

(u)    <u>Adequate Protection Payments</u>. Loan Parties will make adequate protection payments payable in cash on the dates and to the extent required by the Orders (such interest and payments, collectively, the "**Adequate Protection Payments**").

(v)    <u>Challenges</u>. Notwithstanding anything herein to the contrary, no portion or proceeds of the DIP Facility or the Collateral, and no disbursements set forth in the Approved Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with (A) objecting, contesting or raising any defense to the validity, perfection, priority or enforceability of, or any amount due under this Agreement, the Loan Documents, the Prepetition Credit Agreement or any security interests, liens or claims granted under the Orders, the Loan Documents or the "Loan Documents" (as defined in the Prepetition Credit Agreement) to secure such amounts; (B) asserting any challenges, claims, actions or causes of action against Lender, the Prepetition Lender or any of their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (C) preventing, hindering or otherwise delaying enforcement or realization on the Collateral; or (D) seeking to amend or modify any of the rights granted to Lender, the Prepetition Lender under this Agreement, the Loan Documents, the Orders, or the "Loan Documents" (as defined in the Prepetition Credit Agreement), including seeking to use the cash collateral and/or Collateral on a contested basis.

(w)    <u>Bankruptcy Court Filings</u>. All proceedings, motions and other documents filed with the Bankruptcy Court on behalf of the Debtors in the Cases and all such material proceedings, motions and other documents shall include counsel for Lender on any "Special Notice List" or other similar list of parties to be served with papers in the Cases.

Section 5.02    <u>Negative Covenants</u>. For so long as any Loan is outstanding, Borrower and Guarantor shall not, and shall not permit any of their respective Subsidiaries to, directly or indirectly:

(a)    <u>Indebtedness</u>. Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness other than Permitted Indebtedness.

(b)    <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired other than Permitted Liens.

(c)    <u>Restricted Payments</u>. Make any Restricted Payment.

(d)    <u>Investments</u>. Make any Investments, other than Permitted Investments.

(e)    <u>Asset Sales</u>. Dispose of any of the assets of Borrower, Guarantor or any of their respective Subsidiaries (other than Permitted Dispositions); <u>provided</u>, <u>however</u>, in connection with any Permitted Disposition, an amount equal to 100% of the Net Available Cash from such Disposition shall be applied by Borrower, Guarantor or Subsidiary, as provided in such <u>Section 5.01(n)</u>.

(f)    <u>Limitation on Issuance and Sale of Equity Interests</u>. Issue or sell any of its Equity Interests.

(g)    <u>Capital Expenditures</u>. Make any Capital Expenditure, other than Capital Expenditures included in the Approved Budget.

(h)    <u>Transactions with Affiliates</u>. Directly or indirectly, enter into or permit to exist any transaction, or conduct any business, with (x) any Affiliate of Borrower, Guarantor or any of their Subsidiaries or (y) any Affiliate or Related Party of, or any Person that is controlled by, directly or indirectly, any Prepetition Pledgor, in each case, other than as approved by Lender in its sole discretion.

(i)    <u>Fundamental Changes</u>. Enter into any merger, consolidation, reorganization, liquidation or recapitalization, or reclassify its Equity Interests.

(j)    <u>Nature of Business</u>. Materially change its business as conducted on the Closing Date.

(k)    <u>Tamarac Lease</u>. Make any lease payments to Guarantor in respect of the Tamarac Lease (as defined in the Forbearance Agreement).

(l)    <u>Tax Structure</u>. Make any material change to the tax structure of Borrower's business that would (or would reasonably be expected to) materially and adversely affect Lender.

(m)    <u>Governing Documents</u>. Make any material change to any of its Governing Documents that is adverse to Lender.

(n)    <u>Amendments to Other Agreements</u>. Amend, modify or waive any material provision of (i) any Shareholder Loan Agreement, the Prepetition Credit Agreement or any other "Loan Document" or similar term (as defined in each Shareholder Loan Agreement or the Prepetition Credit Agreement, as applicable)), (ii) the Tamarac Lease (as defined in the Prepetition Credit Agreement) or (iii) any agreement governing any other Junior Debt of Borrower, Guarantor or any of their respective Subsidiaries, in each case without the approval of the board of directors or other equivalent governing body of Borrower or Guarantor, as applicable.

(o)    <u>Accounting Methods</u>. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

(p)    <u>Collateral with Bailees</u>. Store any Collateral at any time with a bailee, warehouseman or similar party, unless such bailee, warehouseman or similar party shall have executed a

WEIL:\97711728\19\64058.0301

letter acknowledging Lender's security interest in the Collateral in form and substance reasonably acceptable to Lender.

(q)    ERISA. Cause or permit to exist any ERISA Event.

(r)    Zoning. (i) Initiate or consent to any zoning reclassification of any portion of the Real Property or seek any variance under any existing zoning ordinance or (ii) use or permit the use of any portion of the Real Property in any manner that would reasonably be expected to result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case without the prior written consent of Lender.

(s)    Investment Company Act. Take any action that would result in Borrower, Guarantor or any of their respective Subsidiaries being required to register as an "investment company" under the Investment Company Act of 1940, as amended.

(t)    Margin Stock. Use any proceeds of the Loans for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock.

(u)    Budget Variance. Pay any expenses or other disbursements other than Restructuring Fees or in accordance with the Approved Budget; provided, the Debtors' cumulative disbursements (other than Restructuring Fees) for any calendar week (each, a "**Budget Test Period**") shall not be greater than, in the case of each Budget Test Period, 110% of the budgeted disbursements set forth in such Approved Budget for such Budget Test Period (the foregoing permitted variances from such Approved Budget described above, the "**Permitted Expenditures Budget Variance**").

## ARTICLE VI
### Events of Default

Section 6.01    Events of Default. It shall constitute an "**Event of Default**" if any one or more of the following shall occur:

(a)    Borrower shall fail to pay any principal on any Loan or extension of credit made to it hereunder when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for repayment thereof in accordance with the terms hereof;

(b)    Borrower shall fail to pay any interest on any loan or extension of credit made to it hereunder or any fee or any other Obligation (other than an amount referred to in Section 6.01(a)) due hereunder when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation or warranty made (or deemed made) by any Loan Party in or in connection with the execution and delivery of this Agreement or any other Loan Document or the receipt of any Loan or extension of credit by Borrower hereunder or in any document, certificate, statement or report delivered to Lender pursuant to such Loan Document (including any Variance Report), shall prove to have been incorrect in any material respect (or, in the case of Section 3.05 or 3.06, incorrect in any respect) when so made, deemed made or furnished;

(d)    any Loan Party (i) breaches or defaults under any term, covenant, condition or provision set forth in Section 2.07, Section 4.03, Sections 5.01(b)(ii), (b)(iii), (b)(iv), (e), (l), (p), (q), (s), (t), (u) or (v) or Section 5.02, (ii) breaches or defaults under any term, covenant, condition or provision set forth in Sections 5.01(a), (b)(i), (b)(v) or (w) and this clause (b) and such breach or failure is not cured

54

within two Business Days following the earlier of (x) written notice by Lender to such Loan Party and (y) actual knowledge of a Responsible Officer of any Loan Party of such breach or failure or (iii) breaches or defaults under any term, covenant, condition or provision of this Agreement (other than those set forth in Section 6.01(a), Section 6.01(b), Section 6.01(c) or clauses (i) or (ii) of this Section 6.01(d)) or any other Loan Document or fails to perform timely its obligations hereunder, if such breach or failure is not cured within 30 days following the earlier of (x) written notice by Lender to such Loan Party and (y) actual knowledge of a Responsible Officer of any Loan Party of such breach or failure;

(e)    (i) an Insolvency Proceeding is commenced by any Loan Party or any of its Subsidiaries, in each case, that is not a Debtor or (u) if an Insolvency Proceeding is commenced against any Loan Party or any of its Subsidiaries, in each case, that is not a Debtor and any of the following events occur: (A) such Loan Party or its applicable Subsidiary consents to the institution of such Insolvency Proceeding against it, (B) the petition commencing the Insolvency Proceeding is not dismissed within 60 calendar days of the date of the filing thereof, (C) a receiver, receiver and manager, trustee, restructuring officer or similar official is appointed without such Loan Party's or such Subsidiary's consent to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of such Loan Party or such Subsidiary, which appointment shall continue for a period of 60 calendar days without having been discharged, bonded or dismissed, or (D) an order for relief shall have been issued or entered therein;

(f)    this Agreement or any other Loan Document, for any reason (other than pursuant to the terms thereof), ceases to be the legal, valid and binding obligation of any Loan Party, enforceable against such Loan Party in accordance with its terms;

(g)    there is a default in one or more agreements to which any Loan Party is a party with one or more third Person relating to such Loan Party's Material Indebtedness (other than (x) the Obligations and (y) in the case of any Debtor, any other Material Indebtedness incurred by such Debtor prior to the Petition Date to the extent the holders thereof are stayed from exercising remedies in connection therewith as a result of the Cases), and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of any Loan Party's obligations thereunder;

(h)    (i) this Agreement or any other Loan Document that purports to create a Lien shall, for any reason, fail or cease to create a valid, perfected and first-priority Lien on the Collateral covered thereby (except with respect to Permitted Liens that would otherwise be permitted to have priority), except as a result of an action or failure to act on the part of Lender or (ii) any Loan Party or any of its Affiliates shall contest the validity or enforceability of any Loan Document or disaffirm any Loan Party's obligations under any Loan Document;

(i)    one or more judgments, orders, or awards for the payment of money arising following the Petition Date involving an aggregate amount of $500,000, or more (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) is entered or filed against any Loan Party, or with respect to any of their respective assets, and either (a) there is a period of 30 consecutive days at any time after the entry of any such judgment, order or award during which (1) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (2) a stay of enforcement thereof is not in effect, or (b) enforcement proceedings are commenced upon such judgment, order or award;

(j)    an ERISA Event occurs;

(k)    a Change of Control occurs;

55

(l)        an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Debtors and the Debtors shall have not obtained use of cash collateral pursuant to an order consented to by, and in form and substance acceptable to, Lender;

(m)        any of the Cases of the Loan Parties shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(n)        (i) (A) a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) (other than a fee examiner), (B) a receiver, receiver and manager, trustee or restructuring officer or (C) a monitor with enhanced powers, in each case, is appointed or elected in any of the Cases, or (ii) any Loan Party applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court or any other applicable court shall have entered an order providing for such appointment;

(o)        at any time following the date hereof and prior the closing of the transactions contemplated by the Stalking Horse APA, (i) any past or present failure of any Seller to comply with applicable law in all material respects, including the failure to obtain or maintain any requisite authorization pursuant to any Governmental Authority for the operation of Sellers' business, or comply with applicable Anti-Corruption Laws, Anti-Money Laundering Laws, Sanctions Laws, (ii) one or more material Liabilities of either or both of the Sellers, including any Product Liability or Warranty Liability or (c) any material weaknesses or errors in the "Financial Statements" (as defined in the Stalking Horse APA) or any of Seller's internal controls relating to accounting, financial reporting or compliance with laws, are identified by, disclosed to, and/or become known to, Lender or Buyer following the date hereof that were not disclosed to Buyer in the representations and warranties of the Sellers set forth in Article 4 of the Stalking Horse APA, the Sellers' Disclosure Schedule attached thereto, or the documents made available to Buyer and its representatives in the Berger Singerman LLP electronic data room between November 25, 2020 to December 6, 2020; and such failure, Liability or weakness, individually or in the aggregate, gives rise or is reasonably likely to give rise to (A) material reputational risk to Buyer or Lender (in each case, as determined by Buyer or Lender, respectively, in its sole discretion), (B) any liability or monetary impact to Lender or Buyer (after giving effect to the transactions contemplated by the Stalking Horse APA and this Agreement) that exceeds or is reasonably likely to exceed $5,000,000 in the aggregate, or (C) any other non-monetary effect or condition arising out of such matters that, or is reasonably expected to, materially adversely impact Buyer's ability to operate the Sellers' business following the closing of transactions contemplated by the Stalking Horse APA;

(p)        any Loan Party or any of its Subsidiaries, or any person claiming by or through any Loan Party or any of its Subsidiaries, with any Loan Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (x) Lender relating to the DIP Facility or (y) Prepetition Lender relating to the Prepetition Credit Agreement;

(q)        the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents or the Orders, entitled to superpriority administrative expense claim status in any Case pursuant to Section 364(c)(1) of the Bankruptcy Code that are pari passu with or senior to the claims or Liens of Lender under the DIP Facility, or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests provided for herein securing the Obligations hereunder, except, in each case,

56

as expressly provided in the Loan Documents or in the Order then in effect (but only in the event specifically consented to by Lender), whichever is in effect;

(r)    the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets that constitute Collateral of any of the Debtors which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole);

(s)    (i) An order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order, the Bidding Procedures Order, the Final Order, or the Sale Order without the prior written consent of the Lender or (ii) a Debtor shall apply for the authority to do, or take any action in furtherance of any of the foregoing;

(t)    any of the Loan Parties shall (i) fail to comply with the Stalking Horse APA in any respect; (ii) amend the Stalking Horse APA in a manner that is adverse to the interests of Lender without the prior written consent of Lender; or (iii) a Debtor shall apply for the authority to do, or take any action in furtherance of any of the foregoing;

(u)    any of the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral of any Debtor, as the case may be, or to be in full force and effect, or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of Lender;

(v)    an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by Lender of any amounts received in respect of the Obligations or by the Prepetition Lender of any amounts received in respect of the Prepetition Credit Agreement;

(w)    an order shall have been entered by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of Lender;

(x)    any of the Loan Parties shall fail to comply in any respect with the Interim Order (prior to the Final Order Entry Date), the Final Order (on and after the Final Order Entry Date), the Bidding Procedures Order, or the Sale Order;

(y)    an order shall have been entered by the Bankruptcy Court providing for a change in venue with respect to the Cases, as applicable, without the approval of Lender and such order shall not be reversed or vacated within 10 calendar days;

(z)    an order shall have been entered by the Bankruptcy Court limiting or impairing, in any way the Lender or the Prepetition Lender's right to credit bid under section 363(k) of the Bankruptcy Code.

(aa)    an order in the Cases shall be entered charging any of the Collateral of any Debtor or any of the "Collateral" (as defined in the Prepetition Credit Agreement) under Section 506(c) of the Bankruptcy Code against Lender or the Prepetition Lender or the commencement of other actions by the Debtors that are adverse Lender or the Prepetition Lender or their respective rights and remedies under the

DIP Facility or under the Prepetition Credit Agreement in any of the Cases or inconsistent with any of the Loan Documents or the "Loan Documents" (as defined in the Prepetition Credit Agreement);

(bb)     any order shall be entered which dismisses any of the Cases of the Debtors, which order does not provide for payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) and the "Obligations" under and as defined in the Prepetition Credit Agreement (other than contingent indemnification obligations not yet due and payable), or any of the Debtors and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order;

(cc)     any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in Sections 6.01(l) through 6.01(ll) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(dd)     any Loan Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the DIP Superpriority Claims or the Liens granted to secure the Obligations or any other rights granted to Lender in the Orders or this Agreement; (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral of any Debtor; or (iii) any limitation or impairment of the Lender's or the Prepetition Lender's right to credit bid under section 363(k) of the Bankruptcy Code;

(ee)     any Loan Party shall challenge, support or encourage a challenge of any payments made to Lender with respect to the Obligations or the Prepetition Lender with respect to the obligations under the Prepetition Credit Agreement, other than to challenge the occurrence of a Default or Event of Default;

(ff)     without the consent of Lender, the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(gg)     without Lender's consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without Lender's consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(hh)     any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral having a value in excess of $100,000 outside the ordinary course of business and not otherwise permitted hereunder;

(ii)     if any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Loan Parties shall have five Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order;

58

(jj)      any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables other than payments in respect of the repayment of the Indebtedness under the Prepetition Credit Agreement or as otherwise permitted under this Agreement, in each case, to the extent authorized by one or more "first day" or "second day" orders, the Interim Order or the Final Order and consistent with the Approved Budget;

(kk)      without Lender's consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (i) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to Lender's liens and security interests; (ii) to use, or seek to use, Cash Collateral; or (iii) to modify or affect any of the rights of Lender under the Orders or the Loan Documents, by any order entered in the Cases;

(ll)      the Debtors shall file any chapter 11 plan of reorganization or liquidation that is not an Acceptable Chapter 11 Plan;

(mm)      any order shall be entered confirming a chapter 11 plan of reorganization or liquidation that is not an Acceptable Chapter 11 Plan; or

(nn)      any Loan Party, or any person on behalf of any Loan Party, shall file a motion or other pleading seeking, or otherwise consenting to, or taking action in furtherance of any of the matters set forth in clauses (a) through (mm) above or the granting of any other relief that if granted would give rise to an Event of Default.

For so long as an Event of Default has occurred and is continuing, (A) Lender may, in its sole discretion, (w) deliver a notice to Borrower of an Event of Default, (x) charge the Default Rate of interest on the Loans and other outstanding Obligations, (y) terminate all Commitments then outstanding under the DIP Facility and (z) declare all of the Obligations hereunder to be immediately due and payable in full and (B) subject to the provisions of the Interim Order (and, when entered, the Final Order) (x) the enforcement of Liens or remedies with respect to the Collateral of the Debtors shall be subject to five days' written notice (the "**Remedies Notice Period**") from Lender to the Debtors, the Debtors' counsel, and the counsel to the Committee (if any) and (y) after the expiration of the Remedies Notice Period, Lender shall be entitled to exercise all rights and remedies provided for in this Agreement, the Orders, the other Loan Documents and under applicable law; provided, however, that notwithstanding anything herein, the Debtors may only use Cash Collateral during the Remedies Notice Period with the express written consent of Lender in its sole discretion (subject to the Carve-Out); provided, further, that the Debtors shall have the right to seek an immediate hearing in the Bankruptcy Court to oppose the alleged Event of Default.

Section 6.02    Rights and Remedies of Lender Upon Default. If an Event of Default shall have occurred and be continuing, Lender shall have the following rights and remedies:

(a)      Lender may exercise any or all of the remedies available to it under this Agreement and the other Loan Documents, at law, in equity or otherwise;

(b)      Lender may request that Borrower direct that all Accounts be paid directly to a lock box account established with, or for the benefit of, Lender;

(c)      Each Loan Party shall hold in trust (and not commingle with its other assets) for Lender all Collateral that is Chattel Paper, Instruments or Documents of Title at any time received by it and promptly deliver same to Lender, unless Lender at its option gives such Loan Party written permission to retain such Collateral; at Lender's request, each contract, Chattel Paper, Instrument or Document of Title

so retained shall be marked to state that it is assigned to Lender and each instrument shall be endorsed to the order of Lender (but failure to so mark or endorse shall not impair the security interest granted to Lender hereunder);

(d)　　Each of Borrower and Guarantor irrevocably appoints Lender its true and lawful attorney with full power of substitution, in the name of Borrower or Guarantor, as applicable, for the sole use and benefit of Lender, but at Borrower and Guarantor' expense, to the extent permitted by law, to file claims under any insurance policies of Borrower or Guarantor, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies;

(e)　　Each Loan Party irrevocably appoints Lender its true and lawful attorney with full power of substitution, in the name of such Loan Party, for the sole use and benefit of Lender, but at such Loan Party's expense, to the extent permitted by law (including the UCC of any relevant jurisdiction), to exercise, all or any of the following powers with respect to all or any of such Loan Party's Collateral, as applicable, (to the extent necessary to pay the Obligations in full):

(i)　　to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due upon or by virtue thereof;

(ii)　　to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto;

(iii)　　to take control of, sell, lease, license or otherwise dispose of the same or the Proceeds thereof, as fully and effectually as if Lender were the absolute owner thereof;

(iv)　　to extend the time of payment of any or all thereof and to make any allowance or other adjustment with reference thereto;

(v)　　to endorse Borrower's or Guarantor's name on any notes, acceptances, checks, drafts, money orders or other evidences of payment on Collateral that may come into Lender's possession;

(vi)　　to sign Borrower's or Guarantor's name on any invoice or bill of lading relating thereto, on any drafts against obligors or other Persons making payment with respect thereto, on assignments and verifications of Accounts or other Collateral and on notices to obligors making payment with respect thereto; and

(vii)　　to send requests for verification of obligations to any obligor with respect to Accounts constituting Collateral.

If, following the occurrence of an Event of Default, any obligor or account debtor fails to make payment on any Account constituting Collateral when due, Lender is authorized, in its sole discretion, either in its own name or in any Debtor's name, to take such action as Lender reasonably shall deem appropriate for the collection of any amounts owed with respect to such Account or upon which a delinquency exists. Regardless of any other provision of this Agreement, however, Lender shall not be liable for its failure to collect, or for its failure to exercise diligence in the collection of, any amounts owed with respect to such Account, nor shall it be under any duty to anyone except the Loan Parties to account for funds that it shall actually receive under this Agreement. A receipt given by Lender to any obligor or account debtor shall be a full and complete release, discharge and acquittance to such obligor or account debtor, to the extent of

WEIL:\97711728\19\64058.0301

any amount so paid to Lender. Lender may apply or set off amounts paid and the deposits against any liability of any Loan Party to Lender.

(f)    Lender's sale of less than all the Collateral shall not exhaust Lender's rights under this Agreement and Lender is specifically empowered to make successive sales until all the Collateral is sold. If the proceeds of a sale of less than all the Collateral shall be less than the Obligations, this Agreement and the Lien in favor of Lender hereunder shall remain in full force and effect as to the unsold portion of the Collateral just as though no sale had been made. In the event any sale under this Agreement is not completed or is, in Lender's opinion, defective, such sale shall not exhaust Lender's rights under this Agreement and Lender shall have the right to cause a subsequent sale or sales to be made. Any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale under this Agreement as to nonpayment of the Obligations, or as to the occurrence of any Default, or as to Lender's having declared all of such Obligations to be due and payable, or as to notice of time, place and terms of sale and the properties to be sold having been duly given, or as to any other act or thing having been duly done by Lender, shall be taken as prima facie evidence of the truth of the facts so stated and recited. Lender may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale held by Lender, including the sending of notices and the conduct of sale, but such acts must be done in the name and on behalf of Lender. In connection with the sale of Collateral that constitutes Securities, Lender is authorized, but not obligated, to limit prospective purchasers to the extent deemed necessary or desirable by Lender to render such sale exempt from registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws, and no sale so made in good faith by Lender shall be deemed to not be "commercially reasonable" because so made.

(g)    In addition to any and all other rights afforded to Lender in this Section 6.02, Lender may exercise all the rights of a secured party under the Code (whether or not in effect in the jurisdiction where such rights are exercised) with respect to any Collateral and, if cash shall be insufficient to pay all the Obligations in full, sell, lease, license or otherwise dispose of the Collateral or any part thereof in accordance with the provisions of the Code.

Section 6.03    [Reserved].

Section 6.04    Application of Funds. After the exercise of remedies provided for in Section 6.02 (or after the Loans have automatically become immediately due and payable and as set forth in the proviso to Section 6.01) after the occurrence and during the continuance of an Event of Default, or in connection with a mandatory prepayment pursuant to Section 2.04(b)(v), any amounts received on account of the Obligations, including from the proceeds of Collateral and pursuant to setoff pursuant to Section 8.01), shall be applied in the following order:

(a)    first, to any fees or expenses due and owing hereunder (including all amounts under Section 7.01 or 7.02 then outstanding), until all such fees and expenses have been paid in full;

(b)    second, to accrued and unpaid interest on the Loans (oldest Loan first), until all such accrued and unpaid interest has been paid in full;

(c)    third, to principal of the Loans until all such Loans are paid in full; and

(d)    last, to all other Obligations then due and owing until all such other Obligations have been paid in full.

## ARTICLE VII
### Costs and Expenses

Section 7.01    Lender Costs. The Loan Parties shall pay all reasonable documented out-of-pocket expenses incurred by Lender (including the reasonable documented fees, charges and disbursements of any counsel for Lender) in connection with (x) the preparation and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions of this Agreement or the other Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated) and (y) the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Article VII, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans. Notwithstanding the foregoing, expenses being reimbursed by the Borrower under this Section 9.03 include, without limiting the generality of the foregoing, costs and expenses incurred in connection with:

(i)    the satisfaction of the conditions set forth in Section 4.03;

(ii)    taxes, fees and other charges for (A) lien searches and (B) filing financing statements and continuations, and other actions to perfect, protect, and continue Lender's Liens;

(iii)    sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and

(iv)    forwarding Loan proceeds, collecting checks and other items of payment, and costs and expenses of preserving and protecting the Collateral.

All of the foregoing costs and expenses may be charged to the Borrower as Loans or to another deposit account.

Section 7.02    Indemnity. The Loan Parties, jointly and severally, agree to indemnify and hold harmless Lender and Lender's Related Parties (each, an "**Indemnified Party**") from and against, any and all claims, damages, losses, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnified Party), incurred by any Indemnified Party or asserted against any Indemnified Party by any Person (including any Loan Party) other than such Indemnified Party and its Related Parties arising out of, in connection with, or by reason of (i) the execution or delivery of this Agreement or any other Loan Document or the performance by the Parties of their respective obligations hereunder or thereunder, (E) the actual or proposed use of the proceeds of Loans, or (iii) any actual or prospective claim, investigation, litigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnified Party is a party thereto; provided that such indemnity shall not be available to any Indemnified Party to the extent that such claims, damages, losses, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party.

## ARTICLE VIII
### Miscellaneous

Section 8.01    Recourse; Right to Setoff. Lender shall have full recourse to the Loan Parties for the payment and performance of all Obligations. In addition to any other right or remedy afforded by law or this Agreement, upon the occurrence of an Event of Default, Lender shall be entitled, without prior notice

to any Loan Party (such notice being waived to the fullest extent permitted by applicable law), to set off and apply against all the Obligations any and all amounts at any time held by, and other indebtedness at any time owing by, Lender or any of its Affiliates to or for the credit or the account of any Loan Party. Any remaining portion of the Obligations that still exist after applying such offset as described in the prior sentence shall continue to be immediately due and payable and Lender shall have the right to exercise all right or remedy afforded by law or this Agreement.

Section 8.02    Exercise of Rights. No delay or omission of Lender under this Agreement or any other Loan Document or otherwise in respect of the Loans shall exhaust or impair any right or power of Lender hereunder or thereunder or prevent the exercise of any right or power of Lender hereunder or thereunder during the continuance of any Default or Event of Default. No waiver by Lender of any Default or Event of Default, whether such waiver be full or partial, shall extend to or affect any subsequent Default or Event of Default, or impair the rights resulting therefrom, except as may otherwise be provided herein. No acceptance by Lender of any payment after the occurrence of an Event of Default shall be deemed to waive or cure any Default or Event of Default. No forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Obligations hereunder or any other indulgence given by Lender to any Loan Party, shall operate to release or in any manner affect the liability of Borrower to pay the Obligations.

Section 8.03    Cumulative Remedies. The remedies provided in this Agreement are cumulative and are not exclusive of any remedies provided by applicable law.

Section 8.04    Certain Waivers. Except as may otherwise be provided in this Agreement, Borrower waives notice (including notice of protest, notice of dishonor, notice of intent to accelerate and notice of acceleration), demand, presentment for payment, protest, diligence in collection and bringing suit, and the filing of suit for the purpose of fixing liability, in each case to the fullest extent permitted by applicable law, in respect of this Agreement and the Obligations.

Section 8.05    Third-Party Rights; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

(a)    No Loan Party shall assign or transfer any of its rights or Obligations under this Agreement without the prior written consent of Lender (which consent may be withheld by Lender in their absolute discretion), and any purported assignment or transfer without such consent shall be void.

(b)    Lender shall not assign or transfer any of its rights or obligations under this Agreement (including its Commitments and Loans) other than to an Affiliate of Lender without the prior written consent of Borrower; provided that Lender shall be permitted to transfer its rights and obligations under this Agreement to any Person without the consent of any Loan Party during an Event of Default.

(c)    Lender, without the consent of any Loan Party, may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Governmental Authority, and this Section 8.05 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release Lender from any of its obligations hereunder or substitute (by foreclosure or otherwise) any such pledgee or assignee for such Lender as a party hereto.

Section 8.06    Register. Borrower shall keep at its principal office a register in which provisions shall be made for the recordation of (a) the names and addresses of Lender, (b) the principal amounts (and stated interest) of the Loans owing to Lender pursuant to the terms hereof from time to time and (c) any transfer by Lender of any Loans (or any portion thereof) and the name and address of each transferee. The

WEIL:\97711728\19\64058.0301

register shall be available for inspection by Lender at any reasonable time and from time to time upon reasonable prior notice. It is intended that the Loans be in registered form, and this paragraph shall be construed in a manner consistent therewith.

Section 8.07    <u>Severability; Obligations Absolute</u>. If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision or provisions held to be invalid or unenforceable, and the rights and obligations of the parties hereto hereunder shall be construed and enforced only to such extent as shall be permitted by applicable law. Notwithstanding the foregoing, the Obligations shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms hereof, under all circumstances whatsoever, including the following circumstances: (a) any lack of validity or enforceability of this Agreement; (b) any amendment or waiver of, or any consent to or departure from, any provision of this Agreement; and (c) the existence of any claim, defense or other right which any Loan Party may have at any time against Lender or any other Person, whether in connection with this Agreement, the Loans or otherwise. Each Loan Party understands and agrees that no payment by such Loan Party under any other agreement, arrangement or document (whether voluntary or otherwise) shall constitute a defense to the Obligations.

Section 8.08    <u>Amendment</u>. This Agreement may be amended, supplemented or otherwise modified, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Lender.

Section 8.09    <u>Notices</u>. Any notice, consent, payment, demand or communication required or permitted to be given to any party by any provision of this Agreement shall be in writing and shall be (a) delivered personally to the applicable Person (or to an officer of such Person) to whom the same is directed, or (b) sent by electronic mail, recognized overnight courier service or registered or certified mail, return receipt requested, postage prepaid, addressed to such party in the following manner:

(i)    if to Borrower or Guarantor, to:

Unipharma, LLC
10200 NW 67th Street
Tamarac, Florida 33321
Attn:    Neil F. Luria, Chief Restructuring Officer
Email:  nluria@soliccapital.com

with a copy (which shall not constitute notice) to:

Berger Singerman LLP
1450 Brickell Avenue
Suite 1900
Miami, Florida 33131
Attn:    Paul Steven Singerman
         Christopher Andrew Jarvinen

Email:  singerman@bergersingerman.com;
cjarvinen@bergersingerman.com

(ii)    if to Lender, to:

64

NHTV ULM Holdings LLC
MS Capital Partners Adviser Inc.
1585 Broadway
New York, New York 10036
Attn:    Frederik Wijsenbeek
Email:  Frederik.wijsenbeek@morganstanley.com
Tel:      (212) 761-0461

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:    Ray Schrock; Daniel Dokos
Email:  Ray.Schrock@weil.com; Daniel.Dokos@weil.com
Tel:      (212) 310-8210; (212) 310-8576

or such other address as such party may designate by written notice to the parties as provided in this Section 8.09. Any such notice, consent, payment, demand or communication shall be deemed to be delivered, given and received for all purposes as of (i) the date so delivered, if delivered personally, (ii) upon receipt, if sent by electronic mail (email) or courier service, or (iii) on the date of receipt or refusal indicated on the return receipt, if sent by registered or certified mail, return receipt requested, postage and charges prepaid and properly addressed.

Section 8.10    Interpretation. Unless the context clearly indicates otherwise: (a) each definition herein includes the singular and the plural; (b) each reference herein to any gender includes the masculine, feminine, and neuter where appropriate; (c) the word "including" when used herein means "including, but not limited to," and the word "include" when used herein means "include, without limitation", (d) all references herein to Articles and Sections shall be deemed references to Articles and Sections of this Agreement unless the context shall otherwise require and (e) the word "or" has the inclusive meaning represented by the phrase "and/or". The words "hereof," "herein," "hereto," "hereby," "hereunder," and derivative or similar words refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "law," "applicable law" and any other similar references to the law include, with respect to any Person, all statutes, laws (including common law), treaties, orders, rules, regulations, determinations, orders, judgments, and decrees of any national, federal, state, county, municipal, local or other government, governmental, regulatory, self-regulatory or administrative authority, agency or commission, or any court, tribunal or judicial or arbitral body of competent jurisdiction, whether domestic or foreign, to which such Person or such Person's assets is subject.

Section 8.11    Further Assurances. Each of the Loan Parties shall execute and deliver such additional documents and instruments, and perform such additional acts, in each case, as Lender may reasonably request to effectuate, carry out and perform the provisions and intent of this Agreement and the other Loan Documents.

Section 8.12    Counterparts. This Agreement may be executed in one or more counterparts and by electronic signature, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 8.13    Entire Agreement. This Agreement represents the entire agreement among the Parties with respect to the subject matter hereof.

WEIL:\97711728\19\64058.0301

Section 8.14    <u>Governing Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND ANY CLAIM OR CONTROVERSY RELATING HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 8.15    <u>SUBMISSION TO JURISDICTION; WAIVERS</u>. EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(a)    SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF NEW YORK, THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;

(b)    CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND, TO THE EXTENT PERMITTED BY LAW, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT FORUM AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(c)    AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH THE OTHER PARTIES SHALL HAVE BEEN NOTIFIED; AND

(d)    AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

Section 8.16    <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY

Section 8.17    <u>Non-Recourse</u>. All claims, liabilities, proceedings, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to any legal action or proceeding relating to this Agreement, may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees (collectively, the "<u>Contracting Parties</u>"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party,

(other than the Persons listed on Schedule 8.17(a)), or any director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing, including each of the Persons listed on Schedule 8.17(b) (collectively, the "Nonparty Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, liabilities, or causes of action, arising under, out of, in connection with, or related in any manner to any legal action or proceeding relating to this Agreement; and, to the maximum extent permitted by law, each Contracting Party hereby waives and releases all such claims, liabilities, and causes of action, against any such Nonparty Affiliates.

## ARTICLE IX
### Collateral Matters

Section 9.01     Grant of Security Interest. Each Loan Party hereby unconditionally grants, assigns and pledges to Lender a continuing security interest in all of its respective right, title and interest in all currently existing and hereafter acquired or arising Collateral to secure prompt repayment of any and all of the Obligations in accordance with the terms and conditions of this Agreement and to secure prompt performance or its respective covenants and duties under this Agreement. Lender's Liens in and to the Collateral shall attach to all Collateral without further action on the part of Lender or any Loan Party. Anything contained in this Agreement to the contrary notwithstanding, except for Dispositions not in contravention of Section 5.02(e), no Loan Party has any authority, express or implied, to dispose of any item or portion of the Collateral. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Obligations and would be owed by any Loan Party to Lender, but for the fact that they are unenforceable or not allowable (in whole or in part) as a claim in an Insolvency Proceeding involving any Loan Party due to the existence of such Insolvency Proceeding.

Section 9.02     Loan Parties Remain Liable. Anything herein to the contrary notwithstanding, (a) each Loan Party shall remain liable under the contracts and agreements included in the Collateral to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Lender of any of the rights hereunder shall not release any Loan Party from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) Lender shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of any Loan Party thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 9.03     Control Agreements. Each Loan Party agrees that (a) it will take any and all reasonable steps for Lender to obtain control in accordance with Sections 8-106, 9-104, 9105, 9-106 and 9-107 of the Code with respect to all of such Loan Party's Securities Accounts, Deposit Accounts, electronic chattel paper, Investment Property and letter-of-credit rights constituting Collateral, and (b) it will not transfer assets out of any Deposit Account or Securities Accounts constituting Collateral other than as permitted under this Agreement, and, if to another depositary institution or securities intermediary, unless Lender, the applicable Loan Party and the substitute depository institution or securities intermediary, as applicable, have entered into a Control Agreement. No arrangement contemplated hereby or by any Control Agreement in respect of any Deposit Account, Securities Accounts or other Investment Property shall be modified by any Loan Party without the prior, written consent of Lender. Upon the occurrence and during the continuation of a Default or an Event of Default, Lender may notify any depository institution or securities intermediary to liquidate the applicable Deposit Account, Securities Account or any related Investment Property constituting Collateral maintained or held thereby and remit the proceeds thereof at the direction of Lender.

WEIL:\97711728\19\64058.0301

ARTICLE X
Guaranty

Section 10.01    <u>Guaranty</u>.

(a)    Guarantor hereby unconditionally and irrevocably, guarantees to Lender the prompt and complete payment and performance by Borrower when due and payable (whether at the stated maturity, by acceleration or otherwise) of Obligations owed to Lender.

(b)    Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of Guarantor hereunder and under the other Loan Documents shall in no event exceed the amount that can be guaranteed by Guarantor under applicable law, including applicable federal and state laws relating to the insolvency of debtors.

(c)    Guarantor agrees that the Obligations guaranteed by it hereunder may at any time and from time to time exceed the amount of the liability of Guarantor hereunder without impairing the guarantee contained in this <u>Section 10.1</u> or affecting the rights and remedies of Lender hereunder.

(d)    The guaranty contained in this <u>Section 10.1</u> shall remain in full force and effect until the first date on which all of the Loans and all other Obligations then due and owing, and the obligations of Guarantor under the guaranty contained in this <u>Section 10.1</u> then due and owing, shall have been satisfied by payment in full in cash and the Commitments shall be terminated, notwithstanding that from time to time during the term of this Agreement Borrower may be free from any Obligations.

(e)    No payment made by Borrower, Guarantor or any other Person or received or collected by Lender from Borrower, Guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of any of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of Guarantor hereunder, which shall, notwithstanding any such payment (other than any payment made by Guarantor in respect of the Obligations or any payment received or collected from Guarantor in respect of any of the Obligations), remain liable for the Obligations guaranteed by it hereunder up to the maximum liability of Guarantor hereunder until the first date on which all the Loans and all other Obligations then due and owing are paid in full in cash and the Commitments are terminated.

Section 10.02    <u>No Subrogation</u>. Notwithstanding any payment made by Guarantor hereunder or any set-off or application of funds of Guarantor by Lender, Guarantor shall not be entitled to be subrogated to any of the rights of Lender against Borrower or any collateral security or guaranty or right of offset held by Lender for the payment of the Obligations, nor shall Guarantor seek or be entitled to seek any contribution or reimbursement from Borrower in respect of payments made by Guarantor hereunder, until all amounts owing to Lender by Borrower on account of the Obligations are paid in full in cash and the Commitments are terminated. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid in full in cash or any of the Commitments shall remain in effect, such amount shall be held by Guarantor in trust for Lender, segregated from other funds of Guarantor, and shall, forthwith upon receipt by Guarantor, be turned over to Lender in the exact form received by Guarantor (duly indorsed by Guarantor to Lender, if required), to be held as collateral security for all of the Obligations (whether matured or unmatured) guaranteed by Guarantor and/or then or at any time thereafter may be applied against any Obligations, whether matured or unmatured, in such order as Lender may determine.

Section 10.03    <u>Amendments, etc</u>. To the maximum extent permitted by law, Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Additional

68

Guarantor and without notice to or further assent by Guarantor, any demand for payment of any of the Obligations made by Lender may be rescinded by Lender Party and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, waived, modified, accelerated, compromised, subordinated, waived, surrendered or released by Lender, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, waived, modified, supplemented or terminated, in whole or in part, as Lender may deem advisable from time to time, and any collateral security, guaranty or right of offset at any time held by Lender for the payment of any of the Obligations may be sold, exchanged, waived, surrendered or released. Lender shall have no obligation to protect, secure, perfect or insure any Lien at any time held by it as security for any of the Obligations or for the guarantee contained in this <u>Article X</u> or any property subject thereto, except to the extent required by applicable law.

Section 10.04    <u>Guaranty Absolute and Unconditional</u>. Guarantor waives, to the maximum extent permitted by applicable law, any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by Lender upon the guaranty contained in this <u>Article X</u> or acceptance of the guaranty contained in this <u>Article X</u>; each of the Obligations, and any obligation contained therein, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guaranty contained in this <u>Article X</u>; and all dealings between Borrower and Guarantor, on the one hand, and Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guaranty contained in this <u>Article X</u>. Guarantor waives, to the maximum extent permitted by applicable law, diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon Borrower with respect to any of the Obligations. Guarantor understands and agrees, to the extent permitted by law, that the guarantee contained in this <u>Article X</u> shall be construed as a continuing, absolute and unconditional guaranty of payment and not of collection. Guarantor hereby waives, to the maximum extent permitted by applicable law, any and all defenses (other than any claim alleging breach of a contractual provision of any of the Loan Documents) that it may have arising out of or in connection with any and all of the following: (a) the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any other collateral security therefor or guaranty or right of offset with respect thereto at any time or from time to time held by Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to or be asserted by Borrower against Lender, (c) any change in the time, place, manner or place of payment, amendment, or waiver or increase in any of the Obligations, (d) any exchange, non-perfection, taking, or release of Collateral, (e) any change in the structure or existence of Borrower, (f) any application of Collateral to any of the Obligations, (g) any law, regulation or order of any jurisdiction, or any other event, affecting any term of any Obligation or the rights of Lender with respect thereto, including, without limitation: (i) the application of any such law, regulation, decree or order, including any prior approval, which would prevent the exchange of any currency (other than Dollars) for Dollars or the remittance of funds outside of such jurisdiction or the unavailability of Dollars in any legal exchange market in such jurisdiction in accordance with normal commercial practice, (ii) a declaration of banking moratorium or any suspension of payments by banks in such jurisdiction or the imposition by such jurisdiction or any Governmental Authority thereof of any moratorium on, the required rescheduling or restructuring of, or required approval of payments on, any indebtedness in such jurisdiction, (iii) any expropriation, confiscation, nationalization or requisition by such country or any Governmental Authority that directly or indirectly deprives Borrower of any assets or its use, or of the ability to operate its business or a material part thereof, or (iv) any war (whether or not declared), insurrection, revolution, hostile act, civil strife or similar events occurring in such jurisdiction which has the same effect as the events described in clause (i), (ii) or (iii) above (in each of the cases contemplated in clauses (i) through (iv) above, to the extent occurring or existing on or at any time after the date of this Agreement), or (11) any other circumstance whatsoever (other than payment in full in cash of the Obligations guaranteed by it hereunder)

69

(with or without notice to or knowledge of Borrower or Guarantor) or any existence of or reliance on any representation by Lender that constitutes, or might be construed to constitute, an equitable or legal discharge of Borrower for the Obligations, or of Guarantor under the guaranty contained in this <u>Article X</u>, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against Guarantor, Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against Borrower or any other Person or against any collateral security or guaranty for the Obligations guaranteed by Guarantor hereunder or any right of offset with respect thereto, and any failure by Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from Borrower or any other Person or to realize upon any such collateral security or guaranty or to exercise any such right of offset, or any release of Borrower or any other Person or any such collateral security, guaranty or right of offset, shall not relieve Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of Lender against Guarantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

Section 10.05   <u>Reinstatement</u>. The guaranty of Guarantor contained in this <u>Article X</u> shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations guaranteed by Guarantor hereunder is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or Guarantor or any substantial part of their respective property, or otherwise, all as though such payments had not been made.

Section 10.06   <u>Payments</u>. Guarantor hereby guarantees that payments hereunder will be paid to Lender without set-off, counterclaim, deduction or withholding, other than for taxes required to be deducted or withheld by law. If any taxes are required to be deducted or withheld from any amounts payable by Guarantor hereunder, the amounts so payable shall be increased to the extent necessary so that the net amount actually received (after deduction or withholding of all such taxes) will be equal to the full amount that would have been received had no such deduction or withholding been required. All payments hereunder shall be made, in Dollars (or in the case of any amount required to be paid in any other currency pursuant to the requirements of this Agreement or other agreement relating to the respective Obligations, such other currency), by wire transfer to the Lender Designated Account or as may be directed in writing by Lender to Guarantor.

[THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

WEIL:\97711728\19\64058.0301

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

**UNIPHARMA, LLC**, as Borrower

By: _____
Name:
Title:


**TAMARAC 10200, LLC**, as Guarantor

By: _____
Name:
Title:

**NHTV ULM HOLDINGS LLC**, as Lender

By:   North Haven Tactical Value Fund LP,
      its member

By:   MS Tactical Value Fund GP LP,
      its general partner

By:   MS Tactical Value Fund GP Inc.,
      its general partner

By: _____
Name:
Title:

## **Exhibit B**

## **DIP Budget**

WEIL:\97733750\1\64058.0301
Active\118023760.v1-12/30/20

Uniparma

17-Week Rolling Cash Flow Projection

Draft of December 31, 2020 – 10:30 am Eastern

| Revised | WE 12/11/20 | WE 12/18/20 | WE 12/25/20 | WE 12/31/20 | WE 1/8/21 | WE 1/15/21 | WE 1/22/21 | WE 1/29/21 | WE 2/5/21 | WE 2/12/21 | WE 2/19/21 | WE 2/26/21 | WE 3/5/21 | WE 3/12/21 | WE 3/19/21 | WE 3/26/21 | WE 4/2/21 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | 162,593 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 993,362 | 696,032 | 548,701 | 402,886 | 162,593 |
| **Operating Cash Inflows:** | | | | | | | | | | | | | | | | | | |
| Receipts from existing AR (Trade Customers) | 5,178 | 59,021 | 23,211 | 28,131 | - | 965 | 7,243 | 16,628 | 35,318 | 110,387 | - | - | - | - | - | - | - | 286,082 |
| Receipts from existing AR (Non-Trade) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Receipts from existing AR (BioDose) | 27,348 | 321,921 | 38,400 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 387,669 |
| Receipts from Future Sales (Trade Customers) | - | 17,500 | - | 218,700 | - | - | 351,155 | 231,075 | - | - | - | - | - | - | - | - | - | 818,430 |
| Other Misc. Operating Inflows | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Inflows** | 32,526 | 398,442 | 61,611 | 246,831 | - | 965 | 358,398 | 247,703 | 35,318 | 110,387 | - | - | - | - | - | - | - | 1,492,181 |
| **Operating Cash Outflows:** | | | | | | | | | | | | | | | | | | |
| Inventory Purchases | 0 | (40,000) | 0 | (100,000) | 0 | (41) | (41) | (41) | (439) | (16,439) | (12,041) | 0 | 0 | 0 | 0 | 0 | 0 | (169,041) |
| Other Production Costs | (24,757) | (83,511) | (63,993) | (54,689) | (32,848) | (29,860) | (71,299) | (73,948) | (32,448) | (58,948) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (593,750) |
| Occupancy Costs | (73,679) | (2,907) | (10,250) | (27,750) | (78,039) | (6,000) | 0 | (2,100) | (21,450) | (21,907) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (257,082) |
| Sales & Marketing / Advertising | (1,500) | (19,000) | (10,250) | (27,750) | (29,250) | (6,000) | (31,050) | (27,750) | (25,500) | (25,500) | (1,500) | 0 | 0 | (1,500) | 0 | 0 | (1,500) | (207,800) |
| Wage Expense | 0 | (330,643) | 0 | (332,859) | 0 | (339,627) | 0 | (353,558) | 0 | (353,558) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,710,246) |
| Health Insurance | (45,000) | 0 | 0 | (45,000) | 0 | 0 | 0 | 0 | (45,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (135,000) |
| Business Insurance | 0 | (14,124) | 0 | 0 | (79,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (93,124) |
| Professional Fees (Consultants, Recruiters & Board Fees) | 0 | (10,000) | (30,000) | 0 | 0 | 0 | 0 | (30,000) | 0 | 0 | (12,500) | (42,500) | 0 | 0 | 0 | (55,000) | 0 | (180,000) |
| Property Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (796,917) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (796,917) |
| Federal & State Tax Payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other G&A Costs (General) | (9,310) | (3,705) | (1,071) | (2,900) | (8,607) | (2,405) | (2,787) | (3,435) | (11,077) | (131,270) | (1,500) | (1,500) | 0 | (1,500) | 0 | 0 | (1,500) | (181,067) |
| Utility and COD/COA Deposits | 0 | (130,000) | (60,000) | (60,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (250,000) |
| **Total Operating (Outflows)** | (154,246) | (633,889) | (135,313) | (192,285) | (553,182) | (105,677) | (502,832) | (186,394) | (502,832) | (1,404,539) | (112,002) | (119,502) | 0 | (56,500) | 0 | (56,500) | (56,500) | (4,574,026) |
| **Investing Inflows & Outflows:** | | | | | | | | | | | | | | | | | | |
| Capex/Purchase of PPE | (23,887) | (31,387) | (23,887) | (23,887) | (272,062) | (279,562) | (272,062) | (272,062) | (112,062) | (119,502) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,430,297) |
| **Total Investing Inflows (Outflows)** | (23,887) | (31,387) | (23,887) | (23,887) | (272,062) | (279,562) | (272,062) | (272,062) | (112,002) | (119,502) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,430,297) |
| **Financing Inflows & Outflows:** | | | | | | | | | | | | | | | | | | |
| Forbearance Agreement Loan Proceeds | 1,517,906 | 468,953 | 977,648 | 829,863 | 687,123 | 1,032,371 | 215,382 | 727,203 | 453,548 | 6,034,387 | 160,714 | 189,502 | 1,139,177 | 0 | 0 | 0 | 0 | 14,433,779 |
| DIP Loan Proceeds | - | - | - | - | - | - | - | - | - | - | 160,714 | 189,502 | 1,139,177 | 0 | 0 | 0 | - | - |
| **Total Financing Inflows (Outflows)** | 1,517,906 | 468,953 | 977,648 | 829,863 | 687,123 | 1,032,371 | 215,382 | 727,203 | 453,548 | 6,034,387 | 160,714 | 189,502 | 1,139,177 | 0 | 0 | (0) | 0 | 14,433,779 |
| **Transaction Fees Inflow/Outflow/** | | | | | | | | | | | | | | | | | | |
| Executory Contract Cure Cost estimate | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,000,000) |
| **Total Transaction Fees Inflow/(Outflow)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,000,000) |
| **Restructuring Inflows (Outflows)** | | | | | | | | | | | | | | | | | | |
| Restructuring Costs-Professionals | | | | | | | | | | | | | | | | | | |
| Solic Capital Advisors | (308,148) | (32,500) | (32,500) | (32,500) | (282,500) | (32,500) | (32,500) | (32,500) | (32,500) | (805,000) | (32,500) | (32,500) | (155,000) | (5,000) | (5,000) | (5,000) | (5,000) | (1,808,148) |
| Berger Singerman | (140,435) | (81,781) | (60,000) | (60,000) | (60,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (1,002,215) |
| Lender/DIP Professionals | (70,000) | (570,000) | (70,000) | (72,500) | (62,500) | (62,500) | (62,500) | (62,500) | (62,500) | (2,664,782) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (4,117,282) |
| KCC-Claim Agent | (9,250) | (9,250) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (4,750) | (4,750) | (4,750) | (4,000) | (4,000) | (4,000) | (4,000) | (4,000) | (116,000) |
| US Trustee Fees | (7,060) | (8,588) | (8,310) | (7,863) | (8,893) | (9,877) | (5,327) | (9,299) | (4,487) | (40,486) | (1,250) | (1,250) | (2,616) | (1,101) | (1,116) | (1,672) | (4,000) | (140,584) |
| UCC Professionals | - | - | - | - | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (35,714) | (700,000) |
| Subtotal Restructuring Costs-Professionals | (534,893) | (202,119) | (880,060) | (215,327) | (469,608) | (200,592) | (196,042) | (200,013) | (200,013) | (189,951) | (3,620,732) | (146,714) | (147,002) | (145,830) | (145,815) | (145,815) | (146,386) | (7,884,230) |
| Other | | | | | | | | | | | | | | | | | | |
| Global Settlement Funding - Class V | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,000,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (1,000,000) |
| **Total Restructuring Costs Inflows (Outflows)** | (534,893) | (202,119) | (880,060) | (215,327) | (469,608) | (200,592) | (196,042) | (200,013) | (200,013) | (3,620,732) | (146,714) | (147,002) | (147,330) | (6,638) | (147,330) | (145,815) | (146,386) | (8,884,230) |
| **Net Cash Increase/ (Decrease)** | 837,407 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (0) | 0 | 0 | 0 | (6,638) | (297,330) | (147,330) | (145,815) | (202,886) | 37,407 |
| **Ending Cash Balance** | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 993,362 | 696,032 | 548,701 | 402,886 | 200,000 | 200,000 |